Page 1

1          IN THE CHANCERY COURT OF MADISON COUNTY,
2                        MISSISSIPPI
3
4
5   IN RE:    WYATT & MCALISTER, PLLC,
              a Limited Liability Company
6
              CAUSE NO. 20090-90-B
7
8
9
10
11        HEARING BEFORE SPECIAL MASTER
                 ROBERT W. SNEED
12
13
              Taken at the offices of
14        Brunini, Grantham, Grower & Hewes
          190 East Capitol Street, Suite 100
15             Jackson, Mississippi,
          on Wednesday, November 11, 2009,
16        beginning at approximately 9:00 a.m.
17
18
             APPEARANCES NOTED WITHIN
19
20
21
22             BETHANY CAMMACK
          PROFESSIONAL COURT REPORTING, LLC
23          Certified Shorthand Reporter
             Mississippi CSR No. 1526
24            Post Office Box 320928
          Jackson, Mississippi  39232-0928
25

Exhibit B

Page 2

APPEARANCES

ROBERT W. SNEED, SPECIAL MASTER
Attorney at Law
Post Office Box 2251
Jackson, Mississippi 39225-2251

DAVEY L. TUCKER
Tucker & Tucker
Post Office Box 1261
Jackson, Mississippi 39215-1261
    Counsel for Plaintiff Derek A. Wyatt

CHRISTOPHER A. SHAPLEY
JOSEPH A. SCLAFANI
Brunini, Grantham, Grower & Hewes
Post Office Box 119
Jackson, Mississippi 39205-0119
    Counsel for Defendant
    Mary E. McAlister

KIMBERLY P. TURNER
Attorney at Law
774 Avery Boulevard North
Ridgeland, Mississippi 39157
    Counsel for Intervenor
    Carousel Development

---

Page 4

EXHIBITS

| NO. | DESCRIPTION | M'KD | ADM'D |
|---|---|---|---|
| 1 | Global of Documents Produced by Plaintiffs | 23 | 132 |
| 2 | Search from Secretary of State's Website | 58 | 58 |
| 3 | Inventory of N&M Items | 66 | 66 |
| 4 | Inventory of N&M Items | 76 | 76 |
| 5 | Letter, 9/18/09 With Inventory | 68 | 70 |
| 6 | Bank Statements | 76 | 78 |
| 7 | Acknowledgement of Insurance | 81 | 84 |
| 8 | Letter to E. Coward from D. Wyatt, 12/19/08 | 176 | 176 |
| 9 | Letter to E. Coward from D. Wyatt, 2/12/09 | 177 | 177 |
| 10 | Letter to D. Wyatt from M. McAlister, 1/8/09 | 182 | 182 |
| 11 | Note from M. McAlister's Desktop Screen | 216 | |
| 12 | Letter to Counsel from R. Sneed, 10/28/09 | 227 | 227 |

---

Page 3

TABLE OF CONTENTS
PAGE

Title Page ........................................ 1

Appearance Page ............................. 2

Table of Contents ............................ 3

Exhibit Index ................................... 4

DAVID NUTT:
    Direct Examination By Mr. Shapley ......... 5
    Cross-Examination By Mr. Wyatt ............... 15
MARY EDITH MCALISTER:
    Direct Examination By Mr. Shapley ........... 54
    Voir Dire Examination By Mr. Wyatt .......... 61
    Further Direct Examination By Mr. Shapley ... 65
    Voir Dire Examination By Mr. Wyatt .......... 72
    Further Direct Examination By Mr. Shapley ... 76
    Cross-Examination By Mr. Wyatt .............. 91
DEREK WYATT:
    Direct Examination By Mr. Tucker ........... 103
    Voir Dire Examination By Mr. Shapley ....... 113
    Direct Continued by Mr. Tucker ............ 133
    Voir Dire Examination By Mr. Shapley ...... 158
    Direct Continued by Mr. Tucker ............ 160
    Cross-Examination By Mr. Shapley .......... 169
    Cross-Examination By Ms. Turner ........... 193

MARY EDITH MCALISTER:
    Redirect Examination By Mr. Shapley ....... 214
    Recross-Examination By Mr. Wyatt .......... 220

Certificate Page ............................ 229

---

Page 5

1        MR. SNEED:  My understanding is,
2    Mr. Shapley, you'll be calling your first witness?
3        MR. SHAPLEY:  Right.
4            DAVID NUTT,
5        having been first duly sworn,
6        was examined and testified as follows:
7            DIRECT EXAMINATION
8    BY MR. SHAPLEY:
9        Q.  State your name, please.
10        A.  David Hugh Nutt.
11        Q.  David, I know you're an attorney, and I
12    think everybody here knows you're an attorney.  You
13    were involved in the operation of some law firms,
14    correct?
15        A.  Right.
16        Q.  And David Nutt, PA's one of them?
17        A.  Correct.
18        Q.  Okay.  Nutt & McAlister was one of them?
19        A.  Correct.
20        Q.  And there were some other entities that
21    were involved in the practice of law?
22        A.  Correct.
23        Q.  Okay.  Did there come a point in time in
24    which you determined that you were no longer
25    interested in actively practicing law?

Professional Court Reporting, LLC
601.919.8662

Page 6

1  A.  There did.
2  Q.  Okay.  And approximately when was that?
3  A.  I --
4  Q.  In the last year or so?
5  A.  In the last year or so, yeah.
6  Q.  Okay.  Did you practice law with
7  Ms. McAlister here?
8  A.  I did.
9  Q.  All right.  And were you and Ms. McAlister
10 involved in discussions about your discontinuing
11 your practice of law and her continuing practice of
12 law?
13 A.  We did.
14 Q.  Would you tell Mr. Sneed essentially about
15 those discussions?
16 A.  Well, I made a decision to retire from the
17 practice of law.  I couldn't do it 100 percent
18 because I have matters that are not concluded.
19 Some of the matters are, for instance, a bunch of
20 asbestos cases that never die.  They have an
21 infinite half life.  So I had to continue to handle
22 those cases through either PC or PA.  I'm not sure
23 which one.
24 And Meg and I were practicing law as
25 Wyatt & McAlister and had been doing it for several

Page 7

1  years.
2  Q.  Nutt & McAlister.
3  A.  Yeah, excuse me.
4  Q.  It's easy.  I do it every -- I do it all
5  the time.
6  A.  So we'd been practicing for several years.
7  And we had matters that were ongoing and were not
8  concluded, and we had obligations to the clients to
9  conclude those.
10 So at that -- at the point that I wanted
11 to retire completely, as far as Nutt & McAlister
12 goes, Meg and I had some discussions about how to
13 go about dissolving Nutt & McAlister and her
14 continuing to work on the cases.
15 I was basically always more or less "of
16 counsel" in Nutt & McAlister, just as a matter of
17 practicality, and that was Meg and I's arrangement
18 from the very get-go.  That I could generate
19 business and I could counsel with her on major
20 issues, but she was always the practicing lawyer in
21 Nutt & McAlister.  She and some associate lawyers
22 that we ultimately got, and we had a large number
23 of paralegals in order to do mass litigation cases.
24 So when I told Meg that I wanted to
25 retire, she said that she wanted to continue

Page 8

1  practicing law.  She's a good bit younger than I
2  am.  And so we talked about that she would continue
3  practicing law in some entity and that I would look
4  to her to bring to a conclusion the matters that we
5  had in Nutt & McAlister.
6  It was not any of my business really about
7  what configuration she was going to practice law in
8  in the future, because I was looking to her as a
9  lawyer in those cases to bring them to conclusion.
10 And most of them were fairly close to conclusion.
11 So we began discussions about how to go
12 about dissolving Nutt & McAlister, whether we would
13 dissolve it or whether she would just acquire my
14 interest in Nutt & McAlister.  And we actually met
15 with the Brunini firm and explored some of these
16 possibilities.  And we were looking toward her
17 acquiring the assets of Nutt & McAlister and
18 continuing to keep that entity alive, whether or
19 not that entity concluded the cases or not.
20 So we never resolved that.  We just simply
21 never resolved it before Meg decided that she was
22 going to practice law under the partnership of
23 Wyatt & McAlister.  And that was fine with me.  We
24 were talking about it, and we had a lot of business
25 and lot of issues at the time.

Page 9

1  So Meg -- I owned, I think, most of the
2  hard assets, the furniture and the machinery and
3  all like that.  I had acquired either in PC or PA.
4  Most of it.  Now, we also acquired some items in
5  Nutt & McAlister.  The way my office is configured
6  is kind of a typical law office deal.  It's like in
7  a horseshoe.  One half of the horseshoe was Meg's
8  domain where the paralegals were and where her
9  operations were, her office and the associate
10 offices and the like.
11 So when she got ready to go into practice
12 with Derek, she came to me and said, "We will need
13 certain items of furniture that you already have
14 here or we already have here.  Can I take these
15 items?"
16 And it was just a general discussion.
17 There was no inventory given to me or any of that.
18 I said, "Fine."  You know, "I'm not going to need
19 it."  What our idea was, is she would take the
20 stuff, and at some point in time she would give me
21 an inventory and we would decide what those things
22 were worth, and she would pay me for them.  Or
23 those items would be included in a transfer of the
24 assets of Nutt & McAlister.
25 But we never got to that point.  We got to

Page 10

1    the point where she moved the belongings to the
2    office of Wyatt & McAlister. And started
3    practicing with Derek. But very shortly after they
4    moved in and before we could ever get to the actual
5    conclusion of her compensating me for those assets,
6    they had problems. And the doors got shut on that
7    office.
8        So that Meg is going to testify to the
9    detail of which assets belonged to which entity.
10   We have invoices, and we have put together best we
11   can which hard items are owned by David Nutt, PC,
12   which hard items are owned by David Nutt, PA, and
13   which hard items are owned by Wyatt & McAlister.
14   And she's going to testify to that, as I understand
15   it, in detail.
16       I'm simply saying to the court that all
17   those items belong to me in some fashion. Or at
18   least a significant interest in them. I'm 80
19   percent partner in Wyatt & McAlister. I'm 100
20   percent --
21   Q.   Nutt & McAlister.
22   A.   Nutt & McAlister, I'm sorry.
23   Q.   I do it too.
24   A.   I'm an 80 percent partner in Nutt &
25   McAlister, 100 percent partner in David Nutt, PC,

Page 11

1    and 100 percent owner of David Nutt, PA.
2        The title to all the stuff that was used
3    in Wyatt & McAlister has not changed. It is still
4    in those three entities, as Meg will document. And
5    so my position is, the ownership will easily be
6    determined by the documentation that Meg is going
7    to testify from.
8    Q.   And so have any of the Nutt entities, or
9    you personally, gotten any money for any of the
10   assets that were taken out of your office with your
11   permission and used to operate the Wyatt &
12   McAlister law firm?
13   A.   No.
14   Q.   And have you signed any bill of sale or
15   any document transferring the title of those assets
16   to the Wyatt & McAlister entities?
17   A.   No. Neither Wyatt & McAlister or Meg
18   McAlister.
19       MR. SHAPLEY: All right. That's all
20   I have for Mr. Nutt.
21       MR. SNEED: Cross-examination?
22       MR. TUCKER: Do you want to. . ?
23       MR. SHAPLEY: I'm going to object to
24   him asking questions. It's entirely inappropriate
25   for the client to be asking questions at a hearing.

Page 12

1    He's not counsel of record here.
2        MR. TUCKER: I don't know that it's
3    inappropriate. I --
4        MR. SNEED: Davey, it'd probably go
5    smoother -- do you mind conducting the examination?
6    It's probably -- yeah, it'll probably go a lot
7    smoother if the lawyers handle it, just like we do
8    in virtually any litigation.
9        MR. WYATT: Actually, if I may just
10   speak to that issue briefly. The reason I think
11   Davey is asking that is, I know all these documents
12   pretty well. And, you know, he's sort of been
13   overwhelmed by this as some people would be, but I
14   can get to the heart of the issues with David's
15   testimony a lot faster.
16       But, you know, certainly it's up to
17   you obviously, but if we're just trying to get to
18   the dead center here pretty quick, there's no
19   question about the most expedient way to do it.
20       MR. SHAPLEY: We --
21       MR. TUCKER: And we have discussed
22   that also, but -- we have discussed that matter as
23   to how we would approach this. I don't see a
24   problem with him going to the heart of the matter
25   at all, and I don't think there's any questions I

Page 13

1    could ask -- which I'd be repeating whatever he's
2    going to say anyway.
3        So, I mean, what's the situation
4    there? He's an attorney. He can represent himself
5    as well as I can represent him. And there's no
6    reason that I can't -- that he can't speak for
7    himself.
8        MR. SNEED: Okay.
9        MR. TUCKER: And not through me.
10       MR. SNEED: Chris, I'm not aware of a
11   rule that prohibits Derek from questioning the
12   witness. If you're aware of one, I'll take a look
13   at it.
14       MR. SHAPLEY: Well, I -- he's not
15   counsel of record, and if he's not counsel of
16   record, he's not entitled to ask questions as far
17   as I know.
18       MR. SNEED: I'm not aware of that
19   rule. I mean, you may be right.
20       MR. SHAPLEY: Well, I'd have to look
21   it up. But I can tell you this: The proceedings
22   between these parties has been extremely
23   acrimonious, and I think it would be -- it would
24   not be conducive to an orderly disposition of this
25   matter if these -- if everybody starts going at

**Page 14**

1  each other.
2      MR. SNEED: Yeah.
3      MR. SHAPLEY: And that's exactly
4  what's going to happen if Mr. Wyatt is allowed to
5  ask questions.
6      MR. WYATT: Well --
7      MR. SNEED: Well, if that occurs, I
8  think that's one thing.
9      MR. SHAPLEY: Okay.
10      MR. SNEED: If that occurs.
11  Obviously I've got authority to step in and we'll
12  change the rules.
13      MR. SHAPLEY: All right.
14      MR. SNEED: But I'm not aware of
15  anything that prohibits Derek from asking the
16  questions --
17      MR. SHAPLEY: Okay. That's fine.
18      MR. SNEED: And as long as that --
19      MR. SHAPLEY: As long as that doesn't
20  happen, I'm okay with it.
21      MR. SNEED: As long as everybody's
22  civil, and when civility leaves the room, that's
23  when I'm going to step in.
24      MR. SHAPLEY: All right.
25      MR. SNEED: So -- and that applies to

**Page 15**

1  everybody, and I'm not just pinpointing one --
2      MR. SHAPLEY: And I wasn't either.
3      MR. SNEED: I know that. I know
4  that. Okay.
5      MR. WYATT: Thank you.
6      MR. SNEED: Derek, you have some
7  questions?
8      CROSS-EXAMINATION
9  BY MR. WYATT:
10     Q.  David, Nutt & McAlister -- you contend
11  that Nutt & McAlister is owned by you and Meg
12  McAlister?
13     A.  Absolutely.
14     Q.  Okay. Do you have a document in your
15  office that shows the percentage ownership in Nutt
16  & McAlister, how it's allocated?
17     A.  I don't know.
18     Q.  Have you ever signed an operating
19  agreement showing Nutt & McAlister's mode of
20  operation under the Limited Liability Act in
21  Mississippi?
22     A.  I don't know if I have or not.
23     Q.  To your knowledge, is it true that no
24  operating agreement exists like that?
25     A.  I do not know.

**Page 16**

1     Q.  Okay. So I believe you testified that you
2  had 80 percent. Is that right?
3     A.  Correct.
4     Q.  Okay. So is your testimony based purely
5  on a verbal arrangement?
6     A.  As I say, I don't know if we memorialized
7  it or not, but that was our verbal arrangement.
8     Q.  Okay. But since you don't know of a
9  document, it would be a true statement, that today
10  you're saying that based on a verbal agreement
11  because you don't have any knowledge that there is
12  any other agreement?
13     A.  I don't know if there is. If there is,
14  I'll be glad to look at it.
15     Q.  I understand. How many years has it been
16  in existence?
17     A.  I don't know.
18     Q.  Is it -- it's not an insignificant entity,
19  is it? I mean, in terms of its revenue and so
20  forth?
21     A.  Wyatt and -- excuse me. Nutt & McAlister?
22     Q.  Nutt & McAlister.
23     A.  No, it's very significant.
24     Q.  So I mean, it would be true that as much
25  as $200 million has flowed through the trust

**Page 17**

1  account of Nutt & McAlister just in the last few
2  years. Isn't that correct?
3     A.  I don't know the number, but it is very
4  substantial.
5     Q.  Substantial. Now, do you remember Meg
6  approaching you in September of 2008 about this
7  business of you deciding you're going to retire and
8  what was going to happen to Nutt & McAlister firm?
9     A.  Well, I don't know that Meg approached me.
10  I think I approached her. But, yes, we had a
11  discussion. As far as the specific month, I'm not
12  certain about it, but, yeah.
13     Q.  Okay. And you may or may not recall some
14  of these dates, and it's okay, because it's all of
15  record, but do you recall that in April of 2008
16  that you signed an agreement that essentially
17  transferred all the remaining assets of Nutt &
18  McAlister, the Katrina cases, transferred all those
19  cases out to other parties?
20      MR. SHAPLEY: Mr. Sneed, let me make
21  a comment here, and he's doing exactly what I
22  thought he'd be doing. We're involved in a number
23  of other cases with Derek, and you know, I
24  anticipated, and he is in fact trying to conduct
25  discovery today on those other cases. These

Page 18

1  questions have nothing to do with who owns the
2  assets of Wyatt McAlister.
3      MR. SNEED: I may not -- I'll see
4  where he's going. You know, I don't know.
5      MR. WYATT: Yeah. It's predicate,
6  it's pure predicate. But I can show that pretty
7  quickly.
8  MR. WYATT, CONTINUED:
9      Q.  David, would it be true, based on your
10 recollection, that around April of 2008 was when
11 you came to the discussion that you were going to
12 retire and that Nutt & McAlister, you were going to
13 close it down or dissolve it?
14     A.  At some point I made that decision,
15 correct.
16     Q.  The only reason I'm referencing you to
17 that date is because you do recall, I take it, that
18 there was an agreement executed that transferred
19 all of the Katrina assets in Nutt & McAlister to
20 two other parties, to Barrett & Lovelace?
21     A.  Well, when you say "Katrina assets," I'm
22 not sure about that. At some point -- and you have
23 the agreement? I haven't looked at it lately. But
24 at some point, Nutt & McAlister withdrew from the
25 most current Katrina Litigation Group venture.

Page 19

1      Q.  Right. And the remaining assets that were
2  in that entity were vended or transferred to these
3  other two parties. Is that right?
4      A.  Well, I will go back and tell you that --
5  and the agreement pretty much speaks for itself --
6  Nutt & McAlister withdrew from the latest venture
7  that was conducting Katrina litigation. That is
8  plain and simple.
9          There were files that existed, and we kept
10 copies of those files, as we should, because we
11 were involved in the cases for a considerable
12 period of time. And we made certain that the
13 remaining venturers had the files also, so that
14 they could go forward.
15         And we further told the remaining
16 venturers that we would do whatever we could to
17 make sure that a transition occurred and that they
18 could adequately represent the clients once Nutt &
19 McAlister had withdrawn from that venture.
20     Q.  I guess to close that question, though,
21 you didn't make any further claim on any of those
22 assets. You just -- you abandoned -- or you just
23 abdicated any claim of contingency fee ownership or
24 anything like that. It was just given up, and you
25 withdrew from that.

Page 20

1      A.  We withdrew from it.
2      Q.  That's right. Okay.
3      A.  And we did not get compensated for any
4  future money that was coming in.
5      Q.  All right. And you recall your letter to
6  the court where you formally withdrew from all the
7  cases on the record of the court, too, right?
8      A.  Absolutely.
9      Q.  Okay. So back to September of 2008, since
10 Nutt & McAlister didn't have any book of business
11 at that time -- is that a fair statement?
12     A.  I'm not certain. I don't know if we had
13 any other cases pending in Nutt & McAlister or not.
14 I don't know.
15     Q.  At some point after April of 2008, you let
16 it be known that you were going to shut down Nutt &
17 McAlister. Isn't that right?
18     A.  Absolutely.
19     Q.  And, in fact, you did shut it down on
20 October the 15th, 2008. Isn't that right?
21     A.  I don't know the date. At some point we
22 quit doing business.
23     Q.  Yeah. And all the employees were laid
24 off, were they not?
25     A.  I don't know if all of them were laid off

Page 21

1  or not at that time. There was a transition period
2  where some of the help needed to go with Meg to
3  resolve ongoing cases that they were working on.
4  Whether they were in Nutt & McAlister or PC or PA,
5  it didn't matter to me.
6          I just wanted them resolved, and I was
7  looking for Meg to do it. So some of the
8  employees, I don't know if they stayed on my
9  payroll, or if they went with Meg and we reimbursed
10 or what, but she can tell you that.
11     Q.  Okay. Would you disagree if I suggested
12 that none of those employees stayed on Nutt &
13 McAlister's payroll after --
14     A.  I don't know. That's easy to determine
15 from the documents, though.
16     Q.  Do you recall that there was a severance
17 package offered to each of these employees, and
18 they were terminated from Nutt & McAlister's
19 payroll?
20     A.  I don't recall.
21     Q.  You don't know --
22     A.  But, again, that's easy to. . .
23     Q.  In any event, after October 15th, the
24 horseshoe side of the building that was Nutt &
25 McAlister was no longer Nutt & McAlister.

Page 22

1    A.   That's correct.
2    Q.   Right? And you had some business partners
3  who came up and took those offices?
4    A.   That's right. But there were assets of
5  Nutt & McAlister still sitting there. Furniture,
6  furniture belonging to PC, furniture belonging to
7  PA, furniture and machinery and files belonging to
8  Nutt & McAlister. That didn't dissolve.
9    Q.   Okay.
10       MR. WYATT: I've got an exhibit that
11  I want to mark. It's kind of a global exhibit. I
12  guess I could just do that now.
13       MR. SNEED: Y'all seen it?
14       MR. SHAPLEY: It's an exhibit --
15       MR. WYATT: It's listed. That is a
16  better organized of what y'all sent the other day.
17       MR. SHAPLEY: Yeah. I'm sure we got
18  this, but I don't know.
19       MR. WYATT: Yeah, you have seen it.
20       MR. SHAPLEY: Well, that's fine. I'm
21  not really -- I'm not really -- I'm not questioning
22  whether we got it or not, so. . .
23       MR. WYATT: Can I just --
24       MR. SNEED: You want it marked for
25  identification?

Page 23

1       MR. SHAPLEY: Mark the whole thing
2  for identification?
3       MR. WYATT: Let's just mark it for
4  identification, and I'll just do it as a global.
5       MR. SNEED: That's fine.
6       MR. WYATT: And then refer to the
7  sequential numbers.
8       MR. SNEED: Is that Exhibit 1?
9       COURT REPORTER: Yes.
10  (EXHIBIT 1 WAS MARKED FOR IDENTIFICATION.)
11  MR. WYATT, CONTINUED:
12    Q.   David, if you could take that for a
13  second, and I'll try to get through this pretty
14  quick. If you will look, you'll see that it's got
15  numbers over there on the left side.
16    A.   I see them.
17    Q.   Okay. And we're just going to go through
18  it kind of sequentially there. If you'll look over
19  to No. 2. No. 1 is not --
20       MR. SHAPLEY: Skip Exhibit 1?
21       MR. WYATT: I'm skipping 1 right now,
22  uh-huh.
23  MR. WYATT, CONTINUED:
24    Q.   And just for time's sake, to be sparing as
25  we can and get to the heart of the matter, I'm not

Page 24

1  going to go over all this with you, but I want to
2  ask you a question about the first paragraph up
3  there. And if you could just take a look at that
4  for a second.
5    A.   Yeah, but I don't have any idea what this
6  is. I mean, this is an unsigned -- there's no
7  signature or no letterhead or anything.
8    Q.   Right. Okay. Well, this is a business
9  record of Wyatt & McAlister that was created and
10  authorized by Meg McAlister. And it's in the
11  record of this case attached to an affidavit as --
12  in the record of this case.
13       MR. SHAPLEY: It doesn't matter.
14  It's not -- this witness doesn't know anything
15  about this document, and the fact that it's a --
16  allegedly a business record of another entity that
17  Mr. Nutt has nothing to do with is -- proves
18  nothing.
19       MR. SNEED: I agree. Sustained. You
20  know, you can follow it up, Derek, with proof.
21  Assuming relevance of all this, you can follow it
22  up with proof as to what this is. But David has
23  said he doesn't know what it is, and there's just
24  simply been no identification of the document.
25  MR. WYATT, CONTINUED:

Page 25

1    Q.   To the extent -- whether you know what
2  this document is or not, I'm going to ask you a
3  question about what's written into the document and
4  just see if you agree that that's a true
5  statement or not. "David wants me to meet with
6  Shapley this week, if possible, and explore means
7  to dissolve."
8       Okay. Do you see that statement in there?
9    A.   Yeah.
10    Q.   Okay. Do you find that that statement is
11  erroneous? Do you contend that that's a false
12  statement?
13    A.   I don't even know who made the statement.
14    Q.   Okay. Well, if it were made by
15  Ms. McAlister, do you contend it's false?
16    A.   At some point in time, we agreed to meet
17  with Shapley. I already testified to that. To
18  talk about dissolution. I mean, I don't know the
19  exact date.
20    Q.   And then the next statement says, "I
21  broached the subject of buying out his interest,
22  and he said Shapley had mentioned that as a
23  possibility. I reiterated that it would be best if
24  I could accede to the claims of N&M against
25  Scruggs, and David agreed."

Page 26

1      Is that a true statement?
2      A.  You know, we talked about her taking
3  Nutt -- taking over Nutt & McAlister.  And she
4  would necessarily have any claims that Nutt &
5  McAlister had.
6      Q.  She even asked you about whether Merkel
7  was a good lawyer, didn't she?
8      A.  No.
9      Q.  "I asked David what he knows about Merkel
10 as a possible attorney to pursue my claims against
11 Scruggs."  You contend that's a false statement?
12     A.  I do not remember that.  Merkel and I do
13 not get along.  It would be -- that would -- my
14 recommending Merkel to do anything would be highly
15 unlikely.
16     Q.  So you believe Ms. McAlister somehow wrote
17 this in a way that's not accurate.
18         MR. SHAPLEY:  Mr. Sneed, this is
19 totally irrelevant to determine what the assets of
20 Wyatt & McAlister -- I knew this was going to
21 happen.
22         MR. WYATT:  No --
23         MR. SHAPLEY:  So now he's going down
24 that trail.
25         MR. SNEED:  Let me back up.  The

Page 27

1  document's not in evidence, Derek.  I don't think
2  you can sit here and question him about a document
3  that's not in evidence that he says he knows
4  nothing about.
5          If you want to ask him a question,
6  you can ask him a question.  But to quote a
7  document that we don't know what it is, and there's
8  no evidence in the record as to what the basis of
9  the document is, and to ask him whether it's true
10 or not, I don't think it's appropriate.  And I'm
11 going to sustain the objection.
12         MR. WYATT:  Okay.  If I may -- and
13 I'm not arguing with your ruling.
14         MR. SNEED:  That's okay.  I know.
15         MR. WYATT:  But I would make a
16 proffer, and again, I'll state for the record,
17 there is an affidavit in the official court record
18 of this case that documents these documents as
19 being business records of Wyatt & McAlister, and
20 that's -- that affidavit has been in this record of
21 this case from inception or very close to
22 inception.
23         MR. SNEED:  That's fine.
24         MR. WYATT:  But I'll move on.
25         MR. SNEED:  Okay.

Page 28

1      MR. WYATT, CONTINUED:
2      Q.  So David, disregard the document for a
3  moment.  I just want to ask you this question.
4      A.  Okay.
5      Q.  You agreed, did you not, to allow
6  Ms. McAlister to purchase your interest in Nutt &
7  McAlister?  Whatever that interest really is, you
8  agreed to that, did you not?
9      A.  We never reached an agreement.  We met
10 with lawyers, and we talked about that as a
11 mechanism.  But I don't recall ever signing any
12 agreement whatsoever.
13     Q.  Well, I didn't ask you if you signed an
14 agreement.  That wasn't my question, and to the
15 extent -- that answer, I'd move to strike it if
16 it's nonresponsive.
17          But my question was:  Did you agree to do
18 that?  Did you agree for her to acquire whatever
19 your interest was in Nutt & McAlister, which you
20 had announced was going to be dissolved?
21     A.  We talked about it in principle.  We never
22 finally agreed to it.
23     Q.  Okay.  Look at page 4, if you would,
24 please, David.  Have you ever seen that document
25 before?

Page 29

1      A.  No, not that I recall.
2      Q.  Would you just read what the title of this
3  document is?
4      A.  "Memo to Brunini re dissolution of N&M."
5      Q.  And the date on it?
6      A.  September 22nd of 2008.
7      Q.  Okay.  So you have no knowledge about this
8  document here?
9      A.  No.
10     Q.  Okay.  Do you agree that Brunini and
11 Mr. Shapley and his colleagues were your attorneys
12 at this time?  Were they not?
13     A.  Yes.
14     Q.  And they did represent N&M?
15     A.  Yes.
16     Q.  Nutt & McAlister?
17     A.  Yes.
18     Q.  And they did represent Nutt & McAlister
19 with regard to dissolution of Nutt & McAlister?
20     A.  They counseled with us.
21     Q.  Okay.  And us would be who?
22     A.  Meg and I.
23     Q.  Would you look at No. 5, please.  It may
24 be hard to read there, because there's a circle --
25     A.  I can read it.

Page 30

1    Q.  I apologize.  There's a circle on it.  Can
2  you read what the subject of this e-mail is?
3    A.  Yeah.
4    Q.  What does it say?
5        MR. SNEED:  Let me ask:  Do you
6  recognize that document?
7        THE WITNESS:  No.
8        MR. SNEED:  Okay.
9        THE WITNESS:  I have an idea that
10  these are e-mails or some sort of records that Meg
11  generated.
12        MR. SNEED:  I understand.  If he
13  doesn't recognize the document, he can't identify
14  the document, Derek, and I just think your
15  questioning him regarding these documents that he's
16  unable to identify is simply irrelevant.
17        MR. WYATT:  Well, here's my only
18  problem with it, and certainly I don't want to bog
19  us down over this.  But they wanted to go first.
20  Okay.  I've already signed an affidavit
21  authenticating these documents as documents of
22  Wyatt & McAlister.
23        MR. SNEED:  I understand that.  I've
24  heard that.
25        MR. WYATT:  So -- okay.

Page 31

1        MR. SNEED:  But the problem is, you
2  have a witness on the witness stand who is saying,
3  "I have no knowledge of any of these documents.  I
4  have no knowledge and cannot identify what this
5  document is."  And to continue questioning a
6  witness who says I don't know anything about this
7  document, to me is irrelevant.
8        MR. WYATT:  Well, the problem is, is
9  how are we going to get to this ownership issue if
10  David Nutt is released from this hearing today, and
11  none of these questions are asked to help solve
12  these documents are not in evidence?  Actually --
13        MR. SNEED:  Well, we'll cross that
14  bridge, I guess, when we get to it, but you now
15  have a witness on the witness stand who's not
16  identifying any of these documents, and it is
17  irrelevant what his thoughts are about documents
18  that he knows nothing about.
19        MR. WYATT:  All right.
20        MR. TUCKER:  Excuse me just one
21  second.
22  MR. WYATT, CONTINUED:
23    Q.  Did you meet with Meg McAlister regarding
24  the acquisition of Nutt & McAlister in October of
25  2008?

Page 32

1    A.  I'm not sure about the date.  But, yeah,
2  we met a number of times and talked about it.
3    Q.  And as we said earlier, 15 days later
4  there were no more Nutt & McAlister employees in
5  the building?
6    A.  I don't know that to be the case, but the
7  documents, whenever they're properly introduced,
8  will speak to that.
9    Q.  Okay.  Is Ernie Coward employed by the
10  Nutt entities?
11    A.  He is.
12    Q.  And what is his employment relationship?
13    A.  He's the CFO, chief financial officer.
14    Q.  Of what?
15    A.  Of every entity I've got.
16    Q.  Was he the CFO of Nutt & McAlister?
17    A.  He functioned in that capacity, yes.
18    Q.  Somebody had to be the CFO of Nutt &
19  McAlister when it was in existence?
20    A.  Not necessarily, but Ernie functioned in
21  that capacity as far as I was concerned.
22    Q.  All right.  And what kind of authority did
23  you delegate to him as the CFO?
24    A.  I don't know that I delegated any
25  authority to him, other than to keep me apprised of

Page 33

1  any significant decision, and I would make it.
2    Q.  Did he have your permission to furnish
3  financial documents of Nutt & McAlister to me, for
4  example?
5    A.  I mean, I'd have to see what the
6  particular circumstance was.
7    Q.  Okay.  The books.  I'm speaking of the
8  books of Nutt & McAlister, the transaction
9  histories and such.  Would you have been upset if
10  Ernie Coward had furnished those transaction
11  histories to me?
12    A.  No.
13    Q.  Okay.
14    A.  Why would I be upset?
15    Q.  Okay.  So he was authorized to do that, in
16  other words?
17    A.  Yes, I guess so.  I mean, I wouldn't have
18  complained.  I don't know that that occasion ever
19  came up.  And I don't know, if it came up, I might
20  very well have approved it.  I mean, you're talking
21  theoretically here now.
22    Q.  But you would agree, I was not a formative
23  member of Nutt & McAlister at any time --
24    A.  You were never a member of Nutt &
25  McAlister at any time.

Professional Court Reporting, LLC
601.919.8662

Page 34

1    Q.  So in other words, if your CFO is giving
2  me financial documents, he's not doing it because I
3  was a member of Nutt & McAlister?
4    A.  No, no.  You had a bonus interest.  And if
5  you had a question about how your bonus was
6  computed or whatever, I would have no problem with
7  Ernie getting with you and giving you the
8  documentation whenever you asked for it.
9    Q.  Okay.  Well, aside from bonus, you know, a
10  transaction history is a very long accounting
11  document that lists every single asset in the
12  business.  You know, right down to the last desk
13  lamp.  So I'm not talking about bonuses.
14    But still, your answer would be the same,
15  right?  If he furnished those transaction histories
16  to me, who is not a member of Nutt & McAlister,
17  that was okay with you?
18    A.  Sure.  I mean, we were all practicing law
19  together.  We weren't trying to hide anything from
20  anybody.
21    Q.  And if he did that after Nutt & McAlister
22  closed down --
23    MR. SNEED:  Derek, where are we going
24  with this?  I mean, you've asked him the same
25  question over and over about a half dozen times.  I

Page 35

1  don't know what the relevance is.
2    MR. WYATT:  Okay.
3    MR. SNEED:  We'll go back to what we
4  talked about off the record.  My understanding is,
5  we're here to focus on one issue, and that is
6  ownership of the assets of Wyatt & McAlister.  I
7  don't know were going with all this.
8    MR. WYATT:  I think where we're going
9  with it is where we were going with it when the
10  judicial dissolution was filed originally, which is
11  this:  I think their version of the fact that all
12  this property is in an office that's leased to
13  Wyatt & McAlister is some kind of a unconsummated
14  agreement that they're saying.
15    In other words, everything was moved
16  out, $5,000 of moving expenses, computers were
17  downloaded, employees were severed, Nutt &
18  McAlister's assets were given away and so forth --
19    MR. SNEED:  You were asking him
20  repeatedly a question about Ernie -- was it Coward?
21    MR. WYATT:  Yeah, Coward, yeah.
22    MR. SHAPLEY:  Coward, C-o-w-a-r-d.
23    MR. WYATT:  Well, the purpose of that
24  is that it's going to show in these records that
25  there was an acquisition agreement, and that Ernie

Page 36

1  Coward --
2    MR. SNEED:  Acquisition agreement
3  from whom?
4    MR. WYATT:  From Ernie -- from Nutt &
5  McAlister.  Nutt & McAlister agreed to convey its
6  80 percent -- if that's the interest they have --
7  80 percent interest, rather than dissolve the firm
8  without conveying it.  That was the agreement.
9  That's why we set up Wyatt & McAlister.  And that's
10  why all that property was moved to Wyatt &
11  McAlister.  That's why --
12    MR. SNEED:  You're telling me there's
13  a written agreement to that effect?
14    MR. WYATT:  No.  I'm saying that
15  these documents -- just like his own law firm has
16  no written agreement, these documents comprise the
17  agreement.  That's what they are.  And, you know,
18  if we go through this -- you know, it would have
19  been better for probably her to testify first
20  because we can authenticate all these documents.
21    MR. SNEED:  Okay.
22    MR. WYATT:  And then --
23    MR. SHAPLEY:  Well --
24    MR. WYATT:  But they insisted that
25  they wanted to go first --

Page 37

1    MR. SHAPLEY:  Let me --
2    MR. WYATT:  -- and they wanted to get
3  David sent out --
4    MR. SNEED:  I'm going to cut you off.
5  Nobody insisted on anything.  They asked, as a
6  matter of convenience, if David could go first.
7  You agreed to it.
8    MR. WYATT:  I did.
9    MR. SNEED:  And here we are.  But
10  let -- Mr. Shapley --
11    MR. SHAPLEY:  You know, I don't agree
12  with his theory of the case or anything he said.
13    MR. SNEED:  I know that.
14    MR. SHAPLEY:  But he can't prove what
15  he wants to prove through this witness.  You know,
16  I'm not saying you can't testify to it, Derek, or
17  you can't ask Meg about it, but David doesn't know
18  about these documents.  He wasn't a part of Wyatt &
19  McAlister, and you're wasting time asking him about
20  it.
21    MR. WYATT:  Well, that's not my
22  understanding of it, because ultimately --
23    MR. SNEED:  Well, what your
24  understanding is you can testify to, but you
25  can't -- I mean, you can ask him whether Mr. Coward

Page 38

1   had permission to disclose certain financial
2   information to you or not. I mean, you asked him
3   the question, and I think he's answered it.
4           I just -- if we're going to go
5   through this laboriously -- I understood you were
6   going to be asking questions because we were going
7   to cut to the chase and get to the meat of the
8   issue. It doesn't sound to me like we've done that
9   at all.
10          I just haven't heard anything in
11  cross-examination about assets of Wyatt & McAlister
12  and ownership of assets in Wyatt & McAlister. I
13  understand you're not getting what you want out of
14  David Nutt, but there's nothing that I can do about
15  that. And you may put on proof totally contrary to
16  what David has said, but I don't think you're going
17  to get this information out of David. At least,
18  doesn't sound like it.
19          MR. WYATT: Well, I certainly can't
20  do it without the documents being authenticated.
21  And --
22          MR. SNEED: Well, the documents are
23  authenticated.
24          MR. WYATT: -- being able to question
25  him about the documents. I mean, he may not know

Page 39

1   what these documents are because he may not have
2   seen them. That doesn't mean he doesn't know what
3   the content of the document is.
4           That doesn't mean he can't testify
5   truthfully or not whether the content of the
6   document is accurate. I mean, that's a totally
7   different thing, you know.
8           MR. SNEED: I disagree with you. If
9   a witness takes the witness stand and says, "I have
10  no knowledge about this document," why -- what is
11  the relevance of his testimony regarding a
12  document?
13          MR. WYATT: Suppose I don't even show
14  him the document. I put it under the table --
15          MR. SNEED: You can --
16          MR. WYATT: -- but I ask him a
17  question --
18          MR. SNEED: -- ask him whatever
19  question you want to.
20          MR. WYATT: Well, that's what I'm
21  getting at. And if he has knowledge about what's
22  in the content of the document, it doesn't make any
23  difference whether he knows about the document or
24  not.
25          MR. SNEED: If you're questioning him

Page 40

1   about a document, it does. Now, you can question
2   him about a subject matter.
3           MR. WYATT: Well, all I'm doing right
4   now is questioning him about a subject matter. I'm
5   asking him if his CFO was authorized to give me
6   transaction history that's independent financial
7   records --
8           MR. SNEED: Derek, I agree, but
9   you've asked him the question five or six times,
10  and I think he told me he didn't care if the CFO gave
11  you whatever information.
12          MR. WYATT: Well, okay, that's fine.
13  I mean, you know, I've finished asking him about
14  that particular matter.
15          MR. SNEED: I didn't understand you
16  were finished asking about that, but go ahead.
17          MR. WYATT: Well, I am.
18  MR. WYATT, CONTINUED:
19      Q.  I mean, you know, unless you know
20  something more about it that you haven't told me,
21  that's all I wanted to ask you about that.
22      A.  Okay.
23      Q.  All right. So did you have any
24  discussions with Ernie Coward about the dissolution
25  of Nutt & McAlister and the transfer of your

Page 41

1   ownership in Nutt & McAlister to someone else?
2       A.  Yes.
3       Q.  Okay. What were those discussions?
4       A.  We talked about -- you know, I visited
5   with Ernie the same as I would visit with Meg. We
6   didn't go into any detailed discussion about what
7   furniture and how much she was going to pay or how
8   that was going to be handled.
9           But, yeah, I talked to Ernie pretty much
10  about everything. So I'm sure at some point I told
11  him that we were looking at one of the options,
12  being that Meg acquire Nutt & McAlister. Buy me
13  out of Nutt & McAlister. So I talked to him about
14  it. It never happened.
15      Q.  Yet all the property did leave the
16  building and all the employees were terminated?
17      A.  Right. I told Meg -- Meg and I, you know,
18  got along quite well, as did you and I at the time.
19  I was quite happy to have Meg go ahead and take the
20  stuff and us address it at a later time. I mean,
21  we've always been honest with each other. I had no
22  reason to think we wouldn't continue to be.
23      Q.  Would it be fair to say that you left it
24  up to Ernie to deal with the nuts and bolts of what
25  the price would be?

Professional Court Reporting, LLC
601.919.8662

Page 42

1    A.  No, that would not be fair.  We never got
2  to that.  We never got to any discussion about what
3  the price would be and that sort of thing.
4    Q.  So then you wanted to be the one with the
5  final say about that?
6    A.  Sure.
7    Q.  Okay.  Did you have a price in mind?
8    A.  No.  We never got that far.  Your firm
9  exploded before we got that far.
10    Q.  What did you think you were pricing?
11    A.  I wasn't pricing anything.  We never got
12  to it.  I said to Meg, "Meg, take what you need.  I
13  am not using it.  Take what you need to set up an
14  office so that you can continue to represent the
15  clients of Nutt & McAlister and bring those cases
16  to a conclusion."
17    I mean, I could have parcelled those out
18  to someone that wasn't Meg, for that matter, to get
19  the work done, but that would have been really
20  stupid, because Meg had handled the cases from the
21  get-go.
22    Q.  You're saying Meg, David.  But you agreed,
23  did you not, to pay Wyatt & McAlister on a per diem
24  and hourly basis to wrap up the cases, didn't you?
25    A.  I did not.

Page 43

1    Q.  So in other words, if there's records
2  showing that Wyatt & McAlister was billing you for
3  wrapping up your cases, you contend that's false.
4  Is that right?
5    A.  That's right.
6    Q.  Okay.  And do you have a document showing
7  that there's a falsity about that?  Do you have
8  some kind of agreement that proves that that's
9  false?
10    A.  I don't know what you're talking about.
11    Q.  Did you agree to pay Wyatt & McAlister to
12  wrap up --
13    A.  I agreed to pay Meg.  That was my
14  agreement.
15    Q.  Okay.  Well, what I've asked you, though,
16  is, if there are documents showing that Wyatt &
17  McAlister was billing you for this.  Your version
18  of that is that that's false, that shouldn't have
19  been that way.  Is that right?
20    A.  I don't -- I'm not seeing any documents.
21  I don't know what you're talking about.  I'm
22  telling you -- you're asking me, David Nutt, as I
23  sit here what my agreement was, and I'm telling you
24  what it was.  If you've got documents and you want
25  to introduce them and it seems to contradict that,

Page 44

1  then go for it.
2    Q.  But you wouldn't have any knowledge about
3  those documents?
4    A.  No.
5    Q.  So you wouldn't be able to authenticate
6  them anyway?
7    A.  That's right.
8    Q.  So it's really true that you don't -- you
9  don't really know what the documents say or what
10  the arrangement was in terms of documents, how your
11  firm --
12    MR. SHAPLEY:  What documents?  I
13  object -- I --
14  MR. WYATT, CONTINUED:
15    Q.  -- was billed or anything, right?
16    MR. SNEED:  I'm going to sustain the
17  objection.  We're talking about hypotheticals,
18  obviously.
19    MR. SHAPLEY:  That is not getting to
20  the issue.
21    MR. SNEED:  *This witness is* --
22    MR. SHAPLEY:  I knew it wouldn't.  If
23  you keep letting Derek Wyatt ask questions, we're
24  going to be here for days, because he's conducting
25  discovery in his other cases.  And, you know, he's

Page 45

1  got able counsel here.
2    And I suggest we'd get through this a
3  whole lot quicker and more efficiently if his
4  lawyer asked the questions rather then the client.
5  I know he's not prohibited from it.  Maybe not.
6    But, anyway, he doesn't know about
7  these documents.  And I'm going to -- you know, you
8  can ask him all day long, and just because you have
9  an affidavit doesn't mean that David Nutt knows
10  about these documents.
11    MR. SNEED:  I understand.  Okay.  I'm
12  going to sustain the objection.  You know, let's do
13  it like this, Derek.  If there's a document you
14  want to question him about, present the document to
15  the witness, ask him if he can identify it.  If he
16  can identify it, he's -- and he's familiar with it,
17  then you can question him about the document.
18    If he's not, there's no sense in us
19  spending time talking about unidentified,
20  non-authenticated, hypothetical documents that this
21  witness has testified he has no knowledge about.
22  So --
23    MR. WYATT:  Okay.  Maybe the quickest
24  way to do this, then, would just be to ask you to
25  thumb through these quickly with him.  I'd be happy

Professional Court Reporting, LLC
601.919.8662

Page 46

1    to kind of guide you.
2        MR. SHAPLEY: Oh, if he has any
3    firsthand knowledge about any of it.
4        MR. WYATT: Well, I'm quite sure
5    we're going to end up with a pronounced no. And so
6    if we do, then we'll go from there.
7        MR. SNEED: David, why don't you just
8    take a look at these exhibits and say if you're
9    familiar --
10        MR. SHAPLEY: Can we take a
11    five-minute break while we're doing that?
12        MR. SNEED: That'll be fine. For the
13    record, Mr. Nutt is reviewing the documents
14    contained within global exhibit marked for
15    identification No. 1. All right. And let's take a
16    break.
17        Mr. Nutt, if you'll take a few
18    minutes and just review them, and if you've got any
19    knowledge about any of those documents, we'll get
20    back on the record and figure that out.
21        (OFF THE RECORD.)
22        MR. SNEED: Okay. We're back on the
23    record, and my understanding is, Mr. Nutt, the last
24    question before we took a break, you were asked to
25    identify the documents contained within global

Page 47

1    Exhibit 1 marked for identification. And I'll --
2    have you had an opportunity to do that?
3        THE WITNESS: I have.
4        MR. SNEED: Do you recognize any of
5    those documents?
6        THE WITNESS: I have. I have. I do
7    not recognize any of them.
8        MR. WYATT: I think, you know, I
9    probably have a few more questions for him,
10    non-document questions.
11        MR. SNEED: That's fine.
12        MR. WYATT: But at this time, I'd
13    probably state for the record that I reserve the
14    right to depose David Nutt. And also want the
15    record to be clear that Chris requested or asked if
16    they could go first this morning. We acceded to
17    that.
18        I didn't realize that what the effect
19    of that would be is that it would undermine my
20    ability to question David and cross-examine him
21    thoroughly about what these documents contained,
22    because they're not, at this moment of the hearing,
23    authenticated.
24        Had the order been different and
25    Ms. McAlister, for example, had gone first, the

Page 48

1    documents would be authenticated. And then
2    David -- we would not have this problem of David's
3    objection that the documents are not properly
4    authenticated.
5        So I'm offering a solution to the
6    problem, which is that I reserve the right to
7    depose David and submit the deposition post-hearing
8    after these documents have been authenticated so I
9    can ask him those questions. Because otherwise, we
10    can't get to the issue.
11        MR. SNEED: Okay. The issue as to
12    whether or not you have a right to depose David or
13    not is not before me today. Again, the only issue
14    here today is to determine the ownership of assets
15    of Wyatt & McAlister. There was a request and
16    there was an agreement reached by the parties that
17    Mr. Nutt would testify first, and that's occurred.
18        I don't think, quite frankly, the
19    question of the authentication of the documents is
20    that significant with regard to David's testimony.
21    Whether these are authenticated or not, he's
22    testified he doesn't know about them. He's never
23    seen them. He has no knowledge about them.
24        So I mean, Derek, for you to -- you
25    can reserve whatever objection or right you want

Page 49

1    to. I mean, that's fine. And, again, we'll take
2    up the issue about -- if we need to a later date,
3    about your right or rights or lack thereof -- and,
4    again, I'm not addressing the merits of it -- to
5    depose Mr. Nutt.
6        But, again, he's testified he has no
7    knowledge of the documents that are identified in
8    Exhibit 1. And so for whatever purposes, you made
9    the statement in the record, it's in the record,
10    and you can continue with cross-examination of
11    Mr. Nutt.
12        MR. SHAPLEY: I'd like to just make a
13    brief statement. We didn't insist that we go
14    first. I asked Counsel, Would you-all like to go
15    first. Response was it didn't matter. And I said,
16    Well, it doesn't matter to us, but we'll go first,
17    and that was fine. And that was the agreement that
18    was reached. And I'm not sure if it was on the
19    record or off the record.
20        MR. SNEED: I think it was off the
21    record.
22        MR. SHAPLEY: But, anyway, that's
23    exactly what happened, so. . .
24        MR. SNEED: Okay. And that
25    accurately reflects the understanding.

Professional Court Reporting, LLC
601.919.8662

Page 50

1    MR. TUCKER: We agree with that.
2    MR. SNEED: Okay. Derek, do you have
3 any further questions of David?
4    MR. WYATT: Yeah, just a few.
5 MR. WYATT, CONTINUED:
6    Q. Did you -- do you have any current
7 business operating under the name of Nutt &
8 McAlister?
9    A. No.
10    Q. And have you taken any formal action to
11 dissolve Nutt & McAlister?
12    A. No. You mean, formal --
13    Q. Do you intend to do --
14    A. -- or informal?
15    Q. Do you intend to do that?
16    A. At some point Meg and I will have to
17 resolve the issue of the existence or the
18 nonexistence of Nutt & McAlister. Whether or not
19 it's ultimately going to end up in her acquiring
20 the interest of Nutt & McAlister, I haven't
21 decided.
22    Q. Well, is Ms. McAlister still working in
23 your building under that name, Nutt & McAlister?
24    A. Not to my knowledge. She's working in the
25 building. She's sitting in an office with

Page 51

1 furniture and doing work to bring to a conclusion
2 PC and PA matters. So I -- I assume she's working
3 for herself.
4    Q. But those are other entities other than
5 Nutt & McAlister?
6    A. Yeah. She's not doing any Nutt -- there
7 is no more Nutt & McAlister business, to my
8 knowledge.
9    Q. Do you know these employees: Beth
10 Clatworthy, Melinda Gantt, Judy Groff?
11    A. I do.
12    Q. Okay. Are you aware they worked for
13 Wyatt & McAlister?
14    A. I think they did.
15    Q. And since Wyatt & McAlister has closed its
16 doors, are any of those people working in your
17 building?
18    A. I think Beth is. I believe that Beth is
19 working in Meg's office.
20    Q. And what entity is she an employee of?
21    A. I don't know.
22    Q. Did you have any discussions with her
23 about her leaving Wyatt & McAlister and coming back
24 to your office?
25    A. No.

Page 52

1    MR. WYATT: May I have just one
2 second?
3    MR. SNEED: Sure.
4    MR. WYATT: Subject to the
5 reservation that I made in the record, I don't have
6 any further questions of David Nutt at this time.
7    MR. SNEED: Any redirect?
8    MR. SHAPLEY: I have no redirect.
9 And our position would be, if he has some questions
10 of David Nutt regarding the issues of ownership and
11 the assets of Wyatt & McAlister, he needs to ask
12 them today. And that we will object to any
13 questioning on that issue after Mr. Nutt leaves the
14 room.
15    MR. SNEED: Okay. If that's an issue
16 that needs to be taken up at a later date, we'll
17 take it up.
18    MR. SHAPLEY: Okay.
19    MR. SNEED: All right. Can David be
20 excused?
21    MR. SHAPLEY: We ask that he be
22 allowed to be excused.
23    Kim, are you going to ask David
24 questions?
25    MS. TURNER: I don't --

Page 53

1    MR. SNEED: Oh, I'm sorry, Kim. Did
2 you have any questions of David?
3    MS. TURNER: I don't have any
4 questions.
5    MR. SNEED: I'm sorry. I didn't --
6    MS. TURNER: Thank you. That's all
7 right, Bobby.
8    MR. SNEED: Thank you, Chris. I
9 didn't mean to cut you off. Just jump in there if
10 I cut you off.
11    MR. SHAPLEY: Okay. Thank you,
12 David.
13    MR. SNEED: Okay, David. Thank you
14 for coming.
15    MR. SHAPLEY: Meg?
16    MR. SNEED: Okay. We're still on the
17 record, and I just want to make clear, my
18 understanding is that during a pre-record --
19 pre-on-the-record discussion, there was an
20 agreement that Mr. Nutt would testify first.
21    I want to make sure -- obviously,
22 Derek, you're the plaintiff. You have the burden
23 of proof. You have the right to go forward at this
24 time. We, in effect, took David out of turn.
25    Would you prefer to go forward and

14 (Pages 50 to 53)

Page 54

1 present whatever evidence you have before Meg
2 testifies?
3        MR. WYATT: No. You know, I'm going
4 to stick to what I was asked to agree to, and I did
5 agree to it, but I didn't do it under the
6 understanding that it would divest the record of
7 all of the exhibits.
8        MR. SNEED: We're not going to reopen
9 that can of worms.
10        MR. WYATT: Well, I mean --
11        MR. SNEED: My question is: Do you
12 object to Meg going forward and testifying at this
13 time?
14        MR. WYATT: Subject to what I said,
15 no.
16        MR. SNEED: I'm not sure what you
17 said, but you -- it's my understanding you have no
18 objection to Meg going forward at this time?
19        MR. WYATT: That's right.
20        MR. SNEED: All right. Okay. Chris?
21        MARY EDITH MCALISTER,
22        having been first duly sworn,
23        was examined and testified as follows:
24        DIRECT EXAMINATION
25 BY MR. SHAPLEY:

Page 55

1    Q. State your name, please.
2    A. Mary Edith McAlister.
3    Q. Okay. I'm going to call you Meg for
4 purposes of the questioning. Meg, you were here
5 when David answered the questions about the assets
6 of Nutt & McAlister and the movement of those
7 assets from one building to another. So you're
8 familiar with the background of what we're here
9 about, right?
10    A. Yes.
11    Q. Okay. Do you agree or disagree with
12 Mr. Nutt, that no entity ever paid any Nutt entity
13 any money for any of those assets?
14    A. No entity or any individual ever paid him.
15    Q. Okay. And do you agree with his testimony
16 that there was no document ever signed, to your
17 knowledge, transferring the title to any of those
18 assets from any of the Nutt entities to anybody or
19 to any other entity?
20    A. That's correct. There is no such
21 document.
22    Q. Let me hand you, Meg, McAlister 2. This a
23 certificate of good standing of Nutt & McAlister,
24 PLLC. Is that right?
25    A. Yes.

Page 56

1    Q. Is Nutt & McAlister, PLLC, still in good
2 standing as of today?
3    A. Yes.
4        MR. SHAPLEY: Okay. We move that
5 McAlister 2 be entered into evidence.
6        MR. SNEED: Any objection?
7        MR. WYATT: Let me see.
8        MR. SCLAFANI: I sent him a copy.
9        MR. SHAPLEY: Give him another set.
10        MR. SCLAFANI: Here's a full set of
11 our exhibits.
12        MR. WYATT: Where is it?
13        MR. SCLAFANI: Right here.
14        MR. WYATT: This one page is all
15 you're offering?
16        MR. SHAPLEY: Yeah.
17        MR. WYATT: Okay. This is not the
18 certificate of Nutt & McAlister. We would object
19 on that basis.
20        MR. SNEED: Let me see the document.
21 Okay. (Reviewing document.) All right. Either
22 Davey or Derek, is it y'all's position that Nutt &
23 McAlister is not in good standing? This document's
24 dated as of November 5, 2009. Is that your
25 position, it was --

Page 57

1        MR. WYATT: I have no knowledge about
2 that. The only thing I'm saying is, this was
3 offered as the certificate of Nutt & McAlister to
4 show it's in good standing. This is not the
5 certificate of formation of Nutt & McAlister.
6 That's a different document.
7        MR. SHAPLEY: I didn't claim it was.
8        MR. WYATT: You know, subject to that
9 objection, that's -- you know.
10        COURT REPORTER: I'm sorry?
11        MR. SHAPLEY: I didn't claim it was a
12 certificate of formation.
13        MR. SNEED: Okay.
14        MR. WYATT: I don't know of any
15 certificate there is besides certificate of
16 formation. Anyway, that's our objection.
17        MR. SNEED: All right. Do you need
18 this document, or can Meg just testify the
19 corporation's in good standing?
20        MR. SHAPLEY: I don't know what the
21 judge might need, but I'd like to have it part of
22 the record.
23        MR. SCLAFANI: That is the official
24 record of the Mississippi Secretary of State.
25        MR. SHAPLEY: I know it is. It's an

Page 58

1  official record. You get it right off the
2  Secretary of State's webpage.
3          MR. SNEED: All right. Well, I will
4  let it be admitted. Exhibit 2?
5          MR. SHAPLEY: McAlister 2.
6          MR. SNEED: It's admitted as an
7  official record. It appears to have come off the
8  website. She's identified it and -- you know, so
9  let it be admitted.
10 (EXHIBIT 2 WAS MARKED AND ADMITTED INTO EVIDENCE.)
11 MR. SHAPLEY, CONTINUED:
12     Q. Meg, do you know -- are you familiar with
13 David Nutt, PA?
14     A. Yes.
15     Q. As far as you know, is it still in good
16 standing and in existence?
17     A. Best of my knowledge.
18     Q. Are you familiar with David Nutt &
19 Associates, PC?
20     A. Yes.
21     Q. As far as you know, is it still in good
22 standing and in existence?
23     A. Yes.
24     Q. You were familiar with the entity formerly
25 known as David Nutt & Associates, PA?

Page 59

1      A. My only knowledge of that came from
2  looking at the Secretary of State's website and
3  discovering that at some point there was a name
4  change from David Nutt & Associates, PA to David
5  Nutt & Associates, PC. But that was long before my
6  involvement with David Nutt.
7      Q. Right. Okay. Fair enough. All right.
8  Now, I'm going to McAlister 1 now. Let me hand you
9  what's been marked for identification as
10 McAlister 1 and ask you if you can tell the court
11 what that document is.
12     A. This document is a summary spreadsheet of
13 the furnishings and computer equipment taken from
14 the David Nutt building to Wyatt & McAlister. And
15 I would just like to state that this document was
16 prepared essentially from memory.
17     Q. From your memory?
18     A. From my memory and the memory of the staff
19 at Wyatt & McAlister as to what items were actually
20 taken from the Nutt building to Wyatt & McAlister.
21     Q. Okay. All right. A part of Exhibit
22 McAlister 1 here are a number of invoices.
23     A. Yes.
24     Q. Correct?
25     A. Yes.

Page 60

1      Q. Are you familiar with those invoices?
2      A. Yes.
3      Q. And what are they?
4      A. These are the invoices that reflect who
5  purchased and who owns, to this day, the items
6  listed on the summary spreadsheet.
7      Q. Did Wyatt & McAlister ever purchase any
8  item that's described on McAlister 1?
9      A. No.
10     Q. Okay. Did they ever pay for any of the
11 items on McAlister 1?
12     A. No.
13     Q. Did the Nutt entities -- one of the Nutt
14 entities purchase each and every item on Exhibit 1?
15     A. Yes. Except for --
16     Q. Most of your personal --
17     A. -- my personal property that are also
18 contained within this exhibit, as well as personal
19 property that belonged to our staff.
20     Q. Okay. And that is identified on Exhibit 1
21 as personal property, correct?
22     A. Correct.
23     Q. All right. Is there anything identified
24 on McAlister 1 as being property that was purchased
25 by Wyatt & McAlister?

Page 61

1      A. Not to my knowledge.
2          MR. SHAPLEY: I move that McAlister 1
3  be entered into evidence.
4          MR. SNEED: Any objection?
5          MR. WYATT: Reserve objections at
6  this time. I'd like to voir dire the witness. I
7  don't even know who prepared this document here.
8  How could she testify to an invoice that wasn't
9  even there when she was working in the office?
10         MR. SNEED: You want to voir dire the
11 witness?
12         MR. WYATT: Yeah. I mean, I think
13 it's far afield for her to be able to validate all
14 these documents in one fell swoop. But maybe, you
15 know, for expediency's sake, I'll be happy to
16 reserve my questions for cross if it could be
17 admitted for identity purposes only.
18         MR. SHAPLEY: Well, we're introducing
19 it into evidence.
20         MR. SNEED: Yeah, he's offered them
21 into evidence. If you have an objection, I'll hear
22 you. If you want to voir dire the witness, you're
23 welcome to do that.
24         MR. WYATT: Okay.
25         VOIR DIRE EXAMINATION

Professional Court Reporting, LLC
601.919.8662

Page 62

BY MR. WYATT:

1 Q. Did you prepare the spreadsheet?

2 A. I had input into the preparation of the
3 spreadsheet, but I did not actually sit down and
4 type this spreadsheet.

5 Q. Okay. So you're not the author of this
6 document that is on the top here, this inventory
7 document?

8 A. Well --

9 Q. Is that right?

10 A. Define authored for me.

11 Q. You didn't write it up and type it up and
12 print it yourself?

13 A. I contributed to its preparation, the
14 format that it is in. I identified items that were
15 missing from it that I could recall from memory
16 were taken to Wyatt & McAlister. But I did not
17 physically type this document.

18 Q. Okay. Who did type the document?

19 A. Beth Clatworthy.

20 Q. Were you even working for David Nutt's
21 office in '99?

22 A. No.

23 Q. So there's no way you'd have knowledge of
24 an invoice dated 7/8/99, right, because you weren't

Page 63

1 even there?

2 A. Well, I have a knowledge of it, because
3 the invoices are contained within the Nutt business
4 records. And when it became necessary for us to
5 identify the title owner of all the equipment
6 listed on this spreadsheet, it was necessary to go
7 back and locate invoices that showed where each of
8 these items were acquired by a Nutt entity.

9 And in the course of that project, I saw
10 all the invoices that are attached to this exhibit.

11 Q. Okay. Other than gathering these
12 documents out of files like that, you don't have
13 any personal knowledge about the authenticity of
14 any of them, do you?

15 A. Yes. These are the authentic records of
16 various Nutt entities that document the Nutt
17 entities' acquisition of these items.

18 MR. WYATT: Okay. We object and
19 submit that she's not qualified to authenticate
20 these documents, including the inventory that she's
21 admitted she didn't even prepare herself.

22 MR. SNEED: Okay. She's testified
23 that they're maintained in the regular business of
24 Wyatt & McAlister. She's testified that she's
25 familiar with them. She recognizes them as

Page 64

1 invoices of the entities that -- I say Wyatt &
2 McAlister -- Nutt & McAlister. I'm falling into
3 the same trap.

4 MR. SHAPLEY: That's easy to do.

5 MR. SNEED: So I'm going to overrule
6 your objection, and she's subject to
7 cross-examination about authenticating these
8 documents.

9 MS. TURNER: And, Bobby, I want to
10 put an objection on the record as well to the
11 introduction of Exhibit 2.

12 MR. SNEED: Okay.

13 MS. TURNER: Just to the extent that
14 the equipment that can be tracked by serial number,
15 this was certainly verified by their separate
16 invoice. But there's a lot of equipment that
17 cannot be verified by serial number. We have lots
18 of invoices. You've got several different entities
19 of Nutt's, PA, PC, Nutt & McAlister.

20 There's no way to tell if a chair
21 purchased three years ago to some Nutt entity is,
22 in fact, a chair that made it to our offices, which
23 is Wyatt & McAlister.

24 MR. SNEED: Okay. Your objection is
25 noted and overruled. Let it be admitted. Again,

Page 65

1 she's subject to cross-examination on any of these
2 documents.

3 DIRECT EXAMINATION CONTINUED
4 BY MR. SHAPLEY:

5 Q. Meg, do you know based on your personal
6 knowledge whether each and every item described on
7 here was moved from one of the Nutt entities to the
8 Wyatt & McAlister building?

9 A. Yes.

10 Q. Do you know that on your own?

11 A. Yes.

12 Q. Okay. All right. Now, I want to go to
13 Exhibit 11, McAlister 11.

14 MR. SCLAFANI: No. It's 3, Chris.

15 MR. WYATT: What is that, Chris?

16 MR. SHAPLEY: Okay.

17 MR. WYATT: What is it?

18 MR. SHAPLEY: All right. Hold on
19 just a second. Joseph asked me something. You're
20 asking me something. Let me just stop. I want
21 this document that we just talked about introduced
22 as McAlister 1, not 3.

23 MR. SNEED: All right. You'd marked
24 it as McAlister 1. Do you care if it's introduced
25 as Exhibit 3?

17 (Pages 62 to 65)

Page 66

1    MR. SHAPLEY:  Well, I don't care.
2  It's just going to get confusing.  But you want
3  to -- are we just going to do consecutive numbers?
4    MR. SNEED:  I thought that's what
5  we'd do.
6    MR. SHAPLEY:  That's fine.  Okay.
7    MR. SNEED:  Y'all know better.
8    MR. SHAPLEY:  Let's -- for the
9  record, McAlister 1 will be entered as Exhibit 3.
10  All right.
11  (EXHIBIT 3 WAS MARKED AND ADMITTED INTO EVIDENCE.)
12    MR. SNEED:  Let's take a minute.
13    (OFF THE RECORD.)
14    MR. SHAPLEY:  Exhibit 1 has been
15  marked for identification purposes only at this
16  time.  Exhibits 2 and 3 have been introduced into
17  evidence.
18    MR. SNEED:  That's correct.
19    MR. SHAPLEY:  Okay.
20  MR. SHAPLEY, CONTINUED:
21    Q.  I want to hand you what I'm marking for
22  identification as Exhibit 4.  It's numbered
23  McAlister 11 under that.  Can you identify
24  Exhibit 4, Meg?
25    A.  Yes.

Page 67

1    Q.  What is it?
2    A.  This is the same spreadsheet as has been
3  made Exhibit 3, with an additional column added to
4  it on the right-hand side showing current location.
5    Q.  Okay.  If it has a checkmark under the
6  column marked Current Location, what does that
7  mean?
8    A.  It means that we physically verified that
9  that item was located in the Wyatt & McAlister's
10  offices last Friday, November 6th, 2009.
11    Q.  Okay.  And were you present and did you
12  assist in physically verifying?
13    A.  Yes.
14    MR. SHAPLEY:  Bobby, here's a copy if
15  you need it.
16    MR. SNEED:  Okay.  Thank you.
17  MR. SHAPLEY, CONTINUED:
18    Q.  And then under the Current Location where
19  it has "missing," that means what?
20    A.  It means that the item was nowhere to be
21  found in the premises of Wyatt & McAlister or in
22  the attic above that building, which is above Kim
23  Turner's office.  In other words, it wasn't in the
24  attic portion above Wyatt & McAlister.
25    Q.  For the benefit of Mr. Sneed and the

Page 68

1  court, we all know that you-all went to the former
2  Wyatt & McAlister office last week, right?
3    A.  Yes.
4    Q.  For the purpose of conducting an
5  inventory?
6    A.  Yes.
7    Q.  To find out what's in there?
8    A.  Correct.
9    Q.  And Exhibit 4 indicates what was in there
10  and was not in there, right?
11    A.  Correct.
12    Q.  Okay.  And on page 2 of Exhibit 4, it has
13  at the bottom, for example, 24-inch monitor, and
14  then the current location says "Derek's
15  possession."
16    A.  Correct.
17    Q.  And that means what?
18    A.  Well, Mr. Wyatt provided an inventory to
19  the court of all items he physically removed from
20  Wyatt & McAlister and took somewhere.
21    Q.  Okay.
22    A.  He physically removed them.
23    MR. SHAPLEY:  All right.  Let me mark
24  as Exhibit 5 that inventory.
25    (EXHIBIT 5 WAS MARKED FOR THE RECORD.)

Page 69

1  MR. SHAPLEY, CONTINUED:
2    Q.  Is Exhibit 5 the inventory to which you
3  just referred that was supplied by
4  Mr. McAlister's -- Mr. Wyatt's attorney in which
5  they identify all the items that were in possession
6  of Mr. Wyatt?
7    A.  Yes.  This appears to be a true and
8  correct copy of Davey Tucker's letter to attorneys
9  at Brunini undated.  I believe it's undated.  I
10  don't see a date on this letter.
11    Q.  Okay.
12    MR. SHAPLEY:  I'd like to introduce
13  Exhibit 5 into evidence.
14    MR. SNEED:  All right.  What we'd do
15  with Exhibit 4?
16    MR. SHAPLEY:  I'm still working on
17  it.  I haven't tendered it yet.
18    MR. SNEED:  Any objection to
19  Exhibit 5 coming into evidence?
20    MR. WYATT:  I reserve the right to,
21  you know, voir dire her about it or either to
22  cross-examine.  I don't have any way of knowing any
23  of this is accurate whatsoever.  But I'll be happy
24  to reserve, you know, till cross and --
25    MR. SHAPLEY:  Exhibit 5 was provided

18 (Pages 66 to 69)

Page 70

1  by your counsel.
2        MR. WYATT: I'm sorry. I thought we
3  were talking about -- I thought we were still
4  talking about this -- I'm sorry. Are you talking
5  about a new exhibit?
6        MR. SHAPLEY: Exhibit 5 was provided
7  by Mr. Tucker to us.
8        MR. WYATT: Okay. I didn't
9  understand that. I thought you were still -- have
10  you offered the other one?
11       MR. SHAPLEY: Not yet.
12       MR. WYATT: Oh, okay.
13       MR. SNEED: Any objection to
14  Exhibit 5?
15       MR. WYATT: Let me look at it for a
16  second. No.
17       MR. SNEED: Okay. Exhibit 5 will be
18  admitted without objection.
19       (EXHIBIT 5 WAS ADMITTED INTO EVIDENCE.)
20  MR. SHAPLEY, CONTINUED:
21       Q.  All right. Now, going back to Exhibit 4,
22  Meg. Looking on page 3, again, it has under
23  Current Location, "Derek's possession." And that's
24  reference to an item that's identified on Exhibit 5
25  that we just introduced into evidence, right?

Page 71

1        A.  Correct.
2        Q.  Okay. You were personally present when
3  this inventory was taken?
4        A.  Yes.
5        Q.  Were you -- do you have personal knowledge
6  of each and every item identified on Exhibit 4 and
7  whether it was at the Wyatt & McAlister office last
8  Friday?
9        A.  Yes.
10       Q.  Okay. And do you have personal knowledge
11  where it indicates an item is checked that it was
12  there, and if it says "missing," it was not there?
13       A.  Correct, I do.
14       Q.  All right. And did you direct that
15  Exhibit 4 be prepared?
16       A.  I did.
17       Q.  And can you testify as to its accuracy?
18       A.  Yes. To the best of my knowledge, it's
19  accurate, 100 percent accurate.
20       MR. SHAPLEY: Okay. I move that
21  Exhibit 4 be introduced in evidence.
22       MR. SNEED: Any objection?
23       MR. WYATT: Yeah. I'd like to voir dire
24  if I may.
25       MR. SNEED: Sure.

Page 72

1              VOIR DIRE EXAMINATION
2  BY MR. WYATT:
3        Q.  Do you have laptops that are belonging to
4  Wyatt & McAlister that are not in that office right
5  now?
6        A.  No.
7        Q.  So three laptop computers that were there
8  at the time that Wyatt & McAlister was functioning,
9  you didn't find those there when you went on this
10  inspection, right?
11       A.  That's not true, Derek.
12       Q.  You did find them there?
13       A.  We found some laptops there. They are
14  reflected on Exhibit 4.
15       Q.  Were they there on the premises when you
16  went there?
17       A.  Yes.
18       Q.  Okay. Those are ones that were in the
19  closet by Judy's office?
20       A.  Correct.
21       Q.  Okay. But I'm not talking about those.
22  I'm talking about other functioning laptops that
23  were in the law firm's possession. Did you find
24  those laptops there?
25       A.  The only other two laptops that I am aware

Page 73

1  of, as I sit here, is the laptop that was provided
2  to you by Nutt & McAlister and the laptop provided
3  to me by Nutt & McAlister.
4              You are in possession of a laptop provided
5  to you by Nutt & McAlister, and presumably the
6  carrying case that accompanied it, although that's
7  not on your inventory of what you removed from
8  Wyatt & McAlister. And I am in personal possession
9  of my laptop and the carrying case for it.
10       Q.  So you have a laptop that's been removed
11  from the premises of the law firm, right?
12       A.  The laptop was in my possession at my
13  home --
14       Q.  But not --
15       A.  -- before I even resigned from Wyatt &
16  McAlister.
17       MR. SNEED: Okay. We're not on
18  cross-examination at this point. We're voir diring
19  the witness --
20       MR. WYATT: I understand.
21       MR. SNEED: -- as to the contents of
22  Exhibit 4.
23  MR. WYATT, CONTINUED:
24       Q.  Is that laptop listed on here, the one
25  that you've removed from the premises?

Page 74

```
 1      A.  No.  Because it wasn't on the premises at
 2   the time I resigned as an employee of Wyatt &
 3   McAlister.
 4      Q.  Okay.  Is the laptop that Beth Clatworthy
 5   had that was Wyatt & McAlister's laptop that's not
 6   there, did you list that laptop on this inventory?
 7      A.  You'll have to identify which one.  I
 8   don't know what you're talking about.
 9      Q.  You testified that you have personal
10   knowledge about everything on here.  The laptop
11   that Ms. Clatworthy had.  You listed missing items
12   that you say are in my possession --
13      A.  Time out.  I'm not aware of any laptop
14   that Ms. Clatworthy had.  You're going to have to
15   show me what laptop are you talking about.
16      Q.  Did she have one while we were functioning
17   in the law firm?
18      A.  Which law firm?
19      Q.  Wyatt & McAlister.
20      A.  We had laptops in the office that
21   paralegals may have used from time to time.
22      Q.  Okay.  I'll leave it at this:  Did you
23   list any laptop computer on here that's missing by
24   virtue of being in Ms. Clatworthy's possession and
25   not in the law firm's offices?
```

Page 75

```
 1      A.  No.  I believe the only laptop that's
 2   missing that was not -- that cannot be accounted
 3   for is the laptop that you removed from Wyatt &
 4   McAlister.
 5      Q.  All I'm asking you is a yes or no.  And
 6   the same question for Judy Groff.  Did you list any
 7   laptop on this inventory that is missing from
 8   Wyatt & McAlister's office that she was using at
 9   Wyatt & McAlister's office when it was functioning?
10      A.  I'm not aware of Ms. Groff ever using a
11   laptop at Wyatt & McAlister.
12      Q.  So it's not listed if there is one.  Is
13   that right?
14      MR. SNEED:  I think she answered the
15   question.
16      MR. WYATT:  Not aware --
17      THE WITNESS:  I'm not aware there
18   ever was one.
19   MR. WYATT, CONTINUED:
20      Q.  It's a yes or no.  Okay.
21      MR. SNEED:  Well, she can explain her
22   answer.
23      MR. WYATT:  Okay.
24      MR. SNEED:  She said she's not aware
25   that one exists.
```

Page 76

```
 1      MR. WYATT:  Okay.  That's it.
 2      MR. SNEED:  Any objection to
 3   Exhibit 4 being admitted into evidence?
 4      MR. WYATT:  No objection.
 5      MR. SNEED:  Then let it be
 6   admitted -- Kim do you have any objection?
 7      MS. TURNER:  No, I don't.
 8      MR. SNEED:  Okay.  Let it be admitted
 9   without objection.  All right.
10   (EXHIBIT 4 WAS MARKED AND ADMITTED INTO EVIDENCE.)
11      (EXHIBIT 6 WAS MARKED FOR THE RECORD.)
12      MR. SHAPLEY:  Just one second.
13      MR. SNEED:  Sure.
14      DIRECT EXAMINATION CONTINUED
15   BY MR. SHAPLEY:
16      Q.  Meg, what is Exhibit 6 I put in front of
17   you?  Checks.
18      A.  This appears to be a copy of some
19   documents that we located last Friday at Wyatt &
20   McAlister, and I believe them to be Wyatt &
21   McAlister's bank account records, or some of them
22   anyway.
23      Q.  Okay.  Looking at page 4 of Exhibit 6, for
24   example, that would depict the front page of checks
25   written?
```

Page 77

```
 1      A.  Yes.
 2      Q.  Some signed by you, some signed by Derek?
 3      A.  Correct.
 4      Q.  Okay.  And is that pretty much consistent
 5   with everything else you see in 6?  Take a minute
 6   and look at it and just tell the hearing officer
 7   and the court what we're looking at here.
 8      A.  When we were finally given access to
 9   Wyatt & McAlister last Friday, we went in, videoed
10   the contents of everything we could find.  We
11   looked in the office that had been used by Wyatt &
12   McAlister's bookkeeper, Melinda Gantt.  She had
13   various file folders organized in her desk drawers.
14      And we found various file folders, many of
15   them empty.  And -- but we also found copies of
16   Wyatt & McAlister's bank records, or some of the
17   bank records anyway.  This --
18      Q.  You're not testifying this is --
19      A.  This is what we found there.
20      Q.  -- this is all of them; you're just saying
21   this is what we found?
22      A.  This is what we found.
23      Q.  All right.  And are they true and correct
24   copies of Wyatt & McAlister bank records?
25      A.  Best of my knowledge, yes.
```

Page 78

1    MR. SHAPLEY: Okay. I move that
2 Exhibit 6 be introduced into evidence.
3    MR. SNEED: Any objections?
4    MR. WYATT: No objection.
5    COURT REPORTER: I'm sorry?
6    MR. WYATT: No objection.
7    MR. SNEED: Kim, any objection?
8    MS. TURNER: No objection.
9    MR. TUCKER: That has been marked as
10 6?
11    MR. SHAPLEY: 6.
12    MR. TUCKER: Marked as 6?
13    MR. SHAPLEY: Marked and entered as
14 6.
15    MR. SNEED: Let it be admitted.
16    (EXHIBIT 6 WAS ADMITTED INTO EVIDENCE.)
17 MR. SHAPLEY, CONTINUED:
18    Q.  Meg, did you make a capital contribution
19 to Wyatt & McAlister?
20    A.  I did.
21    Q.  Out of your own -- out of your own
22 personal funds?
23    A.  I did.
24    Q.  How much money?
25    A.  Well --

Page 79

1    Q.  How much money in capital contributions,
2 how much in loans?
3    MR. WYATT: What was your question?
4    THE WITNESS: Well --
5    MR. WYATT: I'm sorry. Excuse me.
6    THE WITNESS: -- initially Derek and
7 I went to --
8    MR. SHAPLEY: I'm sorry. The
9 question was: Did you, Meg McAlister, make a
10 capital contribution out of your personal funds
11 into Wyatt & McAlister.
12    MR. WYATT: Okay.
13    THE WITNESS: And the answer's yes.
14 MR. SHAPLEY, CONTINUED:
15    Q.  Okay. And how much?
16    A.  Initially, Derek and I went together to
17 BancorpSouth, sat down with one of their employees,
18 and discussed the opening of an operating account
19 and an IOLTA account for Wyatt & McAlister.
20    Q.  When you say "IOLTA," you've got --
21    A.  I'm talking about the --
22    Q.  I-O-L-T-A?
23    A.  Right. The client trust fund account --
24    Q.  Right.
25    A.  -- all law firms --

Page 80

1    Q.  Yeah.
2    A.  -- should set up under the ethics rules.
3 And as we sat there in front of this bank
4 representative, Derek and I had a discussion about
5 how much I should make as the initial deposit. I
6 said I can either go ahead and put 100,000 in now
7 or only put in 25,000 and fund more as is needed.
8    And Derek and I agreed that we would set
9 up an operating account with an initial deposit of
10 $25,000. I wrote a personal check to fund that
11 account. And then I also wrote a personal check,
12 if I recall, for $100 to set up the IOLTA account.
13    Q.  Okay. Did you subsequently have to loan
14 the law firm, Wyatt & McAlister, money from your
15 own personal fund?
16    A.  I don't know that "loan" is the correct
17 terminology --
18    Q.  Loan or account contribution.
19    A.  -- but I put in at least another -- an
20 additional $50,000 cash, as well as used my
21 personal credit card and used cash out of my
22 pocket.
23    Q.  Okay.
24    A.  Contributed to Wyatt & McAlister.
25    Q.  Okay.

Page 81

1    A.  To set the business up and keep it
2 running.
3    Q.  Was Mr. Wyatt supposed to match your
4 contributions? In other words, was he supposed to
5 contribute funds like you contributed funds?
6    A.  Mr. Wyatt did not want to provide any
7 capital contribution at all. And there came a
8 time, I believe in November of 2008 -- remember, we
9 opened our doors at Wyatt & McAlister, I think, on
10 November 1st, 2008. And Derek said he could not
11 afford and did not want to contribute any capital.
12    Q.  Okay.
13    A.  To it.
14    Q.  Did he? That was my question, is did he?
15    A.  No.
16    Q.  All right.
17    (EXHIBIT 7 WAS MARKED FOR THE RECORD.)
18 MR. SHAPLEY, CONTINUED:
19    Q.  I've marked as Exhibit 7 a letter to you
20 from MetLife concerning an insurance policy and an
21 attachment which indicates a description of policy
22 No. 28085230. Would you tell Mr. Sneed and the
23 court what is Exhibit 7?
24    A.  Okay. This is a letter to me from
25 Metropolitan Life Insurance Company, cover letter,

Page 82

1    and enclosed with this cover letter is an
2    acknowledgment of insurance document to replace the
3    original policy.
4        Q.   Okay.
5        A.   The reason I don't have the original
6    policy is because it is in the possession, or was
7    in the possession, of Wyatt & McAlister. This is a
8    policy that I have had on my life for probably 12
9    years or so.
10       Q.   Okay.
11       A.   This is a policy that was originally
12   acquired when I was a partner at Bennett,
13   Lotterhos, Sulser & Wilson. The partners there
14   used term life policies as keyman insurance.
15       Q.   Right.
16       A.   When I went to work for David Nutt in year
17   2000, I took this policy with me, and David Nutt
18   then used this policy as keyman life insurance on
19   me.
20       Q.   Okay.
21       A.   When I left David Nutt's office and moved
22   to Wyatt & McAlister, Derek and I had an agreement
23   that we would each have like life insurance to
24   serve as keyman insurance for each of us. I then,
25   in good faith, transferred ownership of this

Page 83

1    policy.
2        Q.   Exhibit 7?
3        A.   Exhibit 7 to Wyatt & McAlister and
4    designated Wyatt & McAlister as the beneficiary.
5    Mr. Wyatt reneged on his reciprocal commitment to
6    obtain life insurance in like amount.
7        Q.   Okay. When you say "reneged," did
8    Mr. Wyatt agree to provide key person insurance in
9    like amount as part of your going into business
10   together with Wyatt & McAlister?
11       A.   Yes.
12       Q.   Just as you did?
13       A.   Yes.
14       Q.   So you fulfilled your end of the deal, and
15   he did not. Is that true?
16       A.   Correct, that's correct.
17       Q.   Okay. And who's been paying the premiums
18   to keep this policy described in Exhibit 7 afloat?
19       A.   I have, with my own personal funds.
20       Q.   Okay. And is it your desire -- and I know
21   that that's not necessarily the purpose we're here
22   for today -- but is it your desire to have this
23   policy transferred back to your name since you were
24   the one paying the premium?
25       A.   Yes.

Page 84

1        Q.   Okay.
2            MR. SNEED:  Are you offering it?
3            MR. SHAPLEY:  I'd like to offer
4    Exhibit 7 into evidence.
5            MR. SNEED:  Any objection to
6    Exhibit 7?
7            MR. WYATT:  Is it merely this letter
8    and the -- I can't see what you've got over there.
9            MR. SHAPLEY:  It's two pages.
10           MR. WYATT:  The letter and the. . .
11           MR. SHAPLEY:  And a description of
12   the policy and the owner of the policy.
13           MR. WYATT:  No, I don't have any
14   objection.
15           MS. TURNER:  No objection.
16           MR. SNEED:  Okay. Then let it be
17   admitted as Exhibit 7.
18       (EXHIBIT 7 WAS ADMITTED FOR THE RECORD.)
19   MR. SHAPLEY, CONTINUED:
20       Q.   Meg, do you know, of your personal
21   knowledge, what assets Wyatt & McAlister purchased
22   with its money after you-all began the operation of
23   the firm?
24       A.   Yes.
25       Q.   Describe those assets.

Page 85

1        A.   We purchased a server, a telephone system,
2    a vacuum cleaner. I think you would call this life
3    insurance on me an asset, although it's just a term
4    policy that has no cash value. We purchased some
5    Christmas decorations, a microwave oven, coffee
6    pot, cleaning supplies. And that's all I can think
7    of at this point.
8        Q.   And other than those items, the things or
9    objects or assets that were located in that office
10   building, were all of the other items, things
11   located there, other than what you just described,
12   things that one of the Nutt entities allowed you to
13   bring over there and put there, except for personal
14   items?
15       A.   Except for personal items.
16       Q.   All right. Now, describe the personal
17   items that were there.
18       A.   Well, personal items I had on the
19   premises --
20       Q.   That you had, right.
21       A.   -- included two wall hangings that were of
22   great sentimental value to me, which are now
23   missing. I had a lot of my personal law books,
24   Hornbooks from law school, books I had purchased
25   over my career as a lawyer.

Page 86

1    I think those books are there. I never
2    had an inventory of those books, but I believe my
3    personal law books are still there. I also owned a
4    partial set of the Southern Reporter series.
5    That's my personal property, which was physically
6    located there last Friday when we inspected.
7        Q.    And are those items described on
8    Exhibit. . ?
9        A.    4?
10       Q.    Is it? Exhibit 4?
11       A.    Exhibit 4, yes.
12            MR. SNEED:    That's actually mine.
13            MR. SHAPLEY:    Oh, I'm sorry.
14            MR. SNEED:    That's okay.
15   MR. SHAPLEY, CONTINUED:
16       Q.    Are they described on Exhibit 4 as
17   personal items that you saw there?
18       A.    Yes, yes.
19       Q.    Okay. And --
20       A.    Now, do you want me to describe the
21   personal possessions that staff members left behind
22   that I'm aware of?
23       Q.    Sure.
24       A.    All right. I understand that Melinda
25   Gantt had her notary seal, her notary logbook, a

Page 87

1    radio and CD player, I think a coffee cup, and
2    maybe a few other items that she was unable to take
3    with her on January 13th when I understand
4    Mr. Wyatt terminated the staff.
5            And when we went to the office last Friday
6    to look for these things, we discovered that they
7    had been thrown away. I don't know that Beth
8    Clatworthy had any personal possessions there. I
9    don't think Judy Groff did.
10       Q.    Okay. Do you remember any personal items
11   that Mr. Wyatt brought and put into that office?
12       A.    He brought a Herman Miller chair that he
13   says he brought from Barrett law office when he
14   worked there. I think he had some, you know, wall
15   hangings of some sort.
16            He purchased a brass and black-colored
17   lamp for his office. He may have had some personal
18   law books. I don't recall anything else of Derek's
19   personal property that was located in Wyatt &
20   McAlister.
21       Q.    Okay. Just one second, please.
22            In addition to the furnishings, computer
23   equipment, things of that nature, were there hard
24   files and electronic files that were moved from one
25   of the Nutt entities over to the Wyatt & McAlister

Page 88

1    building?
2        A.    Yes.
3        Q.    And could you describe what files those
4    were?
5        A.    Well, hard copy files, we brought with us
6    pertinent files from the Nutt building for the
7    cases that I was continuing to handle for the Nutt
8    entities. Those were Kuhlman files --
9        Q.    K-u-h-l-m-a-n?
10       A.    Yes. I think Mr. Sneed's familiar with
11   that. He was --
12       Q.    He's not having to --
13       A.    -- the special master in that.
14       Q.    He's not doing the typing.
15       A.    So we had Kuhlman files, Vioxx litigation
16   files, Avandia litigation files -- Avandia files.
17   We had possibly some Money Store files. We had
18   actual litigation files of lawsuits between Nutt
19   entities, David and me, individually, from various
20   people --
21       Q.    Yep.
22       A.    -- were there.
23       Q.    Katrina files?
24       A.    Katrina files? Yes -- well, yes. There
25   were portions of Katrina files taken to -- yeah.

Page 89

1    Were taken to Wyatt & McAlister.
2        Q.    Okay. And was electronic information
3    transferred from the Nutt entities to --
4        A.    Wyatt --
5        Q.    -- computer equipment at Wyatt &
6    McAlister? And describe that for Mr. Sneed and the
7    court.
8        A.    I understand portions of Nutt &
9    McAlister's electronic data pertaining to the
10   Katrina litigation was transferred, as well as
11   electronic data pertaining to the other cases that
12   I was continuing to conclude for the Nutt entities.
13       Q.    Okay. All right. Do you know what case
14   files were opened by Wyatt & McAlister after you
15   got there? In other words, which ones were not
16   transferred by the Nutt entities over there?
17       A.    Wyatt & McAlister's book of business, if
18   you will, included online travel company litigation
19   files, defective laptop litigation files, Heparin
20   cases, claims against American Express and AOL.
21            There was a car wreck case, Davis versus
22   Hill. There was a small matter, a dispute between
23   a house purchaser and a realtor and the seller.
24   That was the Mark Patrick file, I believe.
25       Q.    Yeah.

Page 90

```
 1      A.  And that's -- let me look.  There may be a
 2   few other of Wyatt --
 3      Q.  Okay.  Well, you can refresh your memory
 4   with any of the exhibits that have been introduced.
 5      A.  Oh, yeah.  Hot gas litigation file
 6   materials were there.
 7          MR. SNEED:  Did you say hot gas?
 8          MR. SHAPLEY:  Hot gas.
 9          THE WITNESS:  Hot gas.  And that's
10   all I recall at this moment, Chris.
11          MR. SHAPLEY:  Okay.  Just a second.
12   MR. SHAPLEY, CONTINUED:
13      Q.  Now, Exhibit 5, I understand that
14   Mr. Wyatt did return some files to the Nutt
15   entities that were in his possession, correct?
16      A.  Yes.
17      Q.  Okay.
18      A.  Some --
19      Q.  Is Exhibit 5 a description of the files
20   that are still in his possession, based on this
21   document?
22      A.  As far as I know.
23      Q.  Okay.  But I mean, Exhibit 5 would not
24   include the files he's returned?
25      A.  That's correct.
```

Page 91

```
 1      Q.  Okay.
 2          MR. SHAPLEY:  That's all we have at
 3   this time.
 4          MR. SNEED:  All right.
 5   Cross-examination?
 6          MR. WYATT:  Do you have the exhibit,
 7   Chris?
 8          MR. SHAPLEY:  Which one?
 9          MR. WYATT:  The one -- the first one.
10   The next --
11          MR. SHAPLEY:  The first one we
12   introduced?
13          MR. WYATT:  Yeah.  No, I think it's
14   the global one.
15          MR. SHAPLEY:  3?
16          MR. WYATT:  Yeah.
17          MR. SHAPLEY:  Let me do this.  Let me
18   give you --
19          MR. WYATT:  No, not that one.
20          MR. SHAPLEY:  Okay.  Which one?
21          MR. WYATT:  I can't see.  I've got my
22   glasses off.
23          MR. SHAPLEY:  4?
24          MR. WYATT:  I think it's this right
25   here.
```

Page 92

```
 1          MR. SHAPLEY:  That's yours.
 2          MR. WYATT:  Yeah, right.
 3          MR. SHAPLEY:  Yeah.  This is yours.
 4          MR. WYATT:  That's right.  Yeah.  You
 5   can just put that up.
 6          MR. SHAPLEY:  All right.
 7          CROSS-EXAMINATION
 8   BY MR. WYATT:
 9      Q.  If you'll turn to the first exhibit there
10   underneath that index.  It's an index on the front
11   essentially.  And that's an e-mail, right?  Take a
12   second and look at it, and I'm just asking you if
13   you recall it and what that concerned.
14      A.  I vaguely recall it.  I object to it,
15   because apparently it's been edited.
16      Q.  Okay.
17      A.  I don't have the complete document in
18   front of me.
19      Q.  Okay.  Well, it -- as best you understand
20   it, is that your e-mail?  Can you recognize that
21   you wrote that e-mail on the top there?
22      A.  Yes.  And I recognize you wrote the
23   beginning e-mail on that page.
24      Q.  Okay.  So it's two e-mails, and they're
25   dated in August of 2008, right?
```

Page 93

```
 1      A.  Yes.
 2      Q.  And what's the subject matter, generally?
 3   What's it relate to?
 4      A.  Well, you're the one that put the subject
 5   matter on it, Derek, and you've got "Sale of a Law
 6   Practice, Rules of Professional Conduct" as your
 7   reference line.
 8      Q.  Okay.  And why would I be sending you a
 9   rule from the professional responsibility group
10   about the sale of a law practice?
11      A.  Because you're constantly up in the middle
12   of my business, and you're apparently independently
13   doing research about some matter, business matter
14   between David Nutt and me.
15          MR. WYATT:  I move to strike that
16   answer.
17   MR. WYATT, CONTINUED:
18      Q.  Ms. McAlister, do you agree or disagree
19   that you had discussed with me in August of 2008
20   your purchasing David Nutt's interest of Nutt &
21   McAlister so that we could use that to found a new
22   law firm?
23      A.  Absolutely deny that I --
24      Q.  You deny that?
25      A.  -- intended to --
```

24 (Pages 90 to 93)

Page 94

1     MR. SNEED: Let her finish her
2  answer.
3     MR. WYATT: Okay.
4     THE WITNESS: That I ever --
5     MR. SNEED: Derek, don't interrupt
6  her. Go ahead, ma'am.
7     THE WITNESS: We had discussions --
8  you and I had discussions about many things at many
9  times. And you knew that I hoped to buy out David
10 Nutt's interest in Nutt & McAlister and acquire it
11 for myself. And you, not asked for by me,
12 apparently took it upon yourself to do legal
13 research.
14 MR. WYATT, CONTINUED:
15    Q. Okay.
16    A. About my hope for acquisition of Nutt &
17 McAlister.
18    Q. Okay. Is the answer to my question that
19 you deny that you discussed with me acquiring the
20 residual interest of Nutt & McAlister so that we
21 would form a law firm? Did you -- do you deny
22 that? Just yes or no.
23    A. I never discussed with you my acquisition
24 of Nutt & McAlister in order to turn it over to you
25 or Wyatt & McAlister.

Page 95

1     MR. WYATT: I move to strike the
2  nonresponsive part.
3     MR. SHAPLEY: Asked and answered.
4     MR. SNEED: I think it is responsive,
5  and I would overrule your objection.
6  MR. WYATT, CONTINUED:
7     Q. Okay. Look at Exhibit 2, please. Is that
8  your memo?
9     A. I think so.
10    Q. Okay. Did you accurately record into this
11 memo what actually happened, or is there anything
12 in there that's erroneous?
13    A. Best of my knowledge, it's accurate.
14    Q. So you did talk with David Nutt about
15 acquiring his interest in Nutt & McAlister, right?
16    A. Yes.
17    Q. And you asked him about whether Merkel
18 would be a good lawyer to pursue claims against --
19    A. Yes. I just testified everything --
20    Q. I'm sorry --
21    A. -- in this memo is accurate.
22    Q. Excuse me. We're speaking over each
23 other. I'm sorry. Maybe I'm speaking too fast.
24    My only question to you was: You
25 discussed with him whether or not Merkel would be a

Page 96

1  good lawyer to pursue claims against Scruggs. Is
2  that correct?
3     A. Yes.
4     Q. Okay. So is there anything in this memo
5  that is not accurate as you look at it?
6     A. No.
7     Q. And it's true that you met with Chris
8  Shapley, your attorney, about this acquisition of
9  David Nutt's interest in Nutt & McAlister after
10 David had approved of this. Isn't that right?
11    MR. SHAPLEY: I think you misspoke.
12 Did you say an acquisition -- say that again. I'm
13 sorry.
14 MR. WYATT, CONTINUED:
15    Q. Okay. It's true that you met with Chris
16 about acquiring the residual interest in Nutt &
17 McAlister after David consented that he would sell
18 it?
19    A. No. I don't have any memory of anything
20 happening like that.
21    Q. Okay. In the first paragraph where it
22 says, "He said Shapley had mentioned that as a
23 possibility," is that an accurate statement?
24    A. That David Nutt said that Shapley had
25 mentioned that as a possibility, yes. That's

Page 97

1  something David said to me, yes.
2     Q. Okay. And so later did you confirm any of
3  this with Chris Shapley is what I'm getting at.
4     MR. SHAPLEY: I'm going to object to
5  Meg testifying about any discussions she had with
6  her counsel about anything and instruct her not to
7  answer.
8     MR. SNEED: Okay.
9     MR. WYATT: I don't know that he's
10 acting as her counsel in this situation. I'm
11 not -- I think David Nutt's testified that they
12 were acting as his counsel, but --
13    MR. SHAPLEY: Well, I don't know
14 exactly which conversation we're talking about, but
15 Meg needs to be aware of -- I don't know which
16 conversation you're talking about and when it
17 occurred.
18    But I'm just saying, if it involved a
19 matter I was handling for her law firm, which she
20 was an owner, then that would be privileged.
21    MR. SNEED: All right. You know, it
22 gets into issues -- for the record, we're talking
23 about global Exhibit 1, that is yet to be
24 introduced into evidence. It is marked for
25 identification only.

25 (Pages 94 to 97)

Page 98

1    We're -- my understanding is the
2  question -- cross-examination in reference to a
3  document dated September 8, '08. Quite frankly,
4  I'm unclear who prepared this document. I'm
5  unclear where the document came from.
6    You know, when you get into
7  privileged situations or privileged issues, there's
8  a question of intent and -- regarding
9  attorney-client privileges, and a question of
10  whether that communication, which could be
11  initially privileged, was ultimately disseminated
12  to third parties, which you may lose the privilege.
13    So there are a lot of issues
14  regarding this document, which the privilege may or
15  may not extend to. So I guess, Meg, my question
16  is: Who prepared the September '08 document?
17    THE WITNESS: I did.
18    MR. SNEED: And do you know how this
19  document came to be in Mr. Wyatt's possession?
20    THE WITNESS: I do not.
21    MR. SNEED: Did you authorize the
22  dissemination of this document to Mr. Wyatt, the
23  communication of this document?
24    THE WITNESS: Not that I recall.
25    MR. SNEED: All right. Derek, you

Page 99

1  can follow that up with regard to any question that
2  you might have regarding the privileged nature of
3  this document. Based on what I've heard up to this
4  point, she consulted with her counsel. There were
5  communications between her and her counsel.
6    It's privileged, unless you give me
7  some information that tells me that that privilege
8  was lost for some reason.
9    MR. WYATT: So do I understand,
10  Bobby, that you're ruling that this document is
11  subject to attorney-client privilege?
12    MR. SNEED: No. I'm saying that on
13  its face, there are references in here in this
14  document to conversations with her attorney. You
15  were asking her about conversations with her
16  attorney. Are we all still talking about the same
17  document?
18    MR. WYATT: I don't think --
19    THE WITNESS: Yeah.
20    MR. WYATT: I think there's maybe a
21  misconception here. I don't think anywhere it says
22  in here that she's consulting with her attorney.
23  It's David Nutt talking about he had discussed with
24  Chris Shapley the sale of his interest, and Meg
25  McAlister's confirming it's okay with David. He's

Page 100

1  checked with Shapley, and everything's okay.
2    MR. SHAPLEY: And I'm fine with that
3  part.
4    MR. WYATT: That's what it says --
5    MR. SHAPLEY: I don't know what
6  you're -- I'm not arguing about that.
7    MR. WYATT: That's -- that's --
8    MR. SHAPLEY: Can I just finish what
9  I'm saying?
10    MR. WYATT: Sure.
11    MR. SHAPLEY: At various times I
12  counseled with David, and at various times I
13  represented Nutt & McAlister. And I don't know
14  exactly what conversation he's asking this witness
15  about.
16    And all I'm saying to Meg is, be
17  careful that whatever he's asking you about, that I
18  wasn't representing your firm at the time. You
19  know.
20    MR. SNEED: Okay.
21    MR. SHAPLEY: I just don't know
22  until --
23    MR. SNEED: I don't know either.
24    MR. SHAPLEY: I don't know.
25    MR. SNEED: Okay.

Page 101

1    MR. SHAPLEY: So I'm not objecting to
2  anything on the floor yet. I'm just saying just be
3  careful and understand the time frame and who --
4    MR. SNEED: Okay. Your caution --
5    MR. SHAPLEY: -- who was involved.
6    MR. SNEED: -- to Meg is noted. I'm
7  not even sure where we were, but go ahead.
8  MR. WYATT, CONTINUED:
9    Q.  This document was on Wyatt & McAlister's
10  computer system, was it not?
11    A.  I don't know.
12    Q.  You have no knowledge of that?
13    A.  I do not. Because for one thing, the date
14  of it predates our even moving to Wyatt &
15  McAlister. So I suspect this was prepared while we
16  were still physically located at the Nutt building.
17    Q.  But you know that the data that was in
18  the Nutt building was copied and put on the Wyatt &
19  McAlister server. You've already --
20    A.  Some data was.
21    Q.  -- acknowledged that.
22    A.  Not all of it, but some data was.
23    Q.  Okay. But you just don't know whether
24  this memo was or not. That's what you're saying,
25  right?

26 (Pages 98 to 101)

Page 102

1    A.  Correct.  I don't know.
2    Q.  Okay.  It is your memo, though.  No
3  question about that.
4    A.  I've answered that four times --
5    Q.  You've --
6    A.  -- yes, I wrote this.
7       MR. WYATT:  Okay.  Well, we would
8  offer it.  We move to admit it.
9       MR. SNEED:  Are we offering separate
10  portions of Exhibit 1 into evidence?
11       MR. WYATT:  I guess so, unless she
12  wants to go through the whole document and then
13  authenticate.  It's going -- a lot of it is going
14  to be hers, you know, in here.  I mean, a lot of
15  this is hers, her creation.  So you know, we can do
16  it page by page.  We can -- you know.
17       MR. SNEED:  I mean, she's your
18  witness right now.  You've got her on cross, and I
19  defer to y'all as far as how you do this.  Off the
20  record.
21          (OFF THE RECORD.)
22       MR. SNEED:  Okay.  My understanding
23  is that what we've agreed to do is Derek has
24  reserved his right for cross-examination with
25  regard to Meg, and Derek is going to present his

Page 103

1  evidence in his case-in-chief at this time.
2       MR. TUCKER:  Okay.
3       MR. SNEED:  Everybody okay with that?
4       MR. SHAPLEY:  I'm fine with it.
5       MR. TUCKER:  I'm fine with that.  Let
6  the record show that I'm Davey Tucker, and I
7  represent Derek Wyatt in the matter.  And we're
8  taking Derek at this point in the file to take his
9  testimony on direct.  And that we're taking
10  Ms. McAlister at a later time.
11       MR. SNEED:  Okay.  That's fine.
12  Derek's first witness.
13          DEREK WYATT,
14       having been first duly sworn,
15       was examined and testified as follows:
16          DIRECT EXAMINATION
17  BY MR. TUCKER:
18    Q.  State your name for the record.
19    A.  Derek Wyatt.
20    Q.  And are you a member of the law firm of
21  Wyatt & McAlister?
22    A.  Yes.
23    Q.  Is that an active corporation, LLC?
24    A.  It's an LLC that's subject to a
25  judicial -- pending judicial dissolution.

Page 104

1    Q.  Correct.  And that's the purpose we're
2  here today.  Is that right?
3    A.  That's correct.
4    Q.  All right.  In that regard, have you --
5  for the court's information, have you prepared
6  documents to present today to the court?
7    A.  Yes, I have.
8    Q.  Okay.  And is that described as Exhibit 1
9  for identification only?
10    A.  Yes, it is.
11    Q.  Okay.  Do you have those documents in
12  front of you at this time?
13    A.  I do.
14    Q.  Could you present to the court in your own
15  language what the nature of these documents are?
16    A.  Certainly.  This -- all of these documents
17  are documents that were in the possession and
18  control of the Wyatt & McAlister law firm at some
19  point in time.  That would include even documents
20  that might have been created over at the Nutt
21  office earlier.
22       But when we set up Wyatt & McAlister, a
23  computer company was hired, BCI, specifically to
24  transfer the data and put it over into Wyatt &
25  McAlister's offices.  They also provided us a link

Page 105

1  into the Nutt office, because we were doing work to
2  be billed back to the Nutt entities, and they were
3  to pay our firm for that work.
4       So all of these documents are and were in
5  the possession of the Wyatt & McAlister law firm.
6    Q.  Okay.  What was your -- well, what was the
7  Wyatt & McAlister law firm's agreements as you
8  understood them with the Nutt entities?
9    A.  Okay.  When David Nutt announced that he
10  was retiring from law practice, and this is after
11  we were disqualified in the Katrina litigation,
12  which occurred on April the 4th, 2008, he had his
13  attorneys prepare an agreement that divested Nutt &
14  McAlister of all of its Katrina assets, which was
15  all Nutt & McAlister essentially had at that time.
16       There might have been something
17  tangential, but that was the book of business at
18  Nutt & McAlister.  When that happened, subsequently
19  Ms. McAlister and I, to continue practicing law,
20  formed a new law firm.
21       Part of the agreement with the Nutt office
22  was that since David was retiring from law
23  practice, he wanted to hire us, our law firm, using
24  employees who used to work in his office who were
25  already familiar with his business -- Beth

Page 106

1  Clatworthy, Melinda Gantt, Judy Groff -- to do work
2  on his files, his PA and PC files, and we would
3  bill that business back to him. And they kept
4  their hourly time and so forth.
5      Q. Did Wyatt & McAlister employ those
6  particular employees of Nutt & McAlister?
7      A. We employed them because that was the
8  agreement that he made with us. Otherwise, we
9  would have not employed them, because it was a
10  tremendous overhead item.
11      But we figured the overhead would be
12  offset by the fact that we would have them working,
13  part of the time at least, on the wrap-up of his PC
14  and PA business, and that would provide income to
15  the Wyatt & McAlister firm.
16      Q. Okay. So as it's set up on that, what was
17  your understanding from Nutt & McAlister as to what
18  consideration would be given to Wyatt & McAlister
19  for the transfers, or what agreements did you have?
20      A. Okay. Restate that a little bit.
21      Q. Well, I don't know if I can or not. But
22  was there any further consideration for the
23  transfer of the properties or from the files from
24  McAlister -- I mean, Nutt & McAlister over to Wyatt
25  McAlister?

Page 107

1      A. There was. And if I may, just if I can
2  describe the agreement, I think that will make it
3  clear.
4      Q. Good.
5      A. The options available to us when David
6  announced he was retiring and told us we would all
7  come to a layoff point, which we did on
8  October 15th, 2008, the options were that we
9  just -- if Ms. McAlister and I decided we'd go into
10  business, we'd go into business raw. Just cold.
11  We'd go out there and just hang out a shingle.
12      That didn't look good. If David was going
13  to dissolve Nutt & McAlister, which he had said,
14  the sensible thing to do was to allow
15  Ms. McAlister, who was a putative at least, 20
16  percent owner of Nutt & McAlister, to acquire the
17  residual interest of David so that that would
18  become a platform for us to continue practicing
19  law.
20      It provided hard assets, such as furniture
21  and computers, which were going to be dispensed
22  with if he was just going to dissolve the law firm
23  anyway. And it also provided an opportunity for us
24  to generate some immediate business by billing back
25  to him. That's what we call the bill-back

Page 108

1  arrangement.
2      We brought these three employees with us
3  so that we could put them to work on the wrap-up of
4  his PA and PC business and bill it back to him,
5  which would be income to us. So there was an
6  additional consideration, which was discussed
7  greatly, and that was the question of any causes of
8  action that Nutt & McAlister may have derived as a
9  result of the unfortunate thing that happened in
10  Katrina.
11      And that was discussed in great detail,
12  and it was agreed that we were acquiring that too.
13  We were acquiring the right to pursue any claims
14  that -- meritorious claims that existed as a result
15  of the massive disqualification we suffered and
16  loss of assets in Katrina.
17      And that included many things, but for me,
18  it included a tremendous amount of work that I had
19  done that I got no compensation for whatsoever.
20      Q. All right. Let me interrupt you a second.
21  In the transition from the Nutt & McAlister
22  entities over to the Wyatt & McAlister, LLC, did
23  you or did Wyatt & McAlister rely upon anything
24  that David Nutt represented to Wyatt & McAlister
25  that he would do to help as far as contributing to

Page 109

1  Wyatt & McAlister either financially or by
2  furniture or anything else? Let's go over the
3  furniture part.
4      A. Well, what we relied on was his
5  representation that he was agreeable to selling the
6  hard assets, which amounted -- it was de minimus.
7  The figure that was being discussed was between 5
8  and $10,000. I'm talking now computers and
9  furniture and all this type of thing.
10      It was de minimus. There was no big
11  concern about that. We relied on him -- you know,
12  he agreed to do that, and pursuant to that, we
13  spent $5,000 moving all that stuff.
14      Q. Who is we?
15      A. Well, Wyatt & McAlister firm.
16      Q. Okay.
17      A. If I may, you know, I can offer this to
18  you, which explains it pretty good. If you'll look
19  in these documents, Exhibit 4. Okay. This says --
20      Q. Let me get this straight. Is this
21  Exhibit 4, is that the Exhibit 4 that we've got in
22  the record?
23      A. No, no. It's global.
24      Q. I'm sorry. It's in here global.
25      A. In this global one.

28 (Pages 106 to 109)

Page 110

1    Q. Okay. I just wanted to make sure on the
2 record.
3    A. I'm sorry. Yeah, it's exhibit marked
4 No. 4 in global 1.
5    Q. Okay.
6    A. Okay. You note that the top of this says,
7 "Memo to Brunini re Dissolution of N&M." Now, this
8 is Ms. McAlister's own document here. This
9 document is dated the exact day that we formed
10 Wyatt & McAlister, September 22nd, 2008. And the
11 reason she's going through and listing all this --
12    Q. Now, let me interrupt you one more time.
13 I won't do it again, I promise. But let's do this.
14 Who prepared this Exhibit 1, all these documents?
15 Who prepared those documents?
16    A. The exhibit itself?
17    Q. Yeah.
18    A. I prepared the exhibit.
19    Q. Okay. Were those -- were you the
20 record-keeper at Wyatt & McAlister?
21    A. Certainly.
22    Q. Did you maintain all the records and the
23 books of the --
24    A. Certainly I'm qualified to testify these
25 are authentic records that were on Wyatt &

Page 111

1 McAlister's computer system at all times and
2 accessible to me and other people.
3    Q. You've got some 40 -- 52 documents that
4 are attached in this global exhibit for
5 identification only. Are all these documents true
6 and correct?
7    A. To the best of my knowledge, they are.
8    Q. And are they all authentic and prepared by
9 you as the --
10    A. Well, they're not all authored by me.
11    Q. Right. But they --
12    A. But they are all authentic business
13 records of Wyatt & McAlister, lawfully in its
14 possession at all times as far as I know.
15    MR. TURNER: Then I'd like to offer
16 these as a composite exhibit, if it please the
17 court, at this time as Exhibit --
18    MR. SNEED: 1. Global Exhibit 1 is
19 what we marked it.
20    MR. SHAPLEY: We object to that for a
21 number of reasons. The proper foundation has not
22 been laid. You know, if we're talking about
23 Exhibit 4, which is part of global Exhibit 1, and
24 Derek's telling me he prepared this document, then
25 I don't have any objection to this document.

Page 112

1    But I mean, we've got -- we've got a
2 lot of documents in here I know for a fact Derek
3 not prepare. He might have lifted them off the
4 computer, but that doesn't mean that he had a right
5 to, number one, or number two, that they are a
6 business record of Wyatt & McAlister.
7    A lot of them were generated in --
8 right on the face by Nutt & McAlister. So -- and
9 when Meg was with Nutt & McAlister. And how he got
10 possession of them, you know, I don't know. But we
11 need to handle these things, you know, one by one.
12    MR. TUCKER: Well, I don't think so,
13 Your Honor. At this time, we've offered them as
14 the records of Wyatt & McAlister, the official
15 records of Wyatt & McAlister. And they're only
16 being offered for that purpose, and that these are the
17 records of Wyatt & McAlister. I don't know how
18 else we'd get them in without offering them in that
19 manner.
20    MR. SHAPLEY: Well, one by one.
21    Yeah. Well, I mean, just because they put them in
22 a big stack doesn't mean that they're all
23 admissible.
24    MR. TURNER: I understand. Well,
25 then --

Page 113

1    MR. SNEED: Well, let me jump in.
2 All right. Derek has testified that these are
3 authentic business records maintained in the course
4 of the business of Wyatt & McAlister. Now, I
5 understand you don't accept that.
6    MR. SHAPLEY: All right.
7    MR. SNEED: But that's what Derek has
8 testified to.
9    MR. SHAPLEY: Right.
10    MR. SNEED: Would you like to voir
11 dire the witness on that?
12    MR. SHAPLEY: Yeah, sure.
13    MR. SHAPLEY: Do it one by one.
14    VOIR DIRE EXAMINATION
15 BY MR. SHAPLEY:
16    Q. Mr. Wyatt, when was Wyatt & McAlister
17 formed?
18    A. It was formed September 22nd, 2008.
19    Q. Okay. 9/22/2008. So any documents that
20 are dated before that date would not have been
21 generated in the usual and ordinary course of the
22 business of Wyatt & McAlister, would it?
23    A. The origin of the document may have
24 predated Wyatt & McAlister. But as I testified to
25 earlier, when we moved to the Wyatt & McAlister

29 (Pages 110 to 113)

Page 114

1  firm, it was explicitly agreed, and we spent a
2  pretty great sum of money to have all the data that
3  we had created over in Nutt's office moved over to
4  our server, and that was done.
5      Q.  Okay.
6      A.  And so those records were -- after that
7  point in time, were always part of Wyatt &
8  McAlister's records.
9      Q.  Okay.  But you do agree that many of these
10  documents in global Exhibit 1 were generated by or
11  on behalf of the law firm of Nutt & McAlister?
12     A.  I think it's probably very few, Chris.
13     Q.  Okay.  Well, let's go through them, and
14  you can identify them.
15     A.  Okay.
16     Q.  Exhibit 1.
17     A.  Yeah.  Exhibit 1 was created over at the
18  Nutt office, but was put onto the Wyatt & McAlister
19  server.
20     Q.  All right.  Exhibit 5.  This is Exhibit 5
21  within global Exhibit 1.
22     A.  Yes.
23     Q.  All right.  Exhibit 5.
24     A.  Exhibit 5 was an e-mail that was
25  originally generated at Nutt's office and was put

Page 115

1  on Wyatt & McAlister's server.
2      Q.  Okay.  Exhibit 8.
3      A.  Exhibit 8 was -- that's a tough call,
4  because we were all terminated on 10/15/2008, and
5  you notice this document is dated 10/28/2008.
6  Although we were in the process of sort of moving
7  in, so this one might be falling into between the
8  cracks.  But nonetheless, this was on Wyatt &
9  McAlister's server at all times and has been and
10  probably is today.
11     Q.  Okay.  When 8 was generated, was it
12  generated by, as it says, the Nutt & McAlister law
13  firm?
14     A.  I really don't know that.  That's her
15  boilerplate signature for her e-mail.  So I really
16  don't know that, because we were out of the office
17  as of 10/15.  There was no more -- we weren't
18  working at the Nutt office.
19     Q.  Okay.  You agree with me Exhibit 8 says
20  Nutt & McAlister on it, right?
21     A.  It says it on her signature, that's
22  correct, uh-huh.
23     Q.  Okay.  Exhibit 10.
24     A.  Exhibit 10.  I assume you have a question.
25     Q.  Exhibit 10 also says Mary E. McAlister,

Page 116

1  Nutt & McAlister, PLLC.
2      A.  It does, uh-huh.
3      Q.  Exhibit. . .
4      MR. SNEED:  Chris, how do you address
5  Derek's position that whether these documents
6  predated Wyatt & McAlister or postdated Wyatt &
7  McAlister and were created or generated by entities
8  other than Wyatt & McAlister -- it's my
9  understanding Derek's testimony is that Wyatt &
10  McAlister obtained possession and ownership of
11  these documents, and that these documents were
12  maintained in the normal and usual course of
13  business of Wyatt & McAlister.
14      I understand you don't agree with
15  that proposition, but that's Derek's testimony.
16      MR. SHAPLEY:  Right.
17      MR. SNEED:  Why does that not lay the
18  foundation for the admissibility of the documents?
19      MR. SHAPLEY:  Well, it may, in fact,
20  establish that they were maintained on the server
21  at Wyatt & McAlister, and I understand that.  It
22  doesn't necessarily make them relevant to what
23  we're here about today, and that is, what are the
24  assets of Wyatt & McAlister.
25      So I would want to look at each and

Page 117

1  every document and reserve my objection on the
2  relevance of them to the issues here.  And many of
3  these documents -- some of them discuss the assets
4  that are going to be bought, sold, transferred,
5  whatever, and some of them had nothing to do with
6  that.
7      So, I mean, I'd like to save time and
8  say, Okay, we'll just put all this in.  But unless
9  it's relevant to what we're here about today, I
10  can't do that.
11      MR. SNEED:  I understand.  Okay.
12  Well, your response is relevance.
13      MR. SHAPLEY:  Could be.  It is
14  relevance on some of these.  You know, and I'm
15  not -- you know, I don't know for a fact, but, I
16  mean, obviously Derek testified that these were
17  lifted off of the Wyatt & McAlister system at some
18  point, and I'm not disputing that.
19      MS. MCALISTER:  If I may --
20      MR. WYATT:  I would quibble a little
21  bit with the term "lifted."  They weren't -- they
22  weren't lifted.  They were -- they were
23  purposefully duplicated and put on the Wyatt &
24  McAlister server with everyone's consent and
25  knowledge and approval and everything, and they

30 (Pages 114 to 117)

Page 118

1 became our records.
2        You remember, Nutt & McAlister is
3 dissolving. And so, you know, they don't --
4 they're not doing anything more. There's no
5 employees there. And so whatever records were
6 created there were of importance to Wyatt &
7 McAlister, of course, since it was proposing to
8 purchase the 80 percent interest of David Nutt and
9 Nutt & McAlister.
10        MR. SHAPLEY: Well, I know Meg
11 doesn't agree with some things Derek said.
12        MR. SNEED: Of course, she doesn't.
13        MR. SHAPLEY: We'll just have to put
14 Meg back on the stand to address that.
15        MR. SNEED: Okay.
16        MR. SHAPLEY: But I understand this
17 is Derek's testimony.
18        MR. SNEED: I understand. And I
19 realize that there's probably very little y'all
20 agree on.
21        MR. SHAPLEY: That's probably true.
22        MR. SNEED: All right. Davey, Meg
23 has raised relevance issues as to some or all of
24 these documents. You're presenting me with
25 a hundred and -- I said earlier 100 to 150

Page 119

1 documents. I have no idea how many documents there
2 are.
3        Just saying, "Hey, it's a business
4 record, admitted" -- it may be a business record,
5 and based on Derek's testimony, I understand that
6 you feel like you laid a foundation for that. What
7 about the relevance issues? How can I just accept
8 as relevant all of these documents?
9        And believe me, I'd love to cut to
10 the chase, but I don't know just sticking a bunch
11 of documents in that may or may not be relevant
12 really accomplishes anything.
13        MR. TUCKER: I don't see why they all
14 wouldn't be relevant. They were all maintained by
15 Wyatt & McAlister. They were all received from
16 Nutt & McAlister. They had agreements between the
17 two of them. Obviously Nutt & McAlister wanted
18 Wyatt & McAlister to have those documents. So I
19 mean --
20        MR. SNEED: Well, the fact that the
21 document was maintained at Wyatt & McAlister
22 doesn't necessarily mean it's relevant to ownership
23 of the assets of Wyatt & McAlister. And I think
24 that's the point they're making.
25        MS. MCALISTER: If I may interject

Page 120

1 here -- and I'm sorry to interrupt. There's also a
2 question as to when and how these documents were
3 taken from a Nutt entity and moved to Wyatt &
4 McAlister.
5        MR. SNEED: I understand.
6        MS. MCALISTER: Because there was a
7 considerable amount of raiding going on by
8 Mr. Wyatt in November, December, and January,
9 tapping into the Nutt server system and
10 transferring things to himself by e-mail.
11        MR. SNEED: Okay.
12        MR. SHAPLEY: Well, that -- I
13 understand that -- that is our position. All I'm
14 saying is I know -- I heard what Derek testified
15 to, but we're going to have to put Ms. McAlister
16 back on to contradict that.
17        MR. SNEED: I know. I know.
18        MR. SHAPLEY: So. . .
19        MR. TUCKER: Well, just suggest this,
20 apparently Ms. McAlister knows as much as Mr. Wyatt
21 does about these documents. Why don't we let them
22 look at the documents and tell us which ones that
23 they don't agree with, and then we can argue the
24 ones that we don't agree with rather than all the
25 ones we do. And let's get a continuance and come

Page 121

1 back another day.
2        MR. SNEED: I don't think we want a
3 continue --
4        MR. SHAPLEY: We don't want to do
5 that.
6        MR. SNEED: -- this case.
7        MR. TUCKER: How can --
8        MR. SNEED: Do you want to make
9 specific objections to specific documents, or do
10 you want to --
11        MR. SHAPLEY: Well, why don't I just
12 do that?
13        MR. SNEED: Okay.
14        MR. SHAPLEY: I'll just -- I'll just
15 go through it real quick, and I'll say relevant or
16 not relevant.
17        MR. SNEED: All right.
18        MR. SHAPLEY: These are all within
19 global exhibit --
20        MR. SNEED: 1.
21        MR. SHAPLEY: 1.
22        (OFF THE RECORD.)
23        MR. SNEED: Yes, sir.
24        MR. SHAPLEY: Ready? We have no
25 objection to the relevance of any documents in

Page 122

1  global Exhibit 1. We reserve the right to
2  cross-examine this witness and to put Ms. McAlister
3  on to contradict the testimony of Mr. Wyatt as to
4  how it came into his possession.
5        And I'd specifically like to voir
6  dire him on Exhibit 36, to which we do not agree is
7  relevant and to which we agree is a privileged
8  communication that was improperly lifted off of
9  Ms. McAlister's computer by Mr. Wyatt and which
10  Judge -- and which Judge Brewer has previously
11  declined to offer into evidence for that very
12  reason in proceedings before her.
13        MR. SNEED: Okay. All right.
14        MR. SHAPLEY: I'd like to voir dire
15  him on Exhibit 36 within global Exhibit 1.
16        MR. SNEED: Okay.
17        MR. WYATT: Chris, one question, my
18  36 doesn't look like your 36, and I'm not sure --
19        MR. SNEED: He's going to show you,
20  Derek. He'll show it to you. Go ahead and voir
21  dire.
22        MR. SHAPLEY: It should be the same.
23        MR. WYATT: In global 1, I've got an
24  e-mail as 36. And I'm not sure, did that come from
25  maybe some other --

Page 123

1        MR. SNEED: This is my global 1
2  Exhibit 36.
3        MR. WYATT: That's the one that he's
4  got.
5        MR. SHAPLEY: I don't know what
6  you've got there, Derek, but we've got -- 36 is
7  on -- described as *the document I had*.
8        MR. WYATT: Okay. Then it must be my
9  problem. You know, this exhibit's got something
10  wrong with it.
11        MR. SHAPLEY: Where is the real
12  Exhibit 1?
13        MR. WYATT: This is the real
14  exhibit --
15        MR. SHAPLEY: Okay.
16        MR. WYATT: No. I guess it's over
17  there.
18        MR. SHAPLEY: I want to make sure
19  what this is, the one that's been marked for
20  identification.
21        MR. TUCKER: Is that it?
22        MR. SHAPLEY: No. See, that's the
23  problem, is the real Exhibit 1 has another
24  Exhibit 36 than the one that the Hearing Officer
25  has and the one that I have. So. . .

Page 124

1        (OFF THE RECORD.)
2        VOIR DIRE EXAMINATION
3  BY MR. SHAPLEY:
4    Q.  Mr. Wyatt, directing your attention to
5  Exhibit 38 within global Exhibit 1, what is that?
6    A.  It is a part of a memo that Ms. McAlister
7  wrote that talks about a conversation she had with
8  Ernie Coward. That would be the CFO over at Nutt's
9  office. And it is addressing the fact that I had
10  written a demand letter in its first part.
11    Q.  So you had a written demand letter to who
12  at this point in time?
13    A.  To the Nutt office asking that they pay
14  the withheld Katrina money that they owed me.
15    Q.  When you say the Nutt office, you had
16  directed this demand letter to Nutt & McAlister,
17  had you not?
18    A.  I'd have to look at the letter to answer
19  that accurately, because I'm not sure how I, you
20  know, captioned it, whether I put --
21    Q.  All right.
22    A.  Okay.
23    Q.  Well, Nutt & McAlister was owned in part
24  by your then law partner, Meg McAlister, correct?
25    A.  I'm sorry. Was owned in part by her?

Page 125

1    Q.  Yes, yes.
2    A.  That's what I was told, yeah. I mean. . .
3    Q.  Okay. And you were practicing law with
4  her at this time on December 23, 2008, right?
5    A.  That's correct.
6    Q.  Right?
7    A.  That's correct.
8    Q.  And you're writing a demand letter to
9  another entity that she owned part of saying that
10  they owed you money, right?
11    A.  I don't know it's directed to that
12  entity --
13    Q.  Are you denying it was?
14    A.  No, I'm not denying, because I've already
15  said I --
16    Q.  Okay.
17    A.  -- would need to see the letter.
18    Q.  So you agree that you personally were
19  putting yourself in a position at that time adverse
20  to your own partner?
21    A.  No, not at all.
22    Q.  Okay. So your asking Nutt & McAlister
23  entity to pay you money, you're denying under oath
24  that that would be putting you personally in an
25  adverse interest to Ms. McAlister, who was a part

Professional Court Reporting, LLC
601.919.8662

Page 126

1  owner of the entity that you were asking to pay
2  you?
3      A.  No. Nutt & McAlister acknowledged, as
4  you'll see in this memo right here, that they owed
5  me money. What they were trying to do here is
6  arrange a way that they could phony up the
7  accounting records and reduce the sum of money they
8  owed me.
9      Q.  Okay. I understand that's what you're
10 saying. But you're claiming that's what Nutt &
11 McAlister was doing, right?
12     A.  I'm claiming that that's what anyone who
13 was the recipient to my asking that they honor what
14 they owed me, that -- you know, she's talking about
15 this is what she and Ernie are trying to do. She's
16 already told Ernie to remove these wrongful
17 accounting entries about the Brown and Rassier suit
18 (phonetic), and Ernie is saying to her, No, let's
19 leave them on there; that would reduce what we owe
20 him.
21     Q.  Okay. When you say "she," you're talking
22 about your law partner, Ms. McAlister?
23     A.  I'm talking about Ms. McAlister, yes,
24 uh-huh.
25     Q.  Okay. Now, isn't it a fact that you

Page 127

1  lifted this document off of her computer?
2      A.  I didn't lift anything.
3      Q.  How did you get -- how --
4      A.  There's no such thing as lifting them
5  off --
6      Q.  How did you get Exhibit 38 if you --
7      A.  I --
8      Q.  Let me ask the question.
9      A.  Okay. All right.
10     Q.  You're not the lawyer and the witness.
11 Okay.
12     A.  I'll answer it.
13     Q.  Isn't it true that you obtained Exhibit 38
14 by going into Ms. McAlister's computer?
15     A.  Going into her computer?
16     Q.  Yes.
17     A.  I obtained this document within Wyatt &
18 McAlister's office by looking at the computers that
19 are in Wyatt & McAlister's office, which I had
20 lawful access to. And this document was on what's
21 called the desktop of Ms. McAlister's computer.
22 Unprotected, no statement about attorney-client
23 privilege, no nothing. It's sitting there.
24         And this is after -- I obtained this
25 document after, mind you, the files were seized

Page 128

1  when she walked out, the bank account was drained.
2  All of this was done secretly. Yes. I went to
3  Ms. McAlister's computer.
4          I went to other computers in my office to
5  see what other documents had existed and been
6  created up to this idea that she was going to walk
7  out of the law firm and drain the bank account and
8  collapse it. Yes. That's what I was looking for.
9      Q.  And did you use Ms. McAlister's password
10 to access the information --
11     A.  No.
12     Q.  -- on her computer?
13     A.  No.
14     Q.  How did you get in her --
15     A.  It was on her desktop screen. In other
16 words, if I walked up and looked at that computer
17 right now, and it's showing the Windows desktop
18 screen, this document was sitting on her desktop.
19 The computer desktop, not this (indicating
20 tabletop).
21     Q.  You're saying Exhibit 38 was just sitting
22 up there shining for all the world to see when you
23 walked in her office?
24     A.  It's on her desktop screen. Just like the
25 logo for Internet Explorer, for any other number of

Page 129

1  items that are on your desktop screen.
2      Q.  Are you saying you didn't have to turn her
3  computer on, enter her password to access
4  Exhibit 38?
5      A.  Her computer is on or was on. I don't
6  know that. I mean --
7          MR. TUCKER: He's answered the
8  question three times.
9          MR. WYATT: All the computers in my
10 office -- I can turn on any computer in my office I
11 desire. I am the owner of that business. I have a
12 right to go in there and look at any employee, any
13 other person's data that's going on my law firm's
14 server, just like you would here at Brunini --
15 MR. SHAPLEY, CONTINUED:
16     Q.  And you're testifying under oath you
17 didn't have to use a password to turn
18 Ms. McAlister's computer on and look at Exhibit 38?
19     A.  I don't recall using any password. The
20 document was on -- to my knowledge, today, it's on
21 the desktop of Ms. McAlister's computer.
22     Q.  Still on there shining on the screen for
23 me to go look at?
24     A.  As far as I know, Chris. I haven't looked
25 at her screen in, you know, I don't know how long.

Page 130

1   But that's what it was then.
2          MR. SHAPLEY: Well, Mr. Sneed,
3   Exhibit 38 is a document that he improperly
4   accessed from Ms. McAlister's computer when they
5   were clearly in an adverse position, when he was
6   clearly threatening litigation, drafting
7   litigation.
8          And Judge Brewer has held he has no
9   right to Exhibit 38, and it contains
10  attorney-client communications, to which he is not
11  entitled to see. And that's our objection.
12         MR. SNEED: Okay. I'll rule your --
13  based on Judge Brewer's previous ruling, I will
14  defer to her and sustain your objection.
15         MR. SHAPLEY: Okay. Other than that,
16  we have no objection to the relevance of any other
17  documents in global Exhibit 1. We do, however,
18  reserve the right to examine this witness on how he
19  obtained this information, and we do reserve the
20  right to question Ms. McAlister to contradict the
21  statements he will make -- we anticipate he will
22  make, about how he obtained it and when he obtained
23  it.
24         MR. TUCKER: Okay. Does anybody have
25  a copy of Judge Brewer's order where she --

Page 131

1   whatever wording she used in that order, I want it
2   to go into the record.
3          MR. SNEED: I'm assuming that a
4   transcript exists.
5          MR. SHAPLEY: Yes, there's a
6   transcript.
7          MR. WYATT: Yeah. And may I say for
8   the record that I disagree with his -- the
9   characterization --
10         MR. SNEED: Derek, no, your lawyer --
11  You're a witness right now, and your lawyer --
12         MR. WYATT: That's not what she ruled
13  is the point.
14         MR. SNEED: It's --
15         MR. TUCKER: Well, I think he was
16  fixing to say what I was fixing to say.
17         MR. WYATT: That's not what she ruled
18  at all.
19         MR. TUCKER: There's no evidence that
20  he improperly did anything.
21         MR. WYATT: No.
22         MR. TUCKER: So that's just a matter
23  of argument right there.
24         MR. SNEED: Okay. My ruling stands,
25  and let Exhibit 1 less sub Exhibit 36 be admitted

Page 132

1   into --
2          MR. SHAPLEY: 38. Now 38.
3          MR. SNEED: 38. Excuse me. 38,
4   that's right. Be admitted.
5          (EXHIBIT 1 WAS ADMITTED INTO EVIDENCE.)
6          MR. TUCKER: So is 36 going to stay
7   in?
8          MR. SNEED: 38.
9          MR. SHAPLEY: 38 is the one that --
10         MR. TUCKER: I understand that.
11  We're not leaving 36?
12         MR. SCLAFANI: Well, that's my 36.
13  Give me that back.
14         MR. SHAPLEY: I knew this was going
15  to happen. Davey, let me tell you what I just did,
16  and you tell me if it's okay. All right. I just
17  removed Exhibit 38 here from global Exhibit 1. All
18  right. And I'm going to put a rubber band back on
19  it and give it to the court reporter.
20         MR. SNEED: Davey, did you have some
21  questions? Some more questions of Derek?
22         MR. TUCKER: Yes, sir. Give me one
23  second --
24         MR. SNEED: Sure.
25         MR. TUCKER: -- and make sure I

Page 133

1   haven't stuck something else somewhere else. I
2   don't really remember where we were -- exactly
3   where -- I was trying to get those documents in.
4          MR. SNEED: You did.
5          MR. TUCKER: So then I'm going to ask
6   that these be marked as Exhibit 6.
7          MR. SNEED: And these being what?
8          MR. TUCKER: Global 1.
9          MR. SNEED: It's admitted as
10  Exhibit 1.
11         MR. TUCKER: Okay. It's already --
12  okay.
13         DIRECT EXAMINATION CONTINUED
14  BY MR. TUCKER:
15  Q.   Now, Derek, let's get back to where we
16  were. I think you were testifying about the
17  agreements and understandings you had with Nutt &
18  McAlister and what you did to set up shop over at
19  Nutt & McAlister.
20         So if you could continue with your
21  testimony on that. I'd particularly like to know
22  what you did relying upon the representations that
23  you had from Nutt & McAlister.
24  A.   Okay. Well, the first thing we did was to
25  create Wyatt & McAlister on that very day that

Page 134

1 David agreed.
2 Q. Is that you and --
3 A. Right.
4 Q. -- Meg McAlister?
5 A. That's right. That's reflected in Exhibit
6 sub 3 of global 1, which is our certificate of
7 formation. And it reflects that we are equal 50
8 percent owners in Wyatt & McAlister.
9 And that was done in reliance upon the
10 agreement that she would acquire David's 80 percent
11 interest and offset it with her own 30 percent,
12 which would reduce whatever amount ultimately was
13 paid for these various and sundry assets.
14 And when I refer to those various and
15 sundry assets, what I'm talking about there is
16 furniture and computers and, I hate to use the word
17 "stuff," but that's what it is. Just hard things.
18 They were of really no value. They had been tax
19 depreciated down.
20 And so it was thought that this was going
21 to be a very small payment for these hard assets,
22 but we needed them to set up a law office, because
23 otherwise we had to go to an office store and write
24 a big check for a bunch of stuff.
25 Q. Okay. Are you talking about the same

Page 135

1 equipment and the office things that you had there
2 at Wyatt & McAlister that you identified in your
3 document and inventory? Is that what you're
4 talking about?
5 A. That's what I'm talking about. And as you
6 go through these documents -- and I'll make
7 reference to these as quickly as I can --
8 Ms. McAlister went through this with the ultimate
9 detail, to put down every serial number of every
10 single piece of desk furniture, equipment, computer
11 screen, whatever it was.
12 And sent those things back and forth to
13 Ernie Coward saying, This is what we're acquiring.
14 Sent those lists to Ken Lefoldt -- who was hired,
15 and I believe paid with our funds, to evaluate this
16 hard asset part, you know, to put a number on it --
17 Bill Jones, who is another accountant in David
18 Nutt's office.
19 You'll see in this stack of information
20 memo after memo after memo Ms. McAlister created on
21 Wyatt & McAlister's computers enumerating in great
22 detail every one of these hard assets.
23 Q. Which you're still talking about
24 Exhibit 1?
25 A. I'm talking about Exhibit 1.

Page 136

1 Q. Okay.
2 A. Now, the other asset, if you will, that
3 was being transferred here was, as I said -- I
4 referred to it as the chosen action. This morning
5 when I asked Mr. Nutt about the recommendation of
6 Merkel as her lawyer, it's not an extraneous issue.
7 That was a huge part of what we were
8 acquiring, was the right to pursue a claim for the
9 loss of all the Katrina business that we suffered
10 as a result of certain breaches of fiduciary duty.
11 David Nutt agreed to transfer that right to us.
12 That's part and parcel of what we were acquiring.
13 She and I met with Mr. Merkel's firm twice
14 about that very thing, to discuss whether -- we met
15 with his whole law firm after --
16 Q. Who is "she"? Who is "she"?
17 A. Ms. McAlister and I. Drove up there, gave
18 them a stack of documents about a half a foot high.
19 They read them all. And we met with the whole law
20 firm for them to evaluate for us what this chosen
21 action was worth and whether they were willing to
22 pursue it on our behalf --
23 Q. Where is that firm located?
24 A. In Clarksdale. That happened on two
25 occasions. So our agreement when David Nutt

Page 137

1 decided to retire from law business was simply
2 this: David, don't dissolve the law firm. Let Meg
3 buy your 80 percent interest. We're going to go
4 into business and this could help us out.
5 And since all of our business had been
6 divested, 400 and something active -- 400 and
7 something cases, plus a RICO case, that untold
8 amount of time and effort put into, with no
9 compensation whatsoever, of course it was
10 appropriate for David Nutt to say, Okay, it's no
11 sweat off my back. I will be dissolving the law
12 firm, and I don't have any use for all this stuff.
13 Now, as far as this chosen action is concerned, I
14 have to consult with Chris Shapley about that.
15 And he did. And he determined that it was
16 okay with him that we were acquiring the chosen
17 action, but obviously he didn't want to go on
18 record as saying, I'm authorizing you to go sue
19 some of those partners in this Katrina venture. He
20 didn't specifically -- Dick Scruggs.
21 But that's what -- that's why we went into
22 this law firm. And Ms. McAlister agreed to
23 capitalize the law firm simply because she had made
24 a lot of money out of the Katrina venture, and she
25 was able to do it and willing to do it. I hadn't

35 (Pages 134 to 137)

Page 138

1 made a lot of money. Not as much money as they had
2 made out of it. And so it was a burden on me.
3        And we agreed that she would capitalize
4 the law firm. That was the whole purpose. We did
5 everything we could do to try to diminish the risk
6 of failure. We took the three employees and
7 plugged them in over at our office, but we were
8 going to bill them back and did bill them back.
9 And there are records in here showing we did, to
10 David Nutt.
11        That would offset their salaries, and we
12 wouldn't be paying a hundred percent out of our
13 pocket. We would have income coming in to offset
14 their salaries. And so all of this was done upon
15 an agreement.
16        We set up Blue Cross Blue Shield health
17 insurance for our employees. We got a tax ID
18 number. We paid quarterly tax contributions to the
19 state. We agreed to the insurance that she
20 testified to earlier, except it wasn't exactly as
21 she said. I applied for an insurance policy to do
22 my side of that transaction, but they declined.
23 They wouldn't write the policy for me. And, you
24 know, it probably has to do with some preexisting
25 issues, but whatever --

Page 139

1    Q. Did you explain that to her?
2    A. Well, she knew.
3        MS. MCALISTER: No, I didn't.
4        THE WITNESS: It was her agent that
5 was -- that was actually Bobby -- whatever his last
6 name was. I'm sorry. I don't recall it. But,
7 anyway, her agent was the one that was doing all
8 that. And that was just one small part --
9 MR. TUCKER, CONTINUED:
10    Q. But were you turned down for the
11 insurance?
12    A. I was, I was. And, you know, the untold
13 other things that we did, you know. We set up
14 bookkeeping. Her accountant was supposed to be
15 doing our books, Ken Lefoldt, and also putting the
16 price on the hard assets.
17        You know, he was going to ultimately
18 say -- talk to Ernie Coward, and he and Ernie were
19 going to agree, Okay, here's a list of desks and
20 computers and so on. We think this is worth, you
21 know, $4,700 or 6 or whatever it was. And that's
22 what the agreement was. Always.
23    Q. In furtherance of that agreement you're
24 testifying to, what promises, if any, did David
25 Nutt make to you as a representative of Wyatt &

Page 140

1 McAlister?
2    A. He made the promise at the outset when we
3 created Wyatt & McAlister he would transfer the
4 hard assets pursuant to some nominal sale agreement
5 of some sort, whatever the amount came to. And
6 most importantly, the big thing he agreed to was,
7 yes, in the transfer, however we set it up, you
8 will be acquiring Nutt & McAlister's right to
9 pursue this claim.
10        If you have a meritorious claim -- if
11 Nutt & McAlister has a meritorious out of the
12 Katrina horror story, the fact that we lost all of
13 our assets and all income and work and everything
14 else, that's being transferred. And, you know, if
15 you wish, I can refer you to documents throughout
16 here.
17    Q. Well, whatever it takes for you to -- for
18 the court to understand.
19    A. All right. Well, let me do that. Let me
20 do that quickly. And let me go through as fast as
21 I can. But the first one I've already talked about
22 is sub 4 of global 1. This is Ms. McAlister's
23 document. I didn't write the title on it. She
24 wrote it. "Memo to Brunini re dissolution of N&M,"
25 dated the same day we set up Wyatt & McAlister.

Page 141

1 Certificate of formation.
2        The next document is 5. It's an e-mail,
3 and if I may, just for speed, I'm going to
4 paraphrase these. Obviously they can be read
5 literally by anyone here. So it's just -- this is
6 Meg telling Chris, Bill Jones, Ernie, and me that
7 David and I, David N, she says, are going to meet
8 tomorrow to discuss my acquisition of N&M. Okay.
9 She copied me on the document, of course.
10        The next one is -- if you look at the
11 second page of that 5, I just point you to the
12 subject matter on the middle e-mail. It's an
13 e-mail to Chris Shapley copied to me, of course.
14 Everybody practically on here. Dissolution of KLG,
15 disposition of CDs and so forth. The dissolution
16 of KLG part is referring to the fact that Nutt &
17 McAlister divested itself of all its assets in
18 that.
19        The next document is 6. That's our first
20 rent check. We go out and look for offices all up
21 and down Highland Parkway, all over Ridgeland,
22 Madison, everywhere trying to find. We find one.
23 We sign the lease. It was a three- or four-year
24 lease. I -- it's in the record here, but that's
25 our first rent check.

Page 142

1    7 is the lease itself, which I would never
2  have signed this lease had I known that
3  Ms. McAlister and Mr. Nutt were going to one day
4  decide that we weren't acquiring any of these
5  assets. So that document was signed pursuant to
6  the agreement.
7    And Exhibit 8 is one of Meg's many
8  e-mails. This one is 10/28 called "The Big Move."
9  And she's telling Ernie Coward, who is -- he's the
10 decisionmaker at Nutt's office. He's the CFO guy.
11 David, as he describes himself, is of counsel.
12 Nothing could be truer.
13    Coward runs the place, him and Jones.
14 She's writing Coward that we're going to move
15 Ernie, all this stuff, even though we haven't
16 agreed on the price yet, and we assume that's okay
17 with everybody, you and David and everybody. We've
18 hired BCI to transfer all the data over to our
19 office, so we're going to be doing that too, Ernie.
20    No one objected to this. No one. This
21 was done. That's 10/28. We're not even there
22 anymore. We've already been terminated on 10/15.
23 We're not even there.
24    I'll skip some of the incidental stuff.
25 But sub Exhibit 11, Meg, relating that she's talked

Page 143

1  to Ernie about valuing these various and sundry
2  hard assets, and that he has talked to Lefoldt.
3  That's Ken Lefoldt, who is our CPA. Supposedly our
4  CPA. We were paying him, as far as I know. He's
5  also her personal CPA, which kind of creates a
6  little conflict here.
7    But he was supposed to be coming up with
8  the number for what the furniture and the computers
9  and the -- all of these things were going to cost.
10 This is her telling me that -- confirming to me
11 that she's talked to Coward, and Coward's talked to
12 Lefoldt, and that they hope to provide within the
13 next few days, you know, the information.
14    And this morning, when I questioned David
15 Nutt about the transaction histories of Nutt &
16 McAlister, that's part and parcel of what I was
17 talking about. Those are internal financial
18 documents which were furnished to me and to her.
19 And we both went over them in great detail to
20 determine -- come up with what was this number for
21 these hard assets.
22    The next document is 12. That's November
23 the 7th. This is Meg with -- and if you look at
24 this document on its face, you will see that she
25 has gone through the office and identified every

Page 144

1  single item and its serial number, I guess.
2    Q. Are these the same -- well, I can't think
3  of what I was going to say. But is this the same
4  equipment that we're talking about today, who owns
5  it?
6    A. Yes. This is the equipment that was moved
7  pursuant to the agreement. The first -- I'm going
8  through this fast. "Monitors I'll take" is the
9  first subject line, if you'll look at that on page
10 12. The next one below that is "monitors left
11 behind."
12    This is going to Lefoldt and to Ernie so
13 they can work up this number. This is what we're
14 taking. This is what -- it's already there,
15 actually. This is what we left behind.
16    Then she has "Computers I'll take," and
17 "Desktop computers left behind." Then there's five
18 laptops, which we went over that subject earlier
19 this morning. They are not there. These five
20 laptops are not in the office as far as I know.
21    Then there's printers, cell phones, all
22 furniture except the furnishings from these several
23 offices, all law books. And then at the bottom,
24 there's "N&M computer equipment in the attic" and
25 some questions about that.

Page 145

1    So the bottom line is, as of November 7th,
2  this is Ms. McAlister providing a in-depth
3  inventory of the items that are being acquired, and
4  she's sending it to Lefoldt, our CPA -- ostensibly
5  our CPA -- and Ernie Coward, who is Nutt's CFO.
6    Okay. 13 is an e-mail that Meg wrote to
7  everybody in Wyatt & McAlister, "N&M Acquisition"
8  is the attachment here, and it's talking about the
9  memo to Ernie. That has an attachment to it, which
10 is the same thing we just went over, the
11 November 7th memo.
12    14, this is Meg asking me to bring
13 computers that I had stored in my automobile at my
14 house. For some reason, we couldn't move them
15 elsewhere at the time, and I had kept them
16 temporarily. To bring those in, so we can get the
17 serial numbers off of those two.
18    15 is an e-mail from Meg to me suggesting
19 about drafting an operating agreement and saying
20 that she's going to meet with Lefoldt and she could
21 go over it at that time. Not that absolutely
22 critical.
23    16, Meg sends an e-mail over to Louise
24 Oakes at Nutt's office wanting to know about some
25 serial numbers, more serial numbers for these

Page 146

```
 1   pieces of equipment.
 2          MR. SHAPLEY: Hold up just a second.
 3          MR. SNEED: Yeah, stop just a second.
 4   Because I think in the --
 5          MR. TUCKER: I don't have a 16.
 6          MR. SHAPLEY: Yeah. In the real
 7   Exhibit 1 that is entered in the record, there's
 8   not a 16 here. So we just need to find whatever
 9   you're talking about, Derek.
10          THE WITNESS: Just put that with it.
11          MR. SHAPLEY: All right. Do you have
12   this? Is this the same one, Joseph?
13          MR. SCLAFANI: Yeah.
14          MR. SHAPLEY: I'm adding it.
15          THE WITNESS: Okay. All right. 17
16   is an e-mail from Meg copying me. And it's talking
17   about the memo, again, to Ernie about the computer
18   equipment, and the attachment is the N&M
19   acquisition.
20          18 is one of Nutt's employees telling
21   that she's closing accounts over there. They've
22   directed her to close any accounts, like Westlaw
23   and so forth, and that we need to get our own
24   accounts for that.
25          19 is more about trying to sort out
```

Page 147

```
 1   what's on the inventory list.
 2          20 is November 17th. This is an
 3   e-mail from Meg to me and a copy to other people.
 4   It's about the Nutt & McAlister acquisition. Those
 5   are her words, not mine. Ken Lefoldt is listed out
 6   to the side. "Ken finally got some draft financial
 7   data from Ernie. I'll meet with him tomorrow."
 8          Okay. That's the financial data I
 9   was questioning David Nutt about this morning. And
10   the reason she's talking to me about this is
11   because we're both going over this financial data,
12   and supposedly Lefoldt is to come up with the
13   number and to run it by Ernie Coward, and then that
14   would be it.
15          Okay. 22 is another extremely
16   detailed version of an inventory that Meg wrote up
17   dated November 20th. And the thing I would point
18   out about this is it says, "Re: Purchase of Nutt &
19   McAlister stock." Okay. Now, by the time this is
20   done, we have moved in that office, signed a
21   four-year lease, signed an equipment lease on a
22   copier, which we're personally liable for, applied
23   for tax ID numbers, hired employees, taken out Blue
24   Cross insurance, tried to acquire cross keyman
25   insurance, bought premises insurance on the office
```

Page 148

```
 1   and all this equipment, by the way.
 2          Everything that a business has to do
 3   to function lawfully, we have done to my knowledge.
 4   And so this is the list that she worked up
 5   regarding the purchase of Nutt & McAlister stock.
 6   November 20th.
 7   MR. TUCKER, CONTINUED:
 8      Q.  That's sub 21?
 9      A.  That's 20 -- I think it was 22.
10      Q.  22?
11      A.  Sub 22. Yes, sub 22. Sub 23. This is
12   Meg McAlister writing me an e-mail saying I'm going
13   to write the Avandia clients and tell them that
14   Nutt & McAlister is dissolving, and we need to get
15   new questionnaires from them that are on Wyatt &
16   McAlister's questionnaire forms.
17          So take a look at the letter, she's
18   saying. Take a look at the letter, and pay careful
19   attention to how I phrase the transition from N&M
20   to W&M. So she's calling my attention to her draft
21   letter, which is the next page, and she's saying,
22   Read that letter and make sure that I've said this
23   right.
24          In the letter, the part that's relevant is
25   it says, "Please note we are in the process of
```

Page 149

```
 1   dissolving Nutt & McAlister and have formed Wyatt &
 2   McAlister, which is handling the Avandia litigation
 3   in association with Beasley Allen." So in effect,
 4   she's telling -- she wrote the letters.
 5          That's 24. And there's -- I haven't
 6   counted them, but if I've got this right, it's
 7   about 60 letters. So she writes 60 letters to
 8   these clients telling them we are dissolving Nutt &
 9   McAlister, and Wyatt & McAlister will be your
10   attorneys now. And that's Exhibit 24.
11          25 is in here because this is a capital
12   contribution that she made, and this is an exhibit
13   because the memo line says, "Meg capital contrib."
14   Okay.
15          We're going to later see a document where
16   she instructs our bookkeeper to change these
17   capital contributions to loans right about the time
18   she's met with people and decided she's going to do
19   a walkout and drain the account. But this check,
20   which is an original check of her capital
21   contribution, shows she made the capital
22   contribution not as a loan, but as a capital
23   contribution, in fact.
24          And if I may, at this point, I'd like to
25   take another opportunity to say that they have
```

38 (Pages 146 to 149)

Page 150

1  testified in court and here today and in documents
2  and over and over that I made no capital
3  contribution to Wyatt & McAlister. It is a false
4  statement, and their own financial records -- or
5  our records that they went in and got from our
6  office, contradict it.
7       There was a $24,000 fee that came in on
8  the Martin versus Homesite Insurance case, if I've
9  got the company name right. That fee was partly
10 mine, and Don Barrett associated me and her to work
11 on the case. I signed over my portion of that fee,
12 of that $24,000, and just put it into the Wyatt &
13 McAlister account as a capital contribution to, you
14 know, help the business get funded, even though
15 that was not our agreement that I was to be
16 contributing capital.
17      She had agreed she was going to capitalize
18 the law firm totally. But I did that nonetheless.
19 And so that is reflected in the financial records
20 that they have put in evidence here today.
21      26 or sub 26 is another one of Meg's
22 memos -- e-mails, excuse me, "Acquisition of Nutt &
23 McAlister" is how -- its subject. "Memo to Ernie
24 about the equipment."
25      Again, here what she's doing is asking

Page 151

1  Muriel to go dig up invoices for the equipment,
2  because she wants all of this to be very well
3  documented. She wants it to be exact of what we're
4  acquiring. And if you look over, as attached to
5  this, you'll see a November 20th list, again,
6  excruciating detail about every single item that
7  we're acquiring.
8       Now, that was sent to Lefoldt and to
9  Coward and to Bill Jones and to Muriel, who Muriel
10 would be the invoice chasing person over in Nutt's
11 office.
12 Q. Is this list of equipment the same
13 equipment we're here in court today?
14 A. It is. It is. It was all brought
15 pursuant to a $5,000 moving expenses, loaded in a
16 truck and moved under everyone's eyes with
17 everyone's consent at all times.
18 Q. Who paid for that?
19 A. We did, our law firm did.
20 Q. Wyatt & McAlister paid for it?
21 A. Absolutely. And that's on the -- that's
22 in that financial document from the Quickbooks too.
23 It's $5,175 or whatever the exact amount is.
24 Q. Is that the same equipment that came over
25 from Nutt?

Page 152

1  A. Absolutely yes. Three Men and a Truck is
2  the item listed on the financial record.
3  Q. Was that equipment taken with his
4  permission?
5  A. Of course. Totally.
6  Q. Why did you have to pay for the moving
7  fee?
8  A. Well, because we were acquiring these
9  assets, and, you know, it wouldn't have been
10 appropriate for him to pay to move the assets we're
11 acquiring.
12 Q. Did he tell you that, that you needed to
13 move them and pay for it?
14 A. That was just understood, you know.
15 Q. Okay.
16 A. The next item is 27, which is an e-mail
17 from Meg. This e-mail confirms what I asked David
18 Nutt about this morning. I believe his testimony
19 was, if I'm right, that Meg was billing him for
20 work on his cases.
21      He -- his version of things was that he
22 had made an agreement with Meg to continue working
23 on his cases, and Meg would bill him for whatever
24 work was done. That is not the agreement. It
25 never was the agreement. And the whole reason we

Page 153

1  took three employees with us to our new law firm is
2  because we were going to use those employees to
3  work on David's files, and Wyatt & McAlister law
4  firm was to bill him for that work.
5       And that's what this e-mail confirms. Meg
6  telling our bookkeeper, Let's bill them monthly.
7  And you'll see later in here where, in fact, there
8  are billings.
9       28 is another e-mail where Meg has found
10 some issues on the accounting records of Nutt &
11 McAlister that were furnished to us. And she wants
12 to discuss these issues to find out if these are
13 legitimate cost items or should they be adjusted
14 somehow.
15      29. She's telling me, Here's some
16 questions I've got about the transaction history.
17 Those are internal Nutt & McAlister financial
18 documents. The reason she's telling me about that
19 is because we are both jointly going through and
20 scrutinizing all these records to come up with the
21 finite number for what is the magic check that we
22 write for all of this stuff, computers and
23 furniture and all that.
24      When you consider it in total, it was much
25 ado about nothing. It was all depreciated anyway.

Page 154

1  Probably could have written a $7,000 check and been
2  done with it, but this was the way they intended
3  and insisted upon proceeding, so that's what we
4  did. But this document, this confirms that she is
5  all the time conferring with me about that cost.
6      Attached to this is her "Acquisition of
7  N&M," questions about the list. She wanted me to
8  review these questions and see if I agree with
9  them, or do I have other questions.
10     30, an e-mail chain or thread. Our
11 bookkeeper has got -- wants to know how do we code
12 the billings that we send over to the Nutt office
13 for working on his files. Give me the accounting
14 code so I've got this right.
15     Now, if it was Meg working on them, he
16 wouldn't have been asking that question. Wyatt &
17 McAlister was working on them. That's the reason
18 we hired the three employees. And we were billing
19 David Nutt's office for that work.
20     In fact, he owes money to Wyatt &
21 McAlister law firm that he never paid, to my
22 knowledge. We did the work. I don't have any
23 knowledge -- I didn't see anything on these
24 financial records where he ever paid for this work.
25     Q. How much?

Page 155

1      A. I don't know. I'd have to go in and
2  figure it out, but we did the work. We sent the
3  bill. And I don't recall seeing any revenue check
4  come in to Wyatt & McAlister in our account that
5  compensated us for that work.
6      31 is -- there's no point in even going
7  through that records. It's really irrelevant.
8  32 is just a newspaper announcement that we're
9  opening up. And it's here because in the
10 announcement it says formerly of Nutt & McAlister.
11 Derek Wyatt and Mary McAlister, formerly of Nutt &
12 McAlister.
13     In other words, it's just underscoring the
14 fact that -- it's commensurate with our agreement.
15 That's how we were setting up our law firm. We're
16 going to acquire what's left of Nutt & McAlister,
17 and we're going to create a new law firm. We're
18 going to use that as the platform to go into
19 business.
20     33 is -- it's another disputed invoice
21 between Meg and somebody at Nutt's office about
22 West Publishing. Here's the -- here is bill back
23 right here.
24     34. December 15th, Wyatt & McAlister --
25 not Meg McAlister -- Wyatt & McAlister is sending

Page 156

1  its bill and its hourly tabulation or whatever to
2  Nutt's office, saying, We did this work, pay it,
3  here's your bill.
4      35, in reference to the objections that
5  were made about these exhibits earlier, this e-mail
6  is from Meg, and it's copied to me. It concerns
7  the fact that when we moved over to Wyatt &
8  McAlister, we had to pay a computer company a whole
9  bunch of money to get them to transfer all this
10 data of off Nutt's server over to our server.
11     In addition to that, they wanted us to be
12 linked back to Nutt's office, because we were doing
13 all this work for Nutt on his files. And so they
14 provided -- in addition to that, they provided a
15 link.
16     What Meg is talking about here is, she
17 wants to try to find a way for Nutt to pay for some
18 of this cost. Hey, David, if we're going to be
19 working on all your files over here, and we brought
20 these three employees, and we're going to bill you
21 back for all of that, you know, we had to incur a
22 pretty big expense to get all that data downloaded
23 over here on our new server.
24     And part of that reason was is because we
25 couldn't take the one that was at Nutt's office.

Page 157

1  It was too complicated to pull it out, so we had to
2  buy a new server. So what she wants to do here is
3  to get Nutt to pay part of this cost. That's what
4  this e-mail is.
5      36 is Meg expressing her pleased
6  affirmation of the fact that the Avandia clients
7  were contracted on Nutt & McAlister forms. Now,
8  why is that important? Well, because we're
9  acquiring Nutt & McAlister, right?
10     And so if the Avandia clients belonged to
11 Nutt & McAlister before we moved, then they now
12 belong to us. But if they were contracted under PC
13 or PA, there might be a squabble about where the
14 Avandia clients belong. So it starts with, "Whew,
15 I'm relieved we did use the N&M contracts."
16     This is along with, of course, the
17 letter -- 60 letters, I think it is, she wrote to
18 clients saying, Folks, y'all had signed up as
19 Avandia clients previously. We're dissolving that
20 law firm. You need to sign a new questionnaire for
21 Wyatt & McAlister because we're the ones that
22 represent you now. And the second page of that
23 just confirms that she's asking our paralegal nurse
24 to make sure those contracts weren't PC or PA.
25     36 is a demand letter, although hardly a

Page 158

1 very assertive one, asking that Ernie Coward pay
2 the monies that were withheld from me from the
3 Katrina work that are still on the books of Nutt &
4 McAlister, or wherever they are over there, to pay
5 my portion of that money. And --
6        MR. SHAPLEY: Can I voir dire him on
7 this document?
8        MR. SNEED: I think it makes sense if
9 you have some questions at this point to do that.
10            VOIR DIRE EXAMINATION
11 BY MR. SHAPLEY:
12    Q. Mr. Wyatt, Exhibit 37 is a letter
13 requesting payment from the Nutt entities to you,
14 correct?
15    A. It is. It says that.
16    Q. All right. And is Nutt & McAlister
17 described in footnote 1 as one of Nutt entities
18 that you requested payment from?
19    A. It is described in footnote 1, and I don't
20 read in here, Chris, that I said that Nutt &
21 McAlister is the responsible party for this money
22 necessarily. As you know, better than anyone, the
23 Nutt firms -- three or four of them, depending on
24 how you look at it, Nutt legal firms shuffled
25 things back and forth a lot.

Page 159

1        For example, I was salaried through a firm
2 at Nutt's office that I never did any work for.
3 PC. But my salary came through there. So my point
4 in saying all that is simply this: I don't believe
5 that I'm directing this and making a decision
6 about, Okay, this firm owes this money.
7        I'm just saying, Ernie, would you please
8 look at the situation and pay me the funds that
9 have been withheld from me. I need it, because I
10 don't have the income right now.
11    Q. Okay. The Nutt entities are described to
12 include Nutt & McAlister, correct?
13    A. They are all listed there, that's right.
14 Nutt & McAlister is included.
15        MR. SHAPLEY: That's all I have at
16 this time.
17        MR. SNEED: Okay.
18        THE WITNESS: 39, this is
19 December 29th. By this time, things have broken
20 down in our office, because I have finally come to
21 understand that there's really no intention to pay
22 me the monies that were withheld from the Katrina
23 work. Or at least, that's what I believe at this
24 point.
25        And I've talked to her extensively

Page 160

1 about it. And every time I've mentioned it, I've
2 been blown off or dismissed or told, "I don't know
3 what you're owed. That's your problem." Or in
4 other words, there's no effort I'm seeing on her
5 part, or anyone else's part, to address the money
6 that they owed me, the leftover money that was owed
7 to me from the Katrina work.
8        So at this point, Meg is asking our
9 bookkeeper to start looking into our law firm's
10 books and give her an accounting, a fresh look, if
11 you will, of what's in the account, what's left,
12 and so forth.
13        This particular e-mail concerns a
14 disputed invoice about Xfone, but you'll see on the
15 bottom that she is asking Ms. Gantt, the
16 bookkeeper, to give her a current statement of
17 what's in our bank accounts.
18        DIRECT EXAMINATION CONTINUED
19 BY MR. TUCKER:
20    Q. Hold on just a minute. Do you have
21 Exhibit 38 anywhere?
22    A. 38 is out. That's the one that's --
23        MR. SNEED: 38 was excluded.
24        MR. TUCKER: Okay.
25        THE WITNESS: All right. And you can

Page 161

1 see that -- this is December 29th on sub 39.
2 That's the date of that e-mail at the top.
3        The next e-mail is Meg, who -- I have
4 told Meg that I have written a preservation letter.
5 And I suppose if one could characterize it, that's
6 an action saying, I'm dead serious about you paying
7 me the money you owe me. And so you can take it
8 any way you want, but I'm telling you, Don't go
9 destroy any records. That's what I've done at this
10 point. I'm sorry, Chris, but --
11        MR. SHAPLEY: That's all right.
12        THE WITNESS: So what 40 is, is
13 between December 29th and January 2nd, Meg has
14 decided to meet -- presumably that's Chris Shapley,
15 sitting here to my left -- with Chris about this
16 issue. Now, what ultimately happens is, she makes
17 a decision to, for lack of a better term, walk out
18 of the law firm.
19        And so this e-mail here, this sub 40,
20 is her confirmation on January 2nd that she's going
21 to talk to Chris Shapley about that. And you'll
22 see the second page of that is her saying, "I just
23 read Derek's e-mail."
24        And I didn't make any -- I didn't do
25 this covertly or anything. I was straightforward.

Page 162

1    I told her, I'm sending a preservation letter. In
2    fact, I sent her an e-mail confirming that I'm
3    sending a preservation letter.
4        Exhibit 41 is here only to show that
5    No. 5 -- this is Clatworthy, who is Meg's employee,
6    or whatever you want to call her. And what she's
7    saying here is, she's confirming that the data was
8    copied to Wyatt & McAlister's server in No. 5,
9    which is exactly what I've testified to, which is
10    confirmed throughout all these records.
11        All of the data at Nutt's office, all
12    of our work product, every e-mail -- it doesn't
13    matter if it was before we formed Wyatt & McAlister
14    or what it was -- it was moved consensually to our
15    computers for every good reason in the world, not
16    the least of which was the fact that Nutt was
17    closing Nutt & McAlister.
18        He had no use for any of this, and it
19    was our work. So if we needed to reference what
20    we'd done before, the sensible thing to do is to
21    transfer it over to our new server, which was done.
22        This is 42, sub 42. And it's an
23    e-mail that Meg sends to our bookkeeper,
24    unbeknownst to me, on January 6th. Now, she's
25    already planned, apparently at this time, how to do

Page 163

1    this, quote, resignation, which I'm not going to
2    give opinions, but the LLC act does not -- didn't
3    have an operating agreement. And specifically, we
4    didn't have an operating agreement that allowed a
5    partner to withdraw. We did not have that
6    document.
7        So this is her sending a covert
8    e-mail to our bookkeeper asking her to change her
9    capital contributions to loans on our books. And
10    this is our bookkeeper, who was also in on her
11    resignation plan, unbeknownst to me -- and we'll
12    see that in a minute -- this is her confirming that
13    she changed it to a loan.
14        Now, earlier we saw in sub 25 a copy
15    of her check showing "Meg capital contrib." It
16    doesn't say a word about loan, and it wouldn't have
17    been a loan. There's no way it was going to be a
18    loan. It was a capital contribution. All of it
19    was. Any money put in there was a capital
20    contribution. Nobody made loans.
21        I didn't loan my portion of the
22    Martin fee to our law firm. I contributed it as
23    capital. Likewise, she did. But this is her
24    telling her bookkeeper to change it to a loan, and
25    the bookkeeper confirming that she's done that.

Page 164

1        43 is just there to show that she has
2    already talked to all our employees unbeknownst to me,
3    and has them going back over to Nutt's office to
4    make ready for all of our files to be seized and
5    taken back over there. But I don't know any of
6    this is going on. I never saw this e-mail. Well,
7    I never saw the one -- actually I'm speaking of the
8    one before this.
9        But this e-mail is one of our
10    bookkeepers telling me she's going to work over at
11    Nutt's off this afternoon. No good reason for her
12    to be doing that at all, other than the fact that
13    she's in on their little plan to go ready Nutt's
14    office when they seize the files from our office
15    and take them all back over there, which is going
16    to be what happens next.
17        This 44 is Meg and one of her
18    confidential employees confirming that they've
19    tested out the computers remotely to see if they
20    can get into the Wyatt & McAlister system and get
21    documents.
22        And the reason they're interested in
23    doing that is because they know that she has
24    resigned or was about to resign. And so they want
25    to be able to remotely tap back into our server and

Page 165

1    get documents. And this is her trusted consort
2    here, this Clatworthy woman, confirming that she's
3    tested that out.
4        This is -- January 9th is 45. Meg
5    called our computer techs and told them to block me
6    out of my own law firm's documents, the server.
7    And I confronted her about this and said, "You
8    don't have the authority to do that. That's
9    unlawful. You're breaching fiduciary duty."
10        I think our discussion resulted --
11    well, I know our discussion resulted in her calling
12    them and reversing the block because of -- you
13    know, I was saying, This is unlawful. You can't do
14    this.
15        46 is -- this is the way she
16    confirmed that would she was, quote, resigning.
17    And I might add here, there is no authorization to
18    resign from an LLC, unless you have an operating
19    agreement that says that. We didn't have one.
20        So there is no way to resign from the
21    law firm. You could file a judicial dissolution,
22    if you were unhappy with the way things were going,
23    and that would be the lawful way to go about
24    dissolving the law firm. But there was no -- there
25    was no legitimate way for me or her to just pick up

Page 166

1  our stuff and walk out and say, I'm not here
2  anymore.
3       All right. This is her e-mail
4  confirming that, but it's only sent to our
5  employees. It's not told to me. I don't even know
6  this is going on at this point in time.
7       I don't see any point in going
8  through 47, because I've made my record over and
9  over, that Chris, Joseph, Larry Allison, have what
10 I consider to be very serious conflicts of interest
11 throughout all of this.
12      Judge Brewer denied a formal motion
13 on that. However, it's preserved in the record
14 and, you know, I just don't need to continuously
15 object about it, because the record speaks for
16 itself, but I do always will.
17      48 is another very detailed letter
18 about the professional conflicts involved. And I
19 think -- let's see. Oh, 51 is a demand letter that
20 I prepared and sent to Meg.
21      MR. SNEED: What's the date of that?
22      THE WITNESS: That is Tuesday,
23 April 7th, 2009. And this is very detailed, and it
24 itemizes all the expenses that are accrued, and it
25 attaches the backup for those expenses.

Page 167

1       And the purpose of this letter was to
2  put her on notice of the fact that there is no such
3  thing as a withdrawal, unless you have a valid
4  operating agreement authorizing that and that her
5  act was, for lack of a better term, ultra vires, or
6  however you want to characterize it. It's not
7  authorized. It's not lawful.
8       And the firm is going to suffer and
9  collapse because all the capital has been withdrawn
10 from the account, and the 50 percent partner has
11 walked out, abandoned the business. So that's what
12 that is. I don't recall whether there was a
13 response to that, but I know that none of the bills
14 were paid. Nothing was ever paid.
15 MR. TUCKER, CONTINUED:
16      Q.  At this point, do you know approximately
17 how much money that Wyatt & McAlister would owe to
18 either the rent or to other bills and costs?
19      A.  I can give you estimates. Looking at 52.
20 And I'll just try to rank these in terms of logic,
21 you know.
22      Q.  Right.
23      A.  The lease itself, which is not personally
24 signed -- it was signed in the name of the firm
25 only -- is -- I estimate is $118,000 obligation,

Page 168

1  not counting extra costs that might be added on for
2  collection or whatever. Whatever. You know,
3  that. . .
4       There is an equipment lease, which was
5  personally guaranteed, and which I signed only upon
6  the reliance of her representations and Mr. Nutt's
7  representations that we were acquiring the 80
8  percent interest of David Nutt in the dissolving
9  Nutt & McAlister law firm. I would never have
10 signed this document under any other circumstances,
11 or that lease for that matter.
12      That's a personal obligation there, and it
13 amounts to somewhere in the neighborhood of
14 $15,000. I've got it as 14,836, but it has late
15 fee provisions, attorneys' fees, all that stuff.
16      The rest of these monthly billings are
17 itemized on this Exhibit -- sub Exhibit 52. And
18 they just continue to accrue all the time. I mean,
19 there's tax warrants that have been issued by the
20 State Tax Commission. They've been filed formally
21 in Madison County.
22      I don't know if a tax return for the law
23 firm has been prepared. I sought to get an
24 extension for it at one time. And I can't give an
25 accurate total, I mean, of what all these things

Page 169

1  amount to. But if you start with the proposition
2  -- if you're looking at Wyatt & McAlister's
3  liabilities on the books, you start with the lease,
4  and you add the equipment lease, and then you work
5  your way into invoices from vendors.
6       And so I don't know. You know, somewhere
7  in the neighborhood probably of $140,000. I'm just
8  picking a number there. I can't say that's
9  accurate, but I'm just trying to give a number that
10 would provide some point of reference to it.
11      Q.  End of story?
12      A.  End of story.
13      MR. TUCKER: Okay. I tender the
14 witness.
15      MR. SNEED: All right. Y'all want to
16 break for lunch?
17      MR. SHAPLEY: Yeah.
18      (OFF THE RECORD.)
19      CROSS-EXAMINATION
20 BY MR. SHAPLEY:
21      Q.  Mr. Wyatt, you've been here when we
22 discussed the items of inventories on Exhibit 3 and
23 Exhibit 4, and then the items described in your own
24 Exhibit 1 where you, I believe, testified that
25 Ms. McAlister went into great detail in describing

43 (Pages 166 to 169)

Page 170

1  the property that was going to be purchased
2  eventually, right?
3     A.  Yes, I have been here, yes.
4     Q.  Okay.  My question is simple.  Do you have
5  any evidence or knowledge that any of the Nutt
6  entities or David Nutt has ever received any money
7  from anybody for any of these assets?
8     A.  I don't have any knowledge that he's
9  received any money in terms of a payment in the
10  form of a check or cash.  And I would have to, you
11  know, look, Chris, at our Quickbooks documents,
12  which I rarely, if ever, looked at to definitively
13  say.
14     But my understanding is that we did not
15  issue a check to David Nutt.  We performed the work
16  pursuant to the agreement.  We did all the things
17  necessary to set up the law firm in furtherance of
18  the agreement.  My position is, I detrimentally
19  relied -- as you've heard, extensively obligated
20  myself in leases and other things.
21     And that the moment of writing a check for
22  the furniture and the computers did not come about
23  because of the reason that I asked for the payment
24  of the Katrina money.  And as a result of that,
25  they decided to renege on the agreement.

Page 171

1     Q.  Okay.  So the answer to that is, no, you
2  don't know of anybody that paid David Nutt or any
3  of the Nutt entities any money for the assets we're
4  talking about here today?
5     A.  Personally I have no knowledge that that
6  was --
7     Q.  Okay.  All right.  And I believe, as you
8  said, that as far as you knew, the deal was moving
9  forward until it became known that you intended to
10  pursue a claim for money owed to you by the -- let
11  me finish -- by the Nutt entities for your work on
12  the Katrina cases?
13     A.  I would answer that question a little
14  differently than the way you're saying it.  There
15  wasn't any question about the deal moving forward.
16  The deal was made before we moved.  We spent $5,000
17  right at the get-go just to move all the equipment
18  and furnishings and so forth there.
19     Then we signed the $118,000 lease.  Then
20  we signed another $14,000 equipment lease.  Then we
21  took out group Blue Cross Blue Shield health
22  insurance.  We did all of those things in
23  furtherance of an already agreed to thing.
24     My impression of what happened is that
25  apparently there was no intention ever to pay me

Page 172

1  the money that they had withheld.  But that was
2  never disclosed to me at the time that I agreed to
3  enter this new law firm relationship and signed
4  those leases and undertake the other things that I
5  undertook to do.
6     If someone had told me, We're not going to
7  pay you any more money from what you did in
8  Katrina, it's over, we're dissolving Nutt &
9  McAlister, and we consider it to be a done deal,
10  I'm quite sure that I would have decided at that
11  moment that I don't want to be in a business
12  relationship with these people anymore, and I need
13  to go hire myself a lawyer and find out what the
14  merits are to my own claims for these unpaid
15  monies.
16     Q.  When you talk about you didn't want to be
17  in business with these people, would "these people"
18  include Ms. McAlister?
19     A.  Well, now, yes.  I mean, but none of that
20  was disclosed to me is my point.
21     Q.  All right.  I understand your position
22  that it was not disclosed to you.  Did anybody tell
23  you you were going to get -- you were going to get
24  additional funds after you left the Nutt &
25  McAlister law firm for your work on Katrina?

Page 173

1     A.  My impression was it was understood that
2  there were monies -- Bill Jones, for example, came
3  to Wyatt & McAlister's offices to go over in great
4  depth the Nutt & McAlister financial documents so
5  we could crank out this.  As I've talked about this
6  morning -- you've heard me say over and over this
7  modest amount of money for this assorted furniture
8  and depreciated stuff.
9     And in that discussion, he admitted, of
10  course, that I was owed additional money, and the
11  document that's been excluded is relevant in that
12  regard.  There was never a question that I was owed
13  more money.  I had a 3.2 percent shared fee
14  interest in the Katrina cases, which increased up
15  to something like 4.2 when Scruggs was cast out of
16  the venture as a result of his legal problems.
17     And so it was known at all times that
18  whatever that percentage amounted to, as a portion
19  of those fees, that I was owed that money.
20     Q.  Are you testifying under oath that some
21  person who worked for the Nutt entities
22  specifically told you you were going to receive a
23  specific additional amount of money from the Nutt
24  firm?
25     A.  Well, I don't know about a specific, but

44 (Pages 170 to 173)

Page 174

1  sure, Bill Jones acknowledged -- you know, and I
2  would -- Ms. McAlister --
3      Q.  Acknowledged what?  You've got to finish
4  your thought.
5      A.  Acknowledged --
6      Q.  Acknowledged what?
7      A.  -- that I was owed money, Chris.
8      Q.  How much?  Did he say?
9      A.  I don't know how much.
10     Q.  Okay.
11     A.  And, you know, you can see from the memo
12  that because they were leaving in inappropriate
13  accounting entries, they were trying to reduce the
14  amount.
15     Q.  Okay.  All right.  Well, let me hand
16  you -- I believe this specific document was
17  included within your composite Exhibit 1, but I
18  want to make it a separate exhibit for the record.
19         MR. SHAPLEY:  Davey, it's a letter --
20         THE WITNESS:  What is the date on it?
21  MR. SHAPLEY, CONTINUED:
22     Q.  Here, I'm going to hand it to you.  Okay.
23  There you go.  It's a letter dated December 19,
24  2008.  And take a minute to look at it.
25     A.  Yeah, I'm aware of it.

Page 175

1      Q.  Is this a letter you wrote on or about
2  December 19, 2008, to Ernie Coward referencing
3  money you claimed was owed to you by the Nutt
4  entities?
5      A.  May I read this for just a second?
6      Q.  Sure.
7      A.  And your question is?  I'm sorry to ask
8  you to repeat it, but --
9      Q.  No.  My question is, is Exhibit 8 a letter
10  you wrote to Ernie Coward in which you were stating
11  that you were owed additional monies by the Nutt
12  entities?
13     A.  That's true.
14     Q.  And it is the Nutt entities described in
15  the footnote No. 1 that you prepared to include
16  Nutt & McAlister, PLLC?
17     A.  Nutt & McAlister, PLLC is listed in the
18  footnote 1.
19     Q.  And that McAlister obviously is
20  Ms. McAlister who was then your law partner?
21     A.  That's exactly right, uh-huh.
22     Q.  Okay.  That's all I have on that.
23         MR. SNEED:  Are you offering that
24  into evidence?
25         MR. SHAPLEY:  Yeah.  I'd like to

Page 176

1  offer 8 into evidence.
2         MR. TUCKER:  Is that Exhibit 8?
3         MR. SHAPLEY:  Yeah.
4         MR. TUCKER:  It's already in, isn't
5  it?
6         MR. SNEED:  It's in as a composite,
7  but he wants it as a separate exhibit.  I think
8  he's entitled to do that.  Let it be admitted.
9  (EXHIBIT 8 WAS MARKED AND ADMITTED INTO EVIDENCE.)
10  MR. SHAPLEY, CONTINUED:
11     Q.  I'm going to hand you Exhibit 9, which is
12  another letter you wrote, and it's dated
13  February 12, 2009.
14     A.  This is a new -- just one moment.
15  (Reviewing document.)  Okay.
16     Q.  Is Exhibit 9 a letter you wrote on or
17  about February 12, 2009?
18     A.  It is.
19     Q.  And in that letter you're expressing again
20  to Mr. Coward that the Nutt organizations remain
21  indebted to you for fees?
22     A.  That's correct.
23     Q.  And did you describe the Nutt
24  organizations in Exhibit 9 to include Nutt &
25  McAlister?

Page 177

1      A.  Well, I footnoted the organizations.  And
2  as you recall from other things I've prepared, I
3  always put all the Nutt entities there, because
4  they shuffled things around so much, and sometimes
5  don't know who's doing what.
6      Q.  My question was simple.  The Nutt
7  organizations you referred to in Exhibit 9 was
8  described by you in footnote 1 to include Nutt &
9  McAlister?
10     A.  I think I answered, but yeah, the answer
11  is yes.
12         MR. SHAPLEY:  I move that that be
13  introduced into evidence.
14         MR. SNEED:  Any objection?
15         MR. TUCKER:  No objection.
16         MR. SNEED:  Let it be admitted.
17  (EXHIBIT 9 WAS MARKED AND ADMITTED INTO EVIDENCE.)
18  MR. SHAPLEY, CONTINUED:
19     Q.  Did I understand you to say earlier you
20  didn't make any capital contributions because you
21  didn't -- you couldn't afford to?
22     A.  No.  What I said was that I did make a
23  capital contribution, although I was not required
24  to because that was not our agreement.  But I took
25  a fee that I had earned relatively close to the

Professional Court Reporting, LLC
601.919.8662

Page 178

```
 1    time that we were about to be turned out from
 2    David's office.
 3         It was a lingering Katrina case that was
 4    not in good shape, and we managed to -- Don Barrett
 5    and I managed to get it settled. And I took my
 6    portion of that fee, and I just endorsed that
 7    check, and placed it in Wyatt & McAlister's account
 8    as a capital contribution.
 9         But my testimony earlier was that it's
10    been represented -- and I'm not implying that
11    anyone's done is maliciously -- but it's been
12    represented over and over throughout these
13    proceedings that I never contributed anything.
14         There's two points about that. One, as
15    I've said previously, I wasn't required to, because
16    that was not the agreement that Meg and I had. But
17    it's incorrect and inaccurate to say that I didn't
18    make a capital contribution, because, in fact, the
19    books and records of Nutt & McAlister and all the
20    documents confirm that I did.
21         Q.  Well, we don't agree with that, and they
22    refute that, and we'll get to that later. But my
23    question is:  Did you not testify earlier that
24    you -- it was not your requirement to make a
25    capital contribution of $25,000 like Ms. McAlister
```

Page 179

```
 1    did because she had the money and you didn't?  You
 2    didn't say that this morning?
 3         A.  My testimony was this -- or is this,
 4    Chris. This is --
 5         Q.  My question was:  What did you say this
 6    morning?
 7         A.  I don't -- I can't tell you.
 8         Q.  Okay. All right.
 9         A.  If you have the record, read it back, but
10    I can tell you what our agreement was.
11         Q.  All right. The record will reflect.
12         Isn't it a fact that in 2007 you earned
13    over $700,000 in income from working for David Nutt
14    Associates and Nutt & McAlister, PLLC?
15         A.  If you're looking at the W-2s and so
16    forth, may I see what you're looking at when you're
17    asking that question?
18         Q.  I'm going to ask you. Are you
19    testifying -- are you saying you don't know whether
20    or not you made over $700,000 in 2007?
21         A.  I think that's probably a correct
22    statement, but it would be a lot easier if I just
23    looked at the tax forms.
24         Q.  Let the record show I handed the witness
25    the tax forms he requested that I hand to him.
```

Page 180

```
 1         A.  Okay. That is a W-2 from PC, which I --
 2         Q.  My question to you was --
 3         A.  I understand.
 4         Q.  -- the income you earned from the Nutt
 5    entities.
 6         A.  Right. I'm trying to look at the two
 7    documents to see if your statement is correct. And
 8    it says $124,675.11 wages, tips, and other
 9    compensation from PC. That's 2007.
10         This is N&M. This is Nutt & McAlister,
11    PLLC, W-2, 2007, and the gross wages, etc., are
12    609,981. So it would be a correct statement that
13    these two represent more than $700,000.
14         Q.  And you undertook to form the Wyatt &
15    McAlister entity when?
16         A.  On September 22nd, 2008.
17         Q.  All right. Some nine months after you
18    had -- a year in which you've earned over $700,000?
19         A.  I don't know if it's nine months, but
20    certainly in the fall of 2008, yes.
21         Q.  You hadn't spent 700 and something
22    thousand dollars in those nine months, had you?
23         A.  Well, when I moved from Lexington,
24    Mississippi to take the position with the Nutt
25    entities, I sold a house and then a bought a house,
```

Page 181

```
 1    and then ended up buying a house in Reunion, which
 2    is probably more house than I really should have
 3    bought, and a great deal of money was spent there.
 4    And then I'd spent other funds. That's true.
 5         But my earlier statement was, I did not
 6    earn what David Nutt and Meg McAlister earned out
 7    of Katrina. Their gross was somewhere in the
 8    neighborhood of $18 million. And the reason that I
 9    testified Ms. McAlister agreed to capitalize our
10    new law firm was because she said that she was able
11    to do it and realized that I didn't have the
12    wherewithal to be the one who could do that.
13         Now, I mean, you know, that's doesn't mean
14    that at some point in the future, you know, our
15    agreement changed or we had discussions about how
16    to capitalize it. It might have resolved
17    differently. But at the outset, that was our
18    agreement.
19         Q.  Did you testify earlier that Ms. McAlister
20    resigned as a member of Wyatt & McAlister, PLLC?
21         A.  Yes. That's what the document that I went
22    through said. It used the word "resign."
23         Q.  Okay. As a member of the P LLC?
24         A.  Well, I don't know about the member part,
25    but --
```

46 (Pages 178 to 181)

Page 182

1    Q.  That's what you testified to.
2    A.  -- but the document said resign.
3    Q.  All right.  Hand you Exhibit 10.  Is this
4  a letter you received from Ms. McAlister shortly
5  after January 8, 2010 (sic), regarding her status
6  in Wyatt & McAlister, PLLC?
7    A.  I did get this letter, yes.  I can't
8  testify with complete accuracy as to exactly what
9  date I got it.  But yes, I did get the letter, and
10  it is her letter referencing, as she says, "I
11  resign my employment."
12    Q.  She resigned her employment, but she did
13  not resign her membership, did she?  In fact, the
14  last sentence in the first paragraph says, "I will
15  maintain my 50 percent equity interest in Wyatt &
16  McAlister, PLLC."
17    A.  That is what she says in her letter,
18  uh-huh.
19    Q.  Okay.
20    MR. SHAPLEY:  I move that be
21  introduced into evidence as Exhibit 10.
22    MR. SNEED:  Any objection?
23    MR. TUCKER:  No objection.
24    MR. SNEED:  Let it be admitted.
25  (EXHIBIT 10 WAS MARKED AND ADMITTED INTO EVIDENCE.)

Page 183

1  MR. SHAPLEY, CONTINUED:
2    Q.  Exhibit 5 here is a list of files and
3  other items.  Is that an inventory that was
4  prepared by you or someone with your assistance?
5    A.  It was prepared by me.
6    Q.  And does that include items that were once
7  on the premises of the Nutt entities?
8    A.  On the premises of the Nutt entities?
9  Just looking at the first page, I see that there
10  are Katrina files listed.  And, yes, of course,
11  those files were created under the auspices of
12  Nutt & McAlister's office, because that's when we
13  were doing the Katrina work.
14    Q.  Right.
15    A.  They were later taken to Wyatt & McAlister
16  pursuant to the agreement I testified to earlier.
17    Q.  Right.  All right.  I'm asking you, just
18  look at the items on Exhibit 5 and tell me, were
19  those items once within the premises of the Nutt
20  entities and thereafter moved to the Wyatt &
21  McAlister?
22    A.  Okay.  Do you want an answer as to
23  everything on here or just. . ?
24    Q.  Just tell me if there's something on there
25  that does not -- that was not once on the premises

Page 184

1  of the Nutt entities and then moved to Wyatt &
2  McAlister.
3    A.  Okay.  On page 2, item No. 26, I'm not
4  sure whether what's listed as online travel means
5  what was created at Nutt & McAlister on -- I mean,
6  excuse me, what was created in Wyatt & McAlister
7  online travel or something that might have
8  preexisted.  So that I'm not sure about.
9    Q.  Well, if we had the file, we could look at
10  it and tell when it was created, couldn't we?
11    A.  Some of it.  I think, you know, it's a
12  mixed bag.
13    Q.  All right.
14    A.  You'll find.  WM computer backup tapes,
15  that's No. 37.  I suspect that that was not created
16  at the Nutt entities.
17    Q.  Okay.
18    A.  I don't know about 44.
19    Q.  What is 44?
20    A.  Y'all already have that box back.
21    Q.  All right.
22    A.  These things that are marked with
23  asterisks, I assume you don't care --
24    Q.  Right.  If it's marked with an asterisk,
25  that means we have it back.  If it's not marked

Page 185

1  with an asterisk, it means we don't have it back.
2  Is that right?
3    A.  That's right.  It's in store -- it's
4  stored.
5    Q.  Right.  Okay.
6    A.  I mean, I have it stored.
7    Q.  So of the items that do not have an
8  asterisk on them on Exhibit 5, I want you to tell
9  me what items, other than the ones you've already
10  mentioned, were not once within the possession of
11  the Nutt entities, and thereafter moved to Wyatt &
12  McAlister.
13    A.  Okay.  Under inventory of miscellaneous
14  files and records, I don't believe -- well, no, I
15  take that back.  Let me just go through them.
16  No. 11 -- excuse me -- I have a question about
17  No. 11, because it's online travel again.
18    Q.  Right.  And we could look at the file and
19  tell what was originated at Nutt and what was
20  originated at Wyatt & McAlister.
21    A.  You'd have to go through every bit.
22    Q.  All right.
23    A.  Uh-huh.  Caremark, that's 12, and 13,
24  Benzine.
25    Q.  Yeah.

Professional Court Reporting, LLC
601.919.8662

Page 186

1     A.  Those are my personal documents that came
2  into being at Nutt's office, because we had people
3  coming in wanting to associate us on these two
4  cases, and we declined.  But I created by own
5  little document cache for those.  And so you know,
6  they were kind of created there, but they're not
7  really part of Nutt's operation at all.
8     21 is the Avandia.  I don't know if
9  there's anything in there that originated back at
10  the Nutt entities, but as you've already seen --
11  you've already seen what originated at Wyatt &
12  McAlister.
13     Q.  We could look at that file and determine
14  what originated at Nutt and what originated at
15  Wyatt & McAlister?
16     A.  I think you can, yeah.
17     Q.  Okay.
18     A.  And then inventory of furnishings and
19  equipment, these are not files --
20     Q.  Right.
21     A.  -- but you're asking --
22     Q.  Things.  Things.
23     A.  Okay.  Well, what's your question about
24  them?
25     Q.  My question was:  Were they once --

Page 187

1     A.  At Nutt's office.
2     Q.  -- at Nutt's office.
3     A.  All right.
4     Q.  And then thereafter moved to Wyatt &
5  McAlister.
6     A.  No. 1 was at one time at Nutt's office and
7  was moved pursuant to --
8     Q.  No. 1 is what?
9     A.  Is Derek's desktop computer.
10     Q.  Okay.
11     A.  The -- I don't know about the stapler.  I
12  can't say.
13     MR. SNEED:  I think the question was
14  what on that list did not originate from Nutt's
15  office.
16     THE WITNESS:  Did not.  Okay.
17  MR. SHAPLEY, CONTINUED:
18     Q.  Right.  What was once at Nutt & McAlister
19  -- all right.  And was -- let me ask it --
20     A.  If you can --
21     Q.  -- like this --
22     A.  -- ask a different way --
23     Q.  Let me ask it like this.  The question is:
24  Is there anything on that Exhibit 5 which was not
25  once at Nutt's office and then moved to Wyatt &

Page 188

1  McAlister's office?  And I think that's how you
2  been answering my question.
3     A.  I think so.
4     Q.  Okay.
5     A.  I think we're on the same wavelength
6  pretty much.
7     Q.  Right, right.
8     A.  The 7, Derek's printer, I believe that was
9  originally at Nutt's office and was part of the
10  acquisition, moved over.  The outbox, I don't know.
11  I can't say.
12     And the laptop computer was something that
13  was part of the acquisition, so that was taken from
14  Nutt's office over to our office.
15     Q.  Okay.  When you said the laptop computer,
16  you were looking at the last page of Exhibit 5?
17     A.  Right.
18     Q.  And you were referring to item No. 12,
19  Derek's HP laptop.
20     A.  That's right.
21     Q.  And that was once at the Nutt office and
22  taken from there or moved from there to Wyatt &
23  McAlister?
24     A.  That's right.  It's on those
25  inventories --

Page 189

1     Q.  Right.
2     A.  -- you know, where we showed all those
3  serial numbers.  It's in there.
4     Q.  All right.  So the -- and I think you've
5  testified that you don't know if any money was paid
6  to the Nutt entities for anything on Exhibit 5?
7     A.  I've testified that I don't know of any
8  check that was issued, you know, right, or cash.
9  But, you know, it pains -- I want to make it
10  painfully clear --
11     Q.  You've done that.
12     A.  Okay.
13     Q.  I know what your theory of the case is.
14  My question is:  Do you know of any monies that
15  were paid to the Nutt entities for anything on
16  Exhibit 5?
17     A.  I believe I've answered, Chris, but I'll
18  say again, I don't know of any.
19     Q.  Okay.
20     A.  Okay.
21     MR. SHAPLEY:  Let me take a break one
22  second.
23     (OFF THE RECORD.)
24  MR. SHAPLEY, CONTINUED:
25     Q.  Mr. Wyatt, you were here this morning when

Page 190

1  I asked Ms. McAlister to describe the assets or
2  things that were purchased by the Wyatt & McAlister
3  firm after you-all started it up.
4      A.  Yeah.
5      Q.  All right.  Do you -- and I'm not asking
6  you to -- do you agree, essentially, with what she
7  had to say about what assets were purchased?
8          What I want to know from you is this:
9  What assets were purchased by Wyatt & McAlister
10 after you-all started it up and before you shut it
11 down?
12     A.  Of course, I guess the server would
13 probably be the, you know, highest dollar item.
14 And I take your question to mean you're asking for
15 hard assets.
16     Q.  I'm not asking a tricky question at all.
17 I'm just saying what did you-all buy --
18     A.  Right.
19     Q.  And I tell you, if you want to refer to --
20 if you want to refer -- if you want to refer to
21 Exhibit 6 or. . .
22         MR. SHAPLEY:  Where is that?
23         MR. SCLAFANI:  We didn't put it in.
24         MR. SHAPLEY:  We didn't put it in?
25 MR. SHAPLEY, CONTINUED:

Page 191

1      Q.  If you want to refer to Exhibit 6, which I
2  believe are copies of your bank records, you can,
3  but -- or you can testify from memory.  What did
4  you-all buy once you started your business?
5      A.  Chris, I didn't participate a great deal
6  in the purchase of a coffee pot or -- and I'm not
7  being flippant in saying that.
8      Q.  I understand.
9      A.  I just mean that these were things that
10 other people -- and, you know, it was only four or
11 five of us, but I just didn't concern myself with
12 going and checking the Quickbooks and seeing did we
13 buy a -- you know, a high-faluting copy device or
14 some other -- I mean, if it was something I had to
15 sign and it was a lot of money, I knew about it.
16        But if it was other things, I really
17 didn't.  And I just didn't pay any attention.  But
18 as I recall, what she said is probably accurate,
19 you know.  The whole purpose of making the
20 agreement with David was to be able to avoid
21 purchasing a bunch of things at the front end and
22 incurring a lot of debt that we were trying to
23 leverage out of.
24        You know, that was our idea.  He's going
25 to dissolve.  This is a way for us to leverage

Page 192

1  ourselves into a facilitated office without going
2  out and writing a big fat check at the front end.
3  And then take the employees, as I said.  That was
4  going to be an overhead item, but since you had a
5  bill-back agreement with David's office, then that
6  would defray that expense.
7          So what you've done by doing that is,
8  you've given yourself a better chance of making it.
9  And if you're in the plaintiff business, as you
10 know, you eat what you kill.  You don't have
11 regular income.  You don't bill hourly.  And so you
12 know, it's a risk.
13     Q.  Right.  This is what I'm asking.  You
14 heard Ms. McAlister testify.  Are you able to
15 dispute the accuracy of her description of what
16 assets were purchased by Wyatt & McAlister?
17     A.  I don't think so, but -- you know, what I
18 recall her saying -- I agree with the server for
19 sure.  I can't talk about the coffee pot.  I don't
20 know.  And I don't remember what else she said.
21     Q.  Okay.
22     A.  You know, she's pretty detailed about
23 these things, and so, you know, she might be right.
24 She would notice if they went and bought a, you
25 know, set of dishes or something like that.  I

Page 193

1  wouldn't, but. . .
2          MR. SHAPLEY:  Okay.  That's all I
3  have.  Thank you.
4          MR. SNEED:  Okay.  Redirect?
5          MR. TUCKER:  I don't believe so.  I
6  think we've heard it all.
7          MS. TURNER:  Bobby, I've got a few
8  questions.
9          MR. SNEED:  Oh, sorry.  Yeah.  Okay.
10 Like I said, jump in there.  I don't mean to forget
11 about you down there.
12         MS. TURNER:  I know you don't.  I'll
13 just sit over here next to Bobby.
14         CROSS-EXAMINATION
15 BY MS. TURNER:
16     Q.  Derek, am I correct in assuming or
17 deriving from your testimony there is no operating
18 agreement between you and Meg for Wyatt &
19 McAlister?
20     A.  That is correct.
21     Q.  Okay.  And there's no writing whatsoever
22 to memorialize an agreement between Meg and David
23 Nutt or Nutt & McAlister and Wyatt & McAlister,
24 correct?
25     A.  You know, I would quibble a little bit

Professional Court Reporting, LLC
601.919.8662

Page 194

1   with that in the sense that, you know, this global
2   Exhibit 1 contains in it -- no, you haven't
3   probably seen all those documents -- but memo after
4   memo after memo confirming the acquisition. And
5   listing in detail exactly what we're -- what was
6   moved to there and what is being priced after we
7   moved there, you know. And so --
8       Q.   And I'm sorry. I understand. I've looked
9   through the exhibits --
10      A.   Oh, okay.
11      Q.   -- and I see the e-mail correspondence.
12  But, I mean, you guys -- or you haven't ever seen,
13  to the best of your knowledge, a nifty agreement
14  called an asset purchase agreement?
15      A.   That's right.
16      Q.   Nothing along those lines that would
17  clearly memorialize what was contemplated between
18  Meg and David or Nutt & McAlister and Wyatt &
19  McAlister?
20      A.   That's true. I've never seen that
21  document, if there is one.
22      Q.   Wyatt & McAlister entered into a lease
23  with Carousel Development, did it not?
24      A.   It did.
25      Q.   Okay. On September 22nd, 2008. Is that

Page 195

1   right?
2       A.   Well, that. . . Let's see.
3       Q.   I think it's Exhibit 7 in your global
4   exhibit.
5       A.   I'm looking at the date. It doesn't look
6   like September. It looks like a two-digit month.
7       Q.   October 21st, 2008?
8       A.   That's probably right. My copy is not
9   real clear, but --
10      Q.   It is. It's October 21st, 2008.
11      A.   Okay.
12      Q.   And at that time a deposit was made, was
13  it not?
14      A.   A rent deposit?
15      Q.   Correct.
16      A.   Yes, it was, uh-huh.
17      Q.   Okay. And it was also on that same date
18  that a first deposit was made into the Wyatt &
19  McAlister checking account from Meg's personal
20  account. Is that true?
21      A.   I'd have to see a record to testify to
22  that. I can't tell you from personal knowledge,
23  but this is a bank statement here --
24      Q.   This is the bank statement right here,
25  Exhibit 6. And I believe if you flip back to the

Page 196

1   back, should be the very first bank statement would
2   show that there were two credits made in October.
3   The Quickbooks account lists Meg's contribution,
4   capital contribution of $25,000.
5       A.   On what date?
6       Q.   October 20th.
7       A.   Okay. Well, that would be the day before
8   the lease was signed.
9       Q.   Do you know how many payments on the lease
10  Wyatt & McAlister made?
11      A.   Well, I don't. But we would have -- I'm
12  assuming you mean payments -- you're calling that a
13  deposit, so you're talking about rental payments.
14      Q.   Rental payments.
15      A.   I feel safe in saying that there was one
16  for at least a half a month in October -- well, I
17  don't know. Let me strike that. There would be
18  one in November. There would be one in December.
19  So those two, at least, and maybe for that piece of
20  the month in October.
21      Q.   Okay. Would you agree with me that no
22  payments were made by Wyatt & McAlister subsequent
23  to Meg's departure in January 2009?
24      A.   I would agree with that.
25      Q.   And is it your testimony that Meg left the

Page 197

1   premises on January 9th of 2009, the date of her
2   resignation?
3       A.   Is that a Friday?
4       Q.   It's the date from the e-mail that you
5   introduced in your global exhibit.
6       A.   Okay. Well, if January 9th is a Friday, I
7   just know that that's the date. I mean, the day of
8   the week that she left, yes.
9       Q.   Okay. The day she left and circulated an
10  e-mail to the staff saying she was leaving at
11  5:00 p.m. that day?
12      A.   That's right.
13      Q.   That's the day she left the premises?
14      A.   That's right.
15      Q.   Did she ever return to the premises, to
16  the best of your knowledge?
17      A.   Yes. She and Mr. Sclafani tried to come
18  back and get in after the doors -- the locks were
19  changed. They tried to, but the police told them
20  not to, to leave.
21      Q.   Okay. Is that February 11th where they
22  confronted you in the parking lot trying to gain
23  access?
24      A.   Yes. That's that day they -- I was
25  leaving out of the parking lot, and they were

50 (Pages 194 to 197)

Page 198

1  coming in. And Mr. Sclafani gave me an ultimatum
2  and told me they were, and I told him that
3  contrary --
4       MR. SHAPLEY: That's hard to believe.
5       THE WITNESS: To what the -- the
6  police had intervened earlier when Meg had arranged
7  secretly for the Nutt people to come over and seize
8  the files from right under my nose. And I didn't
9  know that.
10      And so the police had intervened that
11  day and told them to put our files back and leave.
12  That was on or about January the 9th. And so this
13  is the second occasion she and Mr. Sclafani came
14  and attempted to enter the premises.
15      But I had left. So I was not there.
16  There was no confrontation whatsoever. My
17  understanding is the police told them, No, leave.
18  MS. TURNER, CONTINUED:
19      Q.  Okay. You mentioned changing the locks.
20  When did you change the locks?
21      A.  It would have been after -- if January the
22  9th was Friday, that's the day she left. There
23  were a couple of days the next week that I had to
24  deal with the three employees. And I did exit
25  interviews with them, and then had to get their

Page 199

1  keys and all of that back.
2       And so it would have been after that. And
3  I'm thinking January 13th, 14th, somewhere --
4       Q.  So about within a week after Meg left, you
5  changed the locks on the premises?
6       A.  I think that's about right. There may be
7  a receipt or something that proves the actual date,
8  but. . .
9       Q.  Okay. You also mentioned that there was a
10  time that either David Nutt returned to the
11  premises or Meg returned to the premises with other
12  people to remove property. Do you recall that
13  occasion?
14      A.  No, I don't recall that.
15      Q.  Okay. You don't recall any type of an
16  arranged meeting where either representatives of
17  David Nutt or Meg's returned to the premises with
18  pickup trucks and loaded property?
19      A.  No. That was the day that she had -- the
20  resignation day. The people that came with the
21  pickup trucks, all that was prearranged without my
22  knowing it.
23      The Friday that she was intending to leave
24  and resign, all of it had been prearranged with
25  Nutt and everyone that they were going to come and

Page 200

1  seize the files right away, catch me unawares, and
2  take all that away. And that's the day the police
3  intervened. But I don't recall another occasion
4  when they --
5       Q.  No. They --
6       A.  Now, what you may be referring to --
7       Q.  I was going to say, I'm in that office. I
8  know there is a day --
9       A.  Okay.
10      Q.  -- that people came to that office --
11      A.  You're right.
12      Q.  -- and removed personal property from that
13  space.
14      A.  That's right. And what threw me off is --
15  okay. This is what that was about. We had Vioxx
16  files in our office, which were Nutt in a joint
17  venture with Crymes Pittman and other people, and
18  we were -- our employees were working on their
19  files, but they claimed that they were unlawfully
20  in our office.
21      We weren't even getting paid for our
22  employees working on their files. But this lawyer,
23  Welch, started threatening me and telling me I had
24  about two hours to deliver something -- some untold
25  number of boxes and computer information to him. I

Page 201

1  came to find out later that he was not being
2  truthful about what he was saying. Nonetheless --
3       Q.  Is that Scotty Welch?
4       MR. SHAPLEY: No, that was Vic Welch.
5  MS. TURNER, CONTINUED:
6       Q.  Vic Welch?
7       A.  Victor Welch, one of Ms. McAlister's
8  co-counsel. And Mr. Welch wrote me letters and
9  told me I had two hours to do this and that. So
10  what happened was, I wrote him back telling him no,
11  and that if you do this any further, I'll take some
12  legal action against you --
13      Q.  And don't mean to interrupt, Derek. All I
14  really want to know is: What was taken out of the
15  office?
16      A.  Well, it wasn't taken. That was what I
17  was trying to get to, and I'm sorry I'm telling
18  you --
19      Q.  Or just what was removed from the office.
20      A.  What happened was, I finally agreed to get
21  together whatever it was he was claiming, you know,
22  these Vioxx hard copy files, and to deliver them,
23  you know. Him to come, and he was going to -- you
24  know, we were going to document what he was taking.
25  So that's probably what you're thinking about, Kim.

Page 202

1    That was it.
2    Q.  Okay.  And these are boxes of –
3    A.  Those are case files.  There wasn't any
4    property.  See, that's what was throwing me off.
5    You were talking about personal property.  There
6    was no personal property.
7    Q.  But they were case files?
8    A.  Case files.
9    Q.  How many boxes?
10   A.  It's documented.
11   Q.  It is?
12   A.  Yeah, uh-huh.
13   Q.  Okay.  Do you have an exhibit where it was
14   documented?
15   A.  Do we have that?
16   Q.  Were you present when the boxes were
17   taken?
18   A.  Oh, yeah, I filmed it.
19   Q.  You filmed it?
20   A.  Uh-huh (affirmative response).
21   Q.  Okay.
22   A.  I couldn't tell you off the top of my
23   head.  It may have been as many as 54 boxes, but
24   I'm not sure about that.  And, also, some of that
25   was not just Vioxx.  It was some of Nutt's Rezulin,

Page 203

1    Propulsid, I don't know what all.  Just, you
2    know --
3    Q.  Just case files?
4    A.  Yeah.  Old dead files that had been moved
5    to our office pursuant to the acquisition
6    agreement.
7    Q.  Okay.  And after Meg moved out of the
8    premises on January 9th, you continued to stay on
9    the premises, did you not?
10   A.  That's right.
11   Q.  On what date did you move out, Derek?
12   A.  You're testing me.  I think it was in May,
13   Kim.
14   Q.  Could it be possible it was August?
15   A.  It could be.
16   Q.  Okay.  So if I said August 1st --
17        MR. SHAPLEY:  It was May or August.
18        THE WITNESS:  Yeah, could be.
19   MS. TURNER, CONTINUED:
20   Q.  If I said August 1st, 2009, you wouldn't
21   contradict me?
22   A.  Yeah.  If you have something that confirms
23   what date it was, I won't argue with you a bit, I
24   promise you.
25   Q.  And from January 2009 through the date

Page 204

1    that you actually left the premises, no rent was
2    paid to Carousel Development, was it?
3    A.  That is correct.  And I had a discussion
4    with Sherman Chaplin about that.  And I told him
5    that I had filed a judicial dissolution and copied
6    you with it as soon as he retained you.
7        And I told him that I was attempting to
8    get a trustee or a receiver appointed, and
9    hopefully that would bring some resolution to the
10   problem.  As you know -- anyway.
11   Q.  Okay.  And if I understand what you said
12   to Chris, you are in agreement with Meg's
13   Exhibit 3, I believe, where she sets forth all the
14   hard assets that were taken from David Nutt's
15   office to the Wyatt & McAlister office?
16   A.  I don't know what that exhibit is.  Can we
17   take a look at it?  I just want to make sure.  I
18   don't want to give you a wrong answer here.  I
19   would have to say that I don't know what's in this
20   Exhibit 3.  Okay?
21        I think she prepared this, and then had
22   someone go dig up these ancient invoices, dated
23   back to '99, whatever.  I've never seen any of
24   this.  What I rely on is what was in Wyatt &
25   McAlister's office is what's on her acquisition

Page 205

1    memo.  That makes this stuff look like child's
2    play.  It's got the serial number of everything
3    down to a fountain pen on it.
4    Q.  Well, actually, the memos you're relying
5    on are less specific than Exhibit 3 right,
6    because --
7    A.  Well --
8    Q.  -- Meg does endeavor to be very specific
9    about keyboards and computer mouse and furniture
10   and fixtures, which were just very generalized in
11   the other memos to which you're referring.
12   A.  All right.  Well, then you've looked at
13   them harder than I have.  My point of saying is,
14   I've not reviewed this (indicating).
15   Q.  Okay.
16   A.  So what I always relied on was this
17   (indicating).  This is -- this Exhibit 3 --
18        MR. SNEED:  "This" is Exhibit 3.
19        THE WITNESS:  -- is what they've come
20   up with for today's hearing.
21   MS. TURNER, CONTINUED:
22   Q.  Right.
23   A.  And was compiled, you know, for it.  So
24   while I can't dispute it, I wouldn't sit here and
25   tell you that all this is wrong.  My knowledge

Professional Court Reporting, LLC
601.919.8662

Page 206

1    resides in this over here, this global 1.
2        Q.   Let me ask you this: Had you ever seen
3    this before until you filed the petition for
4    judicial dissolution of the partnership or the LLC?
5        A.   That wasn't even produced in the judicial
6    dissolution proceeding earlier --
7            MR. SNEED:  Are we still talking
8    about Exhibit 3?
9            MS. TURNER:  We are still talking
10   about Exhibit 3.
11   MS. TURNER, CONTINUED:
12       Q.   So this Exhibit 3, to the best of your
13   knowledge, wasn't prepared simultaneous or
14   contemporaneous with the move from Nutt & McAlister
15   to Wyatt & McAlister, to the best of your
16   knowledge?
17       A.   Not to my knowledge.  That's an
18   after-the-fact document.
19       Q.   That was prepared in litigation?
20       A.   I think so, although I didn't prepare it
21   myself.
22       Q.   Okay.  Where is the server?
23       A.   The server is with me.  I have it.
24       Q.   Okay.  And aside from the hard assets --
25   let's move back towards maybe receivables.  Is it

Page 207

1    your contention that the Avandia files belong to
2    Wyatt & McAlister?
3        A.   Absolutely, they do.
4        Q.   Are they being worked right now?
5        A.   Well, they've been associated to Beasley
6    Allen law firm.
7        Q.   Okay.
8        A.   And I don't know what the status of them
9    is at this time.  But, you know, we were not taking
10   an active role in that.  As you know, Beasley Allen
11   is a mass tort firm.  And so you do -- you fill out
12   the forms they tell you to fill out --
13       Q.   Right.
14       A.   -- and get the information from your
15   client, and you turn it over to them, and you keep
16   your fingers crossed, and that's what we did.
17       Q.   Of the 70 some odd letters, I believe,
18   that are part of your Exhibit 23, which is a part
19   of your global exhibit, did you -- did Wyatt &
20   McAlister receive responses back from those clients
21   written?
22       A.   I think so, but I was not the person that
23   processed that.
24       Q.   Who was the person that processed it?
25       A.   Judy Groff, G-r-o-f-f.

Page 208

1        Q.   And I believe you testified as to other
2    open files.  And just so we're clear, online
3    travel, is that a file that belongs to Wyatt &
4    McAlister or to Nutt & McAlister?
5        A.   That's a file that belongs to Wyatt &
6    McAlister exclusively.
7        Q.   And what's the status of that case?
8            COURT REPORTER:  I'm sorry --
9            THE WITNESS:  Exclusively.  I'm
10   sorry.
11           MR. SHAPLEY:  "It belongs to Wyatt &
12   McAlister exclusively."
13           COURT REPORTER:  Thank you.
14           THE WITNESS:  Can I get a glass of
15   water?
16           MS. TURNER:  Sure.
17           (OFF THE RECORD.)
18   MS. TURNER, CONTINUED:
19       Q.   Online travel, that's a Wyatt & McAlister
20   case?
21       A.   Yes, it is.
22       Q.   Being worked right now?
23       A.   Actually there's nothing active at this
24   moment on that.
25       Q.   Defective laptop, is that a case that

Page 209

1    belongs to Wyatt & McAlister?
2        A.   It was a case that we were associated in,
3    and it was -- we were not included as a result of
4    Ms. McAlister withdrawing from the law firm.
5        Q.   Which law firm associated Wyatt &
6    McAlister?
7        A.   John Crongeyer.
8        Q.   Heparin litigation, is that ongoing?
9        A.   I don't know if any cases actually got put
10   together and associated or not, but we solicited --
11   you know, lawfully solicited our clients who had
12   Heparin problems.  And that nurse, that woman I
13   talked about, she's the one that processed those
14   documents.
15       Q.   Okay.  Is that a litigation or a case
16   belonging to Wyatt & McAlister?
17       A.   If there is any litigation, yes.
18       Q.   But you're unaware of the status?
19       A.   I'm unaware.
20       Q.   American Express litigation, is that
21   ongoing?
22       A.   There's nothing ongoing on that.
23       Q.   AOL?
24       A.   Same.
25       Q.   Davis versus -- is it Hall or Hill?

Professional Court Reporting, LLC
601.919.8662

Page 210

1    A.  Hill.
2    Q.  Uh-huh.
3    A.  It's a --
4    Q.  Car wreck case?
5    A.  -- car wreck case that there's nothing
6  active going on in right now.
7    Q.  Does it belong to Wyatt & McAlister?
8    A.  It does.
9    Q.  Mark Patrick file?
10   A.  That's something that Ms. McAlister --
11   Q.  Not an ongoing litigation or an ongoing
12  case?
13   A.  I don't know anything about it.
14   Q.  And the hot gas litigation?
15   A.  Hot gas is not active.
16   Q.  Is that a file that belongs to Wyatt &
17  McAlister?
18   A.  It does, uh-huh.
19   Q.  Is there the possibility it will be
20  active?
21   A.  Not since the law firm dissolved or, you
22  know, broke apart or whatever the term may be.
23   Q.  Okay.  Are there actual clients that are
24  signed up in this litigation?
25   A.  Well, we had clients ready to sign up, but

Page 211

1  it -- see, most of these things -- as you know, we
2  were only in existence two months.  And so you have
3  all this formative book of business that you're
4  trying to develop.  And so when the law firm, you
5  know, splits up, you really haven't had time enough
6  even to make it coalesce real good.
7    Q.  Okay.
8       MS. TURNER:  That's all I have.
9       MR. SNEED:  Redirect?
10      MR. TUCKER:  No redirect.
11      MR. SNEED:  Okay.  Davey, you calling
12  any more witnesses?
13      MR. TUCKER:  Let me have a little
14  brief couple of minutes.
15      MR. SNEED:  Take about a five-minute
16  break.
17         (OFF THE RECORD.)
18      MR. TUCKER:  Plaintiff rests his
19  case.
20      MR. SHAPLEY:  And then we'll rest.
21      MR. SNEED:  Chris, you recalling Meg?
22      MR. SHAPLEY:  Yeah.
23      MR. SNEED:  Okay.
24      MR. SHAPLEY:  Just briefly.
25      MR. TUCKER:  Recall who?

Page 212

1       MR. SHAPLEY:  Meg.
2       MR. TUCKER:  Weren't we on
3  cross-examination?
4       MR. SHAPLEY:  Yeah.  Y'all want to
5  finish?
6       MR. TUCKER:  Well, we -- yeah.  I
7  mean --
8       MR. SHAPLEY:  I think that's right.
9       MR. TUCKER:  -- I'm Just trying to
10  clear up where we are --
11      MR. SHAPLEY:  That's right.
12      MR. TUCKER:  We rested our case, and
13  then we're on cross-examination of her.
14      MR. SNEED:  I believe that's correct.
15      MR. TUCKER:  So we may or may not --
16  did we make a decision if we do or do not?
17      MR. WYATT:  I mean, there's one item
18  that's sort of a housekeeping item that Chris has
19  objected to 38, sub 38.  And I think we took it out
20  of the exhibit there.  I know it'll be still
21  included.
22      But what the court reporter has in
23  her possession, I probably am going to make a
24  proffer regarding that document of some sort, a
25  short one.  But we dispute the characterization

Page 213

1  that Judge Brewer found this was attorney-client
2  privilege and all of that and would offer that --
3  alternatively that this document does not represent
4  any attorney-client privilege relation, but
5  moreover even it did, it constitutes an exception
6  under the crime fraud exception of the
7  attorney-client privilege rule.
8       And so we think it's highly relevant,
9  because it contains an admission that I was owed
10  money by the Nutt entities.  And, of course, that
11  is part of this case, because it explains why there
12  was a reneging on the acquisition agreement.  And
13  that is because I made demand for those monies and
14  insisted those monies be paid to me.  And that
15  forms the explanation for why Nutt and
16  Ms. McAlister reneged on the agreement.  So that's
17  the proffer about that.
18      MR. SNEED:  Okay.  Any response?  You
19  want to respond?
20      MR. SHAPLEY:  Yeah.  I want to ask
21  Meg questions about that.  So are y'all --
22      MR. TUCKER:  Is this still in the
23  context of -- are you going forward with your
24  redirect?
25      MR. SHAPLEY:  Well, yeah.  I want to

Professional Court Reporting, LLC
601.919.8662

Page 214

1  clean up a few things --
2      MR. TUCKER: I was just wondering.
3      MR. SHAPLEY: I was going to do that
4  and a couple of other things, and then I'll be
5  done.
6      MR. TUCKER: Okay. Well --
7      MR. SHAPLEY: So you want me to go on
8  with that now?
9      MR. TUCKER: No. I'm going to let
10  you decide that, but we're not going to do any more
11  cross on Meg. So we're going to go ahead and
12  tender her over to your redirect.
13      MR. SHAPLEY: Okay.
14      MR. TUCKER: That's what I'm trying
15  to get around to.
16      MR. SHAPLEY: Okay.
17          MARY EDITH MCALISTER,
18      having been previously sworn,
19  was further examined and testified as follows:
20          REDIRECT EXAMINATION
21  BY MR. SHAPLEY:
22      Q.  Just briefly, Meg, Exhibit 38 that
23  Mr. Wyatt was referring to --
24      A.  Could I please see a copy of it?
25          (OFF THE RECORD.)

Page 215

1      MR. TUCKER: Let me ask you this:
2  Did we mark that as an exhibit for identification
3  only?
4      MR. SNEED: We're going to do that.
5  Whenever --
6      MR. SHAPLEY: Let's do that. That's
7  what I want to do.
8      MR. TUCKER: Okay.
9      MR. SNEED: Y'all ready?
10      MR. SHAPLEY: Yeah, I'm ready.
11      MR. SNEED: Go ahead. We're going to
12  do that before it's all over with. If you want to
13  go ahead and mark it for identification, that's
14  fine.
15      MR. SHAPLEY: Okay. Let's just mark
16  this document for identification purposes as --
17  what will it be, 11?
18      MR. SNEED: Actually, the next
19  numbered I've got --
20      MR. SHAPLEY: What's the next number?
21      MR. SNEED: Did I miss something?
22      COURT REPORTER: Since he's been
23  marking them, I've lost track.
24      MR. SHAPLEY: I've got 10 here was
25  the letter. It would be 11. So for the record,

Page 216

1  Exhibit 11 here now was Exhibit 38 within global
2  Exhibit 1.
3      MR. SNEED: For identification.
4      MR. SHAPLEY: This is for
5  identification. I'm handing this to Ms. McAlister.
6      (EXHIBIT 11 WAS MARKED FOR IDENTIFICATION.)
7  MR. SHAPLEY, CONTINUED:
8      Q.  And asking you if you recognize that.
9      A.  Yes, I do.
10      Q.  Where did that come from?
11      A.  This is a confidential note I made to
12  myself, which I saved on my -- to the desktop of my
13  computer, protected by a password, at Wyatt &
14  McAlister.
15      Q.  Okay. And is there any way anybody could
16  have accessed that information off your computer
17  without using your password?
18      A.  No.
19      Q.  All right. Now, there's been some
20  testimony about the demand letters that Mr. Wyatt
21  wrote to Mr. Coward saying that the Nutt entities
22  owed him money, and those are all in the record,
23  and you're familiar with those, right?
24      A.  I am now.
25      Q.  Yeah. Okay. Well, those were all in the

Page 217

1  time frame -- one of them was dated December of
2  '08, and then one of them was in January of '09.
3  In the December 2008 time frame, did you begin to
4  have discussions with Mr. Wyatt about his belief
5  that he was owed money by the Nutt entities?
6      A.  I'd been having discussions with Mr. Wyatt
7  and people at Nutt & McAlister about the question
8  of whether Derek, David Nutt, and myself were still
9  owed money from the Katrina litigation.
10      Q.  All right.
11      A.  It wasn't limited to just a question of
12  whether Derek was owed money.
13      Q.  Did it become apparent to you that
14  Mr. McAlister was considering litigation against
15  the Nutt entity -- Mr. Wyatt was considering
16  litigation against the Nutt entities for this
17  money?
18      A.  Yes.
19      Q.  And when did that happen?
20      A.  I believe Derek sent a demand letter to
21  Ernie Coward on Christmas Eve -- very close to
22  Christmas. And the tone and tenor of that letter
23  made me realize that Derek was probably gearing up
24  to sue. Then --
25      Q.  Well, he wrote one letter -- not to

Professional Court Reporting, LLC
601.919.8662

Page 218

1  interrupt you, but he wrote one letter on
2  December 19, which is Exhibit 8?
3      A.  I don't think -- I'm not copied on this
4  letter.
5      Q.  Okay.
6      A.  I don't believe I ever received this
7  letter or saw this letter until some time much
8  later.
9      Q.  Okay.
10     A.  You know, I didn't get this letter on
11  December 19th.
12     Q.  All right.  So some time after
13  December 19th, you became aware that Mr. Wyatt was
14  considering a more formal process of making a
15  claim?
16     A.  Yes.  And it certainly was driven home to
17  me when Mr. Wyatt sent a preservation of evidence
18  letter to the Nutt entities and e-mailed a copy to
19  me.  The date of his preservation letter, was
20  December 31st, 2008, which, of course, was a
21  holiday.  So I did not actually see his
22  preservation letter until I returned to the office
23  on Friday, January 2nd, 2009.
24     Q.  And what was your reaction to this
25  information, that he was considering litigation

Page 219

1  against your old law firm and you?
2      A.  The recognition that he was in a grotesque
3  breach of fiduciary duty to me.  I realized he had
4  defrauded me in forming Wyatt & McAlister,
5  defrauded me in representing to me that we were
6  going to build a law firm from scratch and that we
7  were going to use all the experience we had learned
8  about bad faith insurance litigation in Katrina to
9  pursue other hurricane claims.
10         I got us an invitation to participate in
11  Hurricane Ike cases.  I thought we were there in
12  good faith to build a law firm and work hard on
13  Wyatt & McAlister matters.  But I came to realize
14  apparently Mr. Wyatt never intended to work on
15  anything other than suing David Nutt and me.
16     Q.  After it became apparent to you that that
17  was his intention, did you cease your efforts to
18  acquire the assets of Nutt & McAlister?
19     A.  Absolutely.
20     Q.  Did you cease your assets to acquire the
21  Nutt & McAlister law firm?
22     A.  Yes.
23     Q.  Is that why you did?
24     A.  Yes.
25         MR. SHAPLEY:  That's all the

Page 220

1  questions I have.
2          MR. SNEED:  Cross?
3          MR. WYATT:  Yeah.  May I, Bobby?
4          MR. SNEED:  Yeah.  Who were -- were
5  you taking cross, or was Derek taking cross a
6  minute ago?
7          MR. TUCKER:  He was.
8          MR. SNEED:  Okay.
9              RECROSS-EXAMINATION
10  BY MR. WYATT:
11     Q.  Is it your testimony that you never
12  represented to me that David Nutt had agreed to
13  sell his 80 percent of Nutt & McAlister, and it was
14  with those assets, both tangible an intangible,
15  that we were going to launch our new law firm?
16     A.  No.  I never represented that to you.
17     Q.  Okay.  So did you and I travel to
18  Clarksdale, Mississippi and meet with the entire
19  Merkel Cocke law firm for a whole day to discuss
20  nothing but whether we had meritorious claims
21  against other members of the Katrina venture?
22     A.  We met with Mr. Merkel and other members
23  of his firm to discuss the possibility that I might
24  be able to acquire Nutt & McAlister.  You were
25  there to discuss the possibility of you pursuing a

Page 221

1  lawsuit, which I refer to as your derivative claim,
2  against Mr. Scruggs.
3      Q.  So today you're separating us out as if we
4  didn't have a common interest?  Is that what you're
5  saying on the record?
6      A.  I don't understand what you're saying
7  about common interest.
8      Q.  When Nutt & McAlister's 80 percent was
9  being acquired, the agreement for Mr. Nutt was
10  that, yes, he was transferring those intangible
11  rights to pursue a claim, right?
12         MR. SHAPLEY:  Object to the form of
13  the question.
14         THE WITNESS:  Mr. Nutt --
15         MR. SHAPLEY:  That assumes that he
16  had agreed to sell his 80 percent interest.
17         MR. TUCKER:  He's on cross.
18         MR. WYATT:  Yeah.
19         COURT REPORTER:  I'm sorry?
20         MR. SNEED:  Okay.  Wait a minute.
21  One at a time.
22         MR. TUCKER:  He's on cross.
23         MR. SHAPLEY:  I'm trying to make an
24  objection.
25         MR. SNEED:  Yeah.  Go ahead, Chris.

Professional Court Reporting, LLC
601.919.8662

Page 222

1      MR. SHAPLEY: He said when Mr. Nutt
2  agreed to sell his 80 percent interest, and I
3  objected to the form of the question, because
4  there's no testimony he ever agreed to sell his 80
5  percent interest.
6      MR. SNEED: Okay. She's on
7  cross-examination, so I'll overrule your objection.
8  MR. WYATT, CONTINUED:
9      Q. We've already been through that, because
10 we formed our law firm on the very day that you
11 wrote the memo that you had discussed it with him,
12 and he had agreed.
13      My question to you is this: Are you
14 testifying here today that there was no agreement
15 that we would acquire that right to sue, that right
16 to pursue a claim, if one existed? And the reason
17 we went to the Merkel law firm is we had completely
18 *disparate interests?* I was there wearing one hat,
19 and you were wearing a completely different one?
20 Is that your testimony today?
21      A. Your question is so compound, it's so
22 confusing --
23      MR. SNEED: It really is, Derek.
24      THE WITNESS: -- and I don't
25 understand it.

Page 223

1      MR. SNEED: There are multiple
2  questions within that one statement.
3      MR. WYATT: Let me see if I can
4  rephrase it.
5  MR. WYATT, CONTINUED:
6      Q. Ms. McAlister, do you recall you and I
7  gathering up big bunches of documents and sending
8  them to the Merkel law firm for review?
9      A. Yes.
10      Q. Do you recall us having multiple
11 discussions about us going to meet with the Merkel
12 law firm?
13      A. I don't remember multiple discussions. I
14 remember we arranged an appointment, and we went.
15      Q. Okay. We went twice, didn't we?
16      A. Could be.
17      Q. Didn't we go up there first to see and
18 test the waters if they were even interested?
19      A. You're probably right. There probably
20 were two trips.
21      Q. And then we came back, and you directed
22 one of these people to go gather up a great deal of
23 documents to send off to him, and you copied me
24 with those documents. Am I right?
25      A. Probably.

Page 224

1      Q. Yeah. And then we spent the whole day,
2  virtually the whole day, with the entire law firm,
3  excluding maybe one lawyer that was out of the loop
4  for a while. Is that not true?
5      A. We spent probably the better part of the
6  day meeting with attorneys at Charlie Merkel's
7  office during which we explained to them the
8  origins of the Scruggs Katrina group, Mr. Scruggs'
9  conduct therein, the disqualification of Scruggs
10 Katrina group to represent State Farm insureds.
11      We may have discussed Mr. Scruggs'
12 involvement with the Rigsby sisters, and I think we
13 discussed Mr. Scruggs and your involvement with
14 another witness named Brian Ford, as I recall.
15      Q. Well, you do recall going there and giving
16 them all the documents and staying there all day
17 and discussing it with them?
18      A. I've asked -- you've asked that, and I've
19 answered it.
20      MR. SNEED: It has been asked and
21 answered.
22 MR. WYATT, CONTINUED:
23      Q. Okay. And you answered Mr. Shapley saying
24 that I -- you learned after December 19th, I
25 believe was the date he used, that I had written a

Page 225

1  demand letter and that I was asking for the monies
2  that were withheld from me to be paid. You were
3  aware of that, weren't you?
4      MR. SHAPLEY: I object. It's a vague
5  question. He was -- she was aware of that when?
6      MR. SNEED: Okay --
7      MR. WYATT: Well, after the letter --
8      MR. SNEED: Let me just interrupt you
9  at this point. My -- let me get the procedure of
10 where we are. Meg testifies on direct this
11 morning. You begin your cross-examination. We
12 then recess. You put your proof on. Meg comes
13 back on, and you decline to further cross-examine
14 Meg on the record, as I understand it.
15      Then one question is asked of Meg --
16 I say one question. One series of questions is
17 asked of Meg regarding Exhibit 11 and only
18 Exhibit 11 on redirect.
19      My understanding is, procedurally,
20 you are now limited to recrossing Meg on the
21 limited questions that were developed on redirect.
22 And now we're basically reopening the entire can of
23 worms, which I thought we had gotten way beyond.
24      MR. WYATT: I thought Exhibit 11 was
25 my demand letter.

## Page 226

1    MR. SNEED:  Exhibit 11 is the
2  document that Judge Brewer excluded from evidence,
3  and that I also excluded from evidence, and that
4  you made a proffer on.
5    MR. WYATT:  Well, his redirect was
6  based upon my demand letter.  Isn't that right?
7    MR. SNEED:  I think -- the only thing
8  I've got in my notes -- we can ask the court
9  reporter to go back, but the only thing I've got in
10  my notes was a couple of questions on Exhibit 11.
11    MR. SHAPLEY:  I asked that, and I
12  also asked Meg when she found out that her law
13  partner was fixing to sue her, is that why she
14  decided she didn't want to practice law with him
15  anymore, and she said yes.
16    MR. SNEED:  Okay.  That's fine.
17    MR. SHAPLEY:  But so I did ask that,
18  but this is going way beyond that.
19    MR. SNEED:  Okay.
20    MR. SHAPLEY:  He's going back into
21  stuff they talked about this morning.
22    MR. WYATT:  My understanding was that
23  Chris asked her about my demand letter.  I believe
24  you used the date December 19th.  You referenced
25  that off the letter, and you asked her whether she

## Page 227

1  learned after that that I was intending --
2    MR. SHAPLEY:  Right.
3    MR. WYATT:  -- and was that the
4  reason that --
5    MR. SHAPLEY:  The deal fell apart,
6  and she said so.  I did ask those questions, and
7  that's what she said.
8    MR. WYATT:  Okay.
9    MR. SHAPLEY:  But you're talking
10  about going to see Merkel and, you know, all this
11  other business about what you had been led to
12  believe, and that's beyond what I asked her.
13    MR. WYATT:  All right.  No further
14  questions.
15    MR. SNEED:  Okay.  Anything further
16  for this witness?
17    MR. SHAPLEY:  That's it.
18    MR. SNEED:  Thank you, ma'am.
19  Anything from -- Kim, any proof you want to offer?
20    MS. TURNER:  Nothing.  Thank you.
21    MR. SNEED:  All right.  Does that
22  conclude this?
23    MR. SHAPLEY:  That concludes it.
24    (OFF THE RECORD.)
25  (EXHIBIT 12 WAS MARKED AND ADMITTED INTO EVIDENCE.)

## Page 228

1  (PROCEEDINGS CONCLUDED AT APPROXIMATELY 3:00 P.M.)

## Page 229

1      CERTIFICATE OF COURT REPORTER
2    I, Bethany Cammack, Certified Shorthand
3  Reporter and Notary Public in and for the County of
4  Hinds, State of Mississippi, hereby certify that
5  the foregoing pages, and including this page,
6  contain a true and correct transcript of the
7  proceedings, as taken by me at the time and place
8  heretofore stated, and later reduced to typewritten
9  form by computer-aided transcription under my
10  supervision and to the best of my skill and
11  ability.
12    I further certify that I placed the
13  witnesses under oath to truthfully answer the
14  questions in this matter under the power vested in
15  me by the State of Mississippi.
16    I further certify that I am not in
17  the employ of or related to any counsel or party in
18  this matter, and have no interest, monetary or
19  otherwise, in the final outcome of the proceedings.
20    Witness my signature and seal this
21  the    day of          , 2009.
22
23  BETHANY CAMMACK, CSR
    CSR NO. 1526
24  My Commission Expires April 1, 2011
25