**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**

IN RE: WYATT &  McALISTER, P.L.L.C.,[1]                    Bankruptcy Case No.: 09-04354-EE
Chapter 7 Debtor

**REBUTTAL MEMORANDUM OF LAW SUBMITTED
BY INTERESTED PARTY FILER DEREK A. WYATT
IN OPPOSITION TO MARY McALISTER'S MOTION TO DISMISS**

CASE POSTURE AND PROCEDURAL ISSUES

After W&M filed a Chapter 7 petition, Mary Krichbaum McAlister ("McAlister"), a resigned but alleged member of W&M filed an "emergency" motion to dismiss[2] and demand for sanctions contending she had the right, in effect veto power, to legally nullify the filing. [Dkt. 6]. McAlister concedes she ceased her affiliation with the Debtor by "resigning" from W&M eleven months prior to the filing. [Dkt. 6, Exhibit A].

Putting the cart before the horse, after much crowing about sanctions, the motion cites no rule authority for dismissal. [Dkt. 6]. Without knowing, it is assumed McAlister relies on 11 U.S.C. § 707(a), and alleges as "cause," lack of corporate authority to file.[3] Since McAlister bears the burden of proof, at least initially, this fundamental omission may alone justify the Court's denial of the motion. *See, e.g. Turner v. Johnson (In re Johnson)*, 318 B.R. 907, 912 (Bankr. N.D. Ga. 2005) [The ultimate burden is on the moving party to demonstrate that cause exists for dismissing a Chapter 7 petition for lack of good faith pursuant to § 707(a)].  However, as the briefs show, there are "bigger fish to fry" in this dispute.

In his capacity as an interested party filer, Wyatt timely responded and objected to the motion, attaching an "Affidavit and Supporting Records," containing nine pages of W&M

---

[1] In this memorandum, "W&M" or "W&M PPLC".
[2] In this memorandum, "McAlister's motion."
[3] LLC's are unincorporated entities.  The term "corporate" is used generically.

records. [Dkt. 43]. The response asserted a claim for sanctions against McAlister and her attorney, and requested the court strike McAlister's pleading as containing scandalous, unfounded claims. [Dkt. 43].

On March 5, 2010, the Court set the motion for trial. The Court set April 12, 2010, as a final briefing deadline for rebuttal briefs, and noted for the record two exhibits offered by McAlister – the certificate of formation and her "resignation" letter. Wyatt submitted business record exhibits 1-40, which were marked for identification.

Nearly nine days after Wyatt and the Debtor's attorney had filed their memoranda opposing the motion, McAlister filed a "Supplement to Emergency Motion," attaching a 229 page hearing transcript never offered in support of her motion. [Dkt. 83]. The pleading and transcript was served on the debtor's attorney and Wyatt three (3) days prior to the deadline for filing rebuttal briefs.[4] Like the motion to dismiss, the "Supplement to Emergency Motion" cited no authority for submitting new exhibits after the motion had already been briefed. [Dkt. 83].

## FRAMEWORK OF LEGAL ISSUES

McAlister's motion arises in a rare context. First, this is not a consumer Chapter 7 filing, the typical platform for section 707 motions. Second, this writer has found no reported case wherein a "resigned" member of an LLC – to be sure an *ultra vires* resigned member – sought to challenge a Chapter 7 filing on grounds of "corporate" authority to file. Though Wyatt is the only member of W&M who has not resigned, and is otherwise in good standing, McAlister disputes his authority to file the petition on behalf of W&M.

---

[4] By separate motion, Wyatt will request that the court strike the "Supplement" pleading and attached transcript, none of which was asserted as a basis for dismissal in the motion now before the court. For purposes of this rebuttal, Wyatt deems the "Supplement" to fall outside the scope of matters before the Court.

In this case, the Court must look to the law of the state of Mississippi, W&M's origin state, to determine whether the Chapter 7 petition filed was filed with proper authority. *In Re: Delta Starr Broadcasting, L.L.C.*, Civil Action No. 05-2783 Section: R(3), E.D. La., 2006 U.S. Dist. Lexis 4477, [citing *Price v. Gurney*, 324 U.S. 100, 106, 65 S. Ct. 513, 89 L. Ed. 776 (1945); *Berger v. Newhouse* (*In re Pirhana, Inc*.), 83 Fed. Appx. 19, 21 (5th Cir. 2003)]. Two primary sources of Mississippi law are applicable in this case: *The Mississippi Limited Liability Company Act*, ("Ms LLC Act")[5] and common law.

If analysis of Mississippi law shows Wyatt had authority to file on behalf of the LLC, McAlister's motion must be denied, and the Court must move to phase two, the consideration of sanctions against McAlister and her attorney. The analysis of law calls for an interplay of statutory law (Ms LLC Act) and the law of fiduciary duty as it governs the acts of LLC members, in their status as pure members, and as member-managers. *See, e.g., Kumar vs. Kumar, individually and as manager of Mit-Sar, L.L.C.*, 2009 U.S. Dist. LEXIS 26708, N.D. Miss. (March 31, 2009); (in a husband-wife LLC, the (former) husband member-manager breached his fiduciary duty to the LLC, and derivatively its other member, by converting and misappropriating LLC's assets and funds). (Relevant provisions of the Ms LLC Act as to voting, management powers, dissociation, withdrawal and wrongful dissolution, were extensively discussed in the Wyatt's initial Memorandum of Law opposing McAlister's motion [Dkt. 75], and will not be repeated here).

Under Mississippi law, W&M is the LLC equivalent of a close corporation, and its members are governed by a fiduciary standard of care. *Kumar, supra* at 25; *see also*, *Derouen v. Murray*, 604 So. 2d 1086, 1090-91 (Miss. 1992); and *ERA Franchise Sys. v. Mathis*, 931 So.2d

---

[5] Miss. Code Ann. §§ 79-29-101 *et seq*. (1972), as amended.

1278, 1281 (Miss. 2006).  It is undisputed that W&M is a member-managed "default" LLC, having the provisions of the Ms LLC Act as its "operating agreement."  Its members are also subject to a standard of fiduciary care, which in effect is read into W&M's "operating agreement."  As one court put it when construing a Georgia partnership at will, "a partnership agreement includes, as a matter of law, an agreement for each partner to act 'in the utmost good faith' toward the other partner." *Arford v. Blalock*, 405 S.E.2d 698, 702 (Ga. Ct. App. 1991).  *Accord*, *Asgharneya et al. v. Hadavi et al.*, 680 S.E.2d 866 (Ga. Ct. App. 2009).

Generally, fiduciary duties in an LLC impose a duty of care, and a duty of loyalty.  *See* Mary Szto, *Limited Liability Company Morality: Fiduciary Duties in Historical Context*, 23 Quinnapac L. Rev. 61 (2004).  These duties may arise in a variety of contexts, either through statute, common law, or contractual terms of an operating agreement.  For example, the Virginia Supreme Court cited an LLC statute requiring that managers act "in good faith business judgment of the best interests" of the LLC when it held that two brothers in a three member LLC breached fiduciary duties by transferring the entire LLC's interests to a new LLC, and dissolving the original LLC.  *Flippo v. CSC Associates III, LLC*, 262 Va. 48 (Va. Sup. Ct. 2001).

McAlister acted as co-manager of W&M, from September 22, 2008, through January 9, 2009.  At all times she was subject to a fiduciary standard of care owed, as Magistrate David A. Sanders put it in *Kumar, supra*, "first and foremost" to the LLC, and "to [the other LLC member] derivatively."  *Kumar, supra* at 25.  Conversion and misappropriation of an LLC's assets are breaches of fiduciary duty, and in the *Kumar* case, entitled plaintiff to a permanent injunction. *Id*. at 30.  *Kumar* held acts were found to violate the duty of an LLC manager to "act in good faith," and "in a manner reasonably believed to be in the best interests of the limited liability company." *Id*. at 25-26, (citing Miss. Code Ann. § 79-29-402).

In *Arford, supra*, the Georgia Court of Appeals dismissed the argument that a partnership at will was terminable by any manner or means, stating:

> The power of a partner to dissolve the partnership at will, "like any other power held by a fiduciary, must be exercised in good faith. . . . A partner may not . . . 'freeze out' a co-partner and appropriate the business to his own use.  A partner may not dissolve a partnership to gain the benefits of the business for himself, unless he fully compensates his co-partner for his share of the prospective business opportunity.
>
> . . .
>
> [i]f, however, it is proved that [the partner] acted in bad faith and violated his fiduciary duties by attempting to appropriate to his own use the new prosperity of the partnership without adequate compensation to his co-partner, the *dissolution would be wrongful* and the [partner] would be liable as provided by [the section of the Uniform Partnership Act defining the rights of partners upon wrongful dissolution] for violation of the implied agreement not to exclude [the other partner] wrongfully from the partnership business opportunity. [Citation and punctuation omitted].  [Italics added].

*Id*. at 437-438.  *Accord, Monteleone v. Monteleone*, 497 N.E.2d 1221, 1229 (Ill. Ct. App. 1986) ("A partner's conduct is considered 'wrongful' when it is taken in derogation of the duties imposed either explicitly by the partnership agreement or implicitly by virtue of the nature of the partnership itself." [Citing *Mandell v. Centrum Frontier Corp. (1980), 86 Ill. App. 3d 437, 407 N.E.2d 821*; *Biagi v. Gregory (1958), 19 Ill. App. 2d 534, 154 N.E.2d 849*]. [Additional citations omitted].  *See also, 68th Street Apts., Inc. et al v. Lauricella et al*, 362 A.2d 78 (Sup. Ct. N.J. 1976) (Defendant's withdrawal from a partnership at will, formed to purchase and develop an apartment building, was deemed wrongful in that it violated an express or implied agreement that the partners would undertake the purchase and development, and substantial time, money and energy had been invested.  The court found the Defendant alone was responsible for the project's cessation and demise).

## ARGUMENT

**A. MCALISTER'S REAL MOTIVE TO STAY AWAY FROM BANKRUPTCY COURT.**

The Fifth Circuit refers to the "twin pillars" of bankruptcy as the "discharge of the debtor" and "satisfaction of valid claims against the estate." *Little Creek Dev. Co. v. Commonwealth Mort. Corp. (In re Little Creek Dev. Co.)*, 779 F.2d 1068, 1071-72 (5th Cir. 1986). Other courts have expressed the same goals differently, saying that Chapter 7 serves the purposes of providing the debtor with a fresh start while protecting the creditors through an orderly liquidation of the debtor's non-exempt assets. *In re Boca Vill. Ass'n*, 422 B.R. 318, 324 (Bankr. S.D. Fla. 2009). However stated, a business Chapter 7 is unique. Because the Chapter 7 business debtor is ineligible for discharge, the fresh start feature of bankruptcy is not really served. *See* 11 U.S.C. § 727(a)(1). However, according to a recent Texas bankruptcy ruling, if the debtor's assets are such that claims can be paid, even "in a very small percentage on the dollar," the second pillar is satisfied. *In re: Lots by Murphy, Inc. Debtor*, 2010 Bankr. LEXIS 873 (Bankr. S.D. Texas).

As stated in by the Fifth Circuit in a frequently cited 1988 case, whether to grant a motion to dismiss is to be guided by equitable principles: "The court must balance the equities and weigh the 'benefits and prejudices' of a dismissal." [Citation omitted]. *In the matter of Atlas Supply Corporation*, 876 F.2d 1061, (5th Cir 1988). The court in *Atlas* pointed out that neither Atlas nor its creditors stood to benefit by dismissal. Further, "on the other side of the balance is the prejudice to the creditors," and "if dismissal would prejudice the creditors, then it will ordinarily be denied." *Id*. at 1068, [citing *Matter of Williams, 15 B.R. 655 (E.D.Mo. 1981)*].

While bankruptcy courts often examine the motives of those seeking protection under bankruptcy law, particularly Chapter 7 consumers, the W&M case may beg a new question:

"looking beyond the bankruptcy filer for a moment, what is to be made of an LLC stakeholder gaming the legal system to *prevent* the scrutiny of a bankruptcy court and trustee?"

1. **MATERIAL MISREPRESENTATIONS TO THE CHANCERY COURT; CONCEALMENT, ASSET CONVERSION AND MISAPPROPRIATION.**

On Tuesday, March 17, 2009, McAlister sat in mute silence at the counsel table in Madison County Chancery Court and listened to her attorney repeatedly misrepresent core facts concerning W&M's formation, assets, and respective member contributions. (Exhibits 30 and 31, excerpts of hearing transcript). The distortions were so severe as to shock the conscience. The Brunini attorneys had of course provided legal advice back in September and October 2008, in connection with W&M's formation, and the buy out/name change agreement forged with Nutt. (Composite Exhibit 15, buy out/name change agreement). Brunini knew, as did McAlister, that W&M was formed and capitalized by the buy out of Nutt & McAlister, which Nutt slated to dissolved, and on September 8, 2008, agreed to transfer. (Composite Exhibit 15, buy out/name change agreement).

The Brunini firm was so familiar with the details of the buy out agreement, one of its partners, Chris Shapely, urged McAlister and Wyatt to retain him as their counsel to pursue a legal claim against Dickie Scruggs, a chose in action transferred under the buy out agreement. (Ultimately, Wyatt and McAlister met extensively on two occasions with the Merkel law firm of Clarksdale, in anticipation of retaining that firm).

Despite all this, McAlister's attorney stood before the Chancellor and represented "we don't know what that is" when Wyatt pointed to a stack of documents and memos detailing the buy out/name change agreement. (Exhibit 30). The attorney told the Chancellor "I assume that's something he has taken out of Ms. McAlister's office." *Id*. The attorney told the

Chancellor "I have no idea what that it [sic] . . . [t]here is no asset purchase agreement . . . Nutt & McAlister is an operating law firm." *Id*.

Throughout this, McAlister remained silent, knowing none of the statements of the attorney were true, but more importantly, realizing that if the Chancellor knew what really occurred in the days and hours leading up to her walkout, there would implications far beyond a mere dissolution decree. Specifically, at the very time her attorney was speaking, McAlister *mea culpa* knew:

1) she had intentionally breached the buy out/name change agreement to retaliate against Wyatt for demanding payment of a debt (Exhibits 25, 28);

2) she had transferred and referred W&M's Avandia cases to the Beasley-Allen firm under false pretenses, representing the cases as Nutt & McAlister referrals (Exhibit 2);

3) she had directed W&M's bookkeeper to convert $75,000 in capital contributions to (undocumented) loans (Exhibit 3);

4) she had engaged in a conspiracy to defraud Wyatt through phony accounting entries (Exhibit 20);

5) she had attempted to convert a $400,000 life insurance policy belonging to W&M (Exhibit 33);

6) she had arranged for the illegal seizure of 90 boxes of case files from W&M's office (Exhibit 28);

7) she had illegally waived an estimated $24,000 in billings due and owing from Nutt ; and,

8) she had attempted to secretly tape record Wyatt, and induce a false admission relating to withheld attorney fees (Exhibit 20).

McAlister and her attorneys were apparently banking on the fact that the resulting chaos of her walkout, the sudden termination of funding, breach of the buy out and intentional dissolution of W&M, would leave Wyatt so dazed and confused it would take weeks and months to learn what had actually transpired. To an extent this shrewd calculation was correct. Most of Wyatt's activities in the wake of the walkout were devoted to figuring out how to manage W&M

with $1,526.69 in the firm's account; $141,000.00 in long term debt and lease obligations; monthly expenses largely in arrears; and three employees who had colluded in the walkout, all filing MESC wage claims. As the time of the March hearing, Wyatt had not fully learned of McAlister's pre-walkout activities.

McAlister and her attorneys managed to have the chancery case referred to a special master, who, upon her request, conducted a hearing to "determine the assets" of W&M. After 318 days on the docket, by December 10, 2010, no order of dissolution had been entered, nor had any order been issued on the request for a receiver or trustee. Like the chancery proceedings, the special master nominated by Brunini conducted a hearing under circumstances wholly disregarding the buy out agreement, or any evidence of McAlister's fraud, conversion of assets and wrongful dissolution of W&M. (This will be addressed in detail after a motion is filed to strike the "Supplement," *supra*).

The reason McAlister and her attorneys so desperately want the bankruptcy filing dismissed, has little to do with a genuine challenge to corporate authority, and everything to do with concealment, conversion and misappropriation of the Debtor's assets. For the same reason McAlister and her attorneys vigorously resisted appointment of a receiver or trustee in the judicial dissolution case, they desperately want out of the bankruptcy court. McAlister and her attorneys are well aware that the falsely referred Avandia cases alone would go far to satisfy the creditors claims generated by her intentionally causing the insolvency of W&M. Likewise, they understand the immense equity powers of the bankruptcy court to impose constructive trusts, liens, and stays. In essence, the last thing McAlister or her attorneys who aided and abetted the wrongful dissolution of W&M want to see is the front door of the bankruptcy court, and a retinue of trustees waiting in the wings. Hence the Freudian slip in filing a motion entitled "Emergency."

These are the facts McAlister's attorneys characterize in their brief as having "no relevance whatsoever" to the pending motion to dismiss. [Dkt. 73, p. 2)

### **REBUTTAL ARGUMENT**

McAlister relies on *In Re: Delta Starr Broadcasting, L.L.C.*, Civil Action No. 05-2783 Section: R(3), E.D. La., 2006 U.S. Dist. Lexis 4477, for the proposition that "a petition in bankruptcy must be authorized by a majority of the members, unless the articles of incorporation or operating agreement specifically provides otherwise." First, it must be noted that the *Delta Starr* Court was construing Louisiana civil law, not Mississippi's law regarding LLC's. However, as a general proposition, where no member has materially violated the LLC or its controlling law, this may very well be the same result under Mississippi law. This however is not the case with W&M and McAlister's actions as a member, and member-manager.

McAlister contends that despite her abandonment of W&M, she is still a member because she said so in her "resignation" letter, and Section 79-29-307(3) makes her unable to withdraw. In other words, she argues on balance that she can achieve indirectly that which she was prohibited from doing directly. If McAlister's characterization were correct, any LLC would be vulnerable to circumvention of the non-withdrawal provision by simple wordsmithing. No authority is cited in support of this arcane interpretation.

As a general principle, the Mississippi Supreme Court condemns the interpretation of a statute that results in emasculating its purpose. *Mississippi Employment Sec. Com. v. Sanderson Plumbing Products, Inc.*, 604 So. 2d 215, 217 (Miss. 1992) (Sanderson Plumbing's argument [. . .] is not only a strained and tenuous interpretation of the words of the statute, but also would emasculate the salutary purpose of the act. A main purpose of the act is to give some compensation to a worker who, without fault or choice on his own part, finds himself unemployed. Miss. Code Ann. § 71-5-1).

In typical conclusory fashion, McAlister and her attorney claim it is "absurd" to suggest she verbally agreed to fund W&M. [DKt. 73, p. 12]. The assertion however flies in the face of documentary proof. (Exhibit 6, Exhibit 22). McAlister made regular, monthly deposits of $25,000 to W&M's operating account, and stated in a December 29, 2008, email to W&M's bookkeeper "I'll need to deposit another $25,000 this week." (Exhibit 22). What McAlister and her attorney really mean to say is, not that she didn't promise, every person involved with W&M knew she agreed to fund, but that no one can enforce the promise because it wasn't reduced to writing per the statute. Miss. Code Ann. 79-29-502. This argument assumes that the emails, together with bank records documenting her deposits, have no probative value in establishing her promise, or an admission against interest under circumstances showing detrimental reliance. Whether McAlister's obligation to fund can be proved or not, is not dispositive of whether *she represented* that she would fund W&M until it could self-fund. In scrutinizing her motives for wrongful dissolution, the material issue is whether she made the representation, not whether she can be legally bound to honor it.

Next McAlister claims that the bankruptcy filings establish she is still a member, because the forms reflect her as a member. Further, she alleges Wyatt admitted McAlister was a member in a section 341 meeting. This assertion is likewise flawed, logically and legally. First, Wyatt cannot affix McAlister's legal status by referring to her as a member, or non-member. Neither can an independent contractor affix his status by assigning words and names. Given McAlister's penchant for saber rattling, consider the result if Wyatt had represented in every bankruptcy filing or hearing that W&M consisted of one member – himself. Of course the issue of McAlister's true status, whether a defaulted member, a non-member, a member engaged in wrongful dissolution . . . is a matter for the Court. Wyatt's referral to McAlister's membership

was simply to accurately and honestly represent the formative status of W&M, and make clear that no formal change has been made to the certificate.

Finally, McAlister argues that dissolution is accomplished by filing a certificate of dissolution with the Secretary of State.  This is correct where there's consensual dissolution.  In judicial dissolution, the court decrees the dissolution.  Regardless, dissolution is not so much the the end of the LLC, as the LLC continues beyond, but it marks the beginning of the winding up process.  In any case, if an event of dissociation has occurred, nonjudicial dissolution is option the "remaining members" may elect or not.  Miss Code Ann. § 79-29-801 (d).

In conclusion, applying Mississippi LLC law, the common law of fiduciary duty, as well as federal bankruptcy law, mandates that the focus in this case belongs on the party challenging the bankruptcy filing, not the member in good standing who acted in earnest to protect the claims of creditors, and have the estate administered in accordance with law and equity.

        Respectfully submitted,

        Derek A. Wyatt, a member-manager in good standing of WYATT & McALISTER, PLLC, and interested party filer, appearing *pro se*,

        By: s/ Derek A. Wyatt, *pro se*
           Derek A. Wyatt, MSB No. 7413

**Physical Address:**
Derek A. Wyatt , Esq.
MSB No. 7413
102 Northlake Lane
Madison, MS 39110
tel 601 954-1140

**Mailing Address:**
Derek A. Wyatt , Esq.
MSB No. 7413
102 Northlake Lane
Madison, MS 39110
email: dwyatt@wyattlawpllc.com
tel 601 954-1140

## CERTIFICATE OF SERVICE

The undersigned counsel of record, Derek A. Wyatt *pro se*, for interested party filer Derek A. Wyatt, has this day caused the above and foregoing pleading or other document to be served by electronic mail on the following:

| | |
|---|---|
| For the Debtor: | Vann F. Leonard, Esq.<br>P.O. Box 16026<br>Jackson, MS 39236-6026 |
| For the movant: | Lawrence Allison<br>Brunini Law Firm<br>P.O. Drawer 119<br>Jackson, MS 39205-0119 |
| Trustee: | Stephen Smith<br>5 Old River Place<br>Suite 107<br>Jackson, MS 39202-3449 |
| Trustee's attorney: | Eileen N. Shaffer<br>P.O. Box 1177<br>Jackson, MS 39215-1177 |
| U.S. Trustee: | R. Michael Bolen<br>100 W. Capitol St.<br>Suite 706<br>Jackson, MS 39269 |

This the 12th day of April, 2010.

By:    s/ Derek A. Wyatt, *pro se*
Derek A. Wyatt, MSB No. 7413