IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI

IN RE: WYATT & McALISTER, P.L.L.C.,[1]  Bankruptcy Case No.: 09-04354-EE
Chapter 7 Debtor

**REBUTTAL TO "OBJECTION AND RESPONSE OF MARY
McALISTER TO JOINT MOTION FOR NEW TRIAL, TO ALTER OR
AMEND JUDGMENT, AND/OR FOR RELIEF FROM FINAL JUDGMENT"**

INTRODUCTION AND BACKGROUND[2]

After the Court rendered a decision dismissing the filing of the Chapter 7 bankruptcy petition, W&M (Debtor) and Wyatt (an interested party filer) timely filed a joint motion for new trial, to alter or amend judgment, and/or for relief from final judgment. [Dkt. 94 and 95]. Mary McAlister ("McAlister"), claiming still to be a 50% member of W&M despite having *de facto* withdrawn from W&M without the slightest approval, vote or statutory authorization, 335 days prior to the bankruptcy filing, responded and objected to the motion. (Objection and Response of Mary McAlister to Joint Motion for New Trial, to Alter or Amend Judgment, and/or for Relief from Final Judgment).[3] [Dkt. 98].

McAlister's objection and response is without merit as to any issue raised, and is based on flawed and erroneous representations of Mississippi law. The disposition of this case, here, or an appeal to the District Court or Fifth Circuit Court of Appeals, will likely be controlled by the holdings in two Mississippi cases: *Kumar vs. Kumar, individually and as manager of Mit-Sar, L.L.C.*, 2009 U.S. Dist. LEXIS 26708, (N.D. Miss. March 31,

---

[1] In this rebuttal, "W&M" or "W&M PPLC".

[2] In this rebuttal, references to exhibits are meant to refer to Exhibits 1-40, offered in the record on March 5, 2010.

[3] Herein, McAlister's "objection and response."

1

2009) [citing *ERA Franchise Sys. v. Mathis*, 931 So.2d 1278 (Miss. 2006) and *Derouen v. Murray*, 604 So. 2d 1086 (Miss. 1992)]; and *Home Telephone Company v. Darley et al*, 355 F. Supp 992 (N.D. Miss. 1973). Before discussing the cited cases and how they apply, an issue raised by McAlister's objection and response requires clarification.

### MISINTERPRETATION OF THE MEMBER-MANAGER CONCEPT

In her objection and response, McAlister refers to Wyatt as "a self-anointed 'member-manager' of W&M," and states in a footnote "neither McAlister nor Wyatt is a 'manager' of W&M." (Objection and response, p. 2; fn. 4, p. 2). [Dkt. 98]

Ignoring the *ad hominem*, the question is whether these statements have any real basis in law or fact, or stated another way, whether McAlister accurately represents the law as it applies to LLC's and LLC members. McAlister states "[n]either member may speak or act on behalf of W&M without the affirmative vote of the other." (Objection and response, p. 3). While this flippant remark may have some relevance to the need for "affirmative vote" when a member – worse still a member-manager – without the slightest authority or approval, speaks or acts by repudiating a buyout/name agreement upon which the firm was formed and capitalized and revoking funding in order to cause insolvency, it is nonetheless an incomplete and inept statement of Mississippi LLC law.

McAlister claims there is no validity to the term "member-manager," and to support this, points to the fact that the term "member-manager" is not found in the Ms LLC Act. A leading treatise of Mississippi law and published opinion by Judge Neil P. Olack of this Court, disagree. In the 2007 case of *In re Northlake Development, LLC, Debtor, et al v. Northlake Development, LLC et al*, the Court stated:

> Unless the Certificate of Formation contains an affirmative election of management by managers, the LLC is member-managed. *Miss. Code Ann.*

> *§ 79-29-302*. However, regardless of whether an LLC is manager-managed or member-managed, the Certificate of Formation or the LLC Agreement may impose restrictions on the powers and authority of those managing the LLC. Id. (emphasis added); *see also* 6 ENCYCLOPEDIA OF MISSISSIPPI LAW § 49.11.

*Id*. 2007 Bankr. LEXIS 4403, * 5.

The terms "member-managed" and its alternative, "manager-managed" are common in the parlance of LLC law, and have important distinctions when construing the structure of a LLC. 6 Jeffrey Jackson and Mary Miller, *Encyclopedia of Mississippi Law* § 49.20, (herein, "*Jackson & Miller*"). It is uncontested that W&M did not designate a manager or managers in its certificate of formation. As a result, during its operational phase W&M was by default, member-managed. *See,* 6 *Jackson & Miller*, § 49.20 stating: "[u]nless the Certificate of Formation contains an affirmative election of manager-management, the LLC is, by default member-managed."

Member-managers are subject to the statutory duties set forth in Miss. Code § 79-29-402(1)(a)(b)(c) to the same extent as persons designated in the certificate as manager-managers are. In pertinent part, *Jackson & Miller* states: "[a]dditionally, unless the company has elected to be manager-managed, members also have the right to participate in management of the company. Under such circumstances, members also have additional obligations in connection with their management duties." 6 *Jackson & Miller*, 49.29 (citing Miss. Code § 79-29-302, which in pertinent part provides, absent a certificate designating managers, "management *shall be* vested in its members.") (Italics added).

In addressing the obligations of managers, whether they be member-managers in a default LLC or designated manager-managers, *Jackson & Miller* states in pertinent part:

3

> Managers, and in the case of member-managed LLC's, members are statutorily obligated to discharge their management duties in "good faith," with the care of an "ordinarily prudent person in a like position," in a manner reasonably believed to be in the best interests of the company.

6 *Jackson & Miller*, 49.30.

According to *Jackson & Miller*, and Mississippi case law interpreting the Ms LLC Act, when McAlister abruptly revoked funding for W&M causing its insolvency, repudiated the buyout/name change agreement used to form and capitalize the firm, and converted and misappropriated its assets, she was not only subject to the statutory duties, but also had a duty of loyalty "to act on the company's behalf, ahead of [her] personal interests." 6 *Jackson & Miller*, 49.30; *see also, Kumar vs. Kumar, individually and as manager of Mit-Sar, L.L.C.*; *Mit-Sar L.L.C.*, 2009 U.S. Dist. LEXIS 26708, * 7 (N.D. Miss. March 31, 2009) [referring to the duty as a "fiduciary" duty, and citing *ERA Franchise Sys. v. Mathis*, 931 So.2d 1278, 1281 (Miss. 2006) and *Derouen v. Murray*, 604 So. 2d 1086, 1090-91 (Miss. 1992)].

*Jackson & Miller* explain that the duty of loyalty, while not expressed in Miss. Code § 79-29-402(1)(a)(b)(c), is implied elsewhere in the Act and "by analogous common law duties established in corporate jurisprudence." 6 *Jackson & Miller*, 49.30 [citing *Omni Bank v. United Southern Bank*, 607 So. 2d 76 (Miss. 1993); *Ellzey v. Fyr-pruf, Inc.*, 376 So. 2d 1328 (Miss. 1979)]. The authors point to Miss. Code Ann. § 79-29-110 as evidence that a duty of loyalty is implied. That section provides that indemnification of a member or manager is conditioned upon not personally benefitting from the alleged wrongdoing. More importantly, *Omni Bank* and *Fyr-Pruf, supra*, are bedrock cases defining the corporate duties of loyalty and fiduciary care under Mississippi law. Further on the duty of loyalty, *Jackson & Miller* state:

4

> A manager's duty of loyalty is essentially a duty to act on the company's behalf, ahead of the manager's personal interests. This duty is fiduciary in nature, and can arise in the area of self-dealing, whereupon a manager profits from transactions with the LLC, fails to fairly present business opportunities to the LLC, or uses of firm assets, which in effect may be an unauthorized compensation or distribution. A manager's competition with the LLC may also breach his or her duty of loyalty, even if the opportunity were unavailable to the LLC.

6 *Jackson & Miller*, § 49:30.

## APPLICATION OF *KUMAR*

**STATUTORY DUTIES OF A LLC MEMBER-MANAGER; COMMON LAW FIDUCIARY DUTY IN A LLC; THE APPLICATION OF CORPORATE LAW IN CLOSELY-HELD COMPANIES.**

The *Kumar* case has been cited extensively in previous briefs filed in this matter by W&M and Wyatt. For obvious reasons, McAlister has not addressed the *Kumar* case in any filing on her behalf.

In *Kumar*, a husband and wife formed Mit-Sar, a Mississippi LLC, and through Mit-Sar operated a Holiday Inn located in Columbus, Mississippi. Each were 50% owners in Mit-Sar, and although not required by any LLC operating agreement provision, both worked at the Holiday Inn. After 25 years of marriage, Mrs. Kumar separated and filed for divorce. Sometime later Mrs. Kumar moved to Atlanta. Though she was aware that Mr. Kumar continued to operate the Holiday Inn, at some point Mrs. Kumar became concerned that Mr. Kumar may have been mishandling funds. After a demand to inspect books and records, Mrs. Kumar filed a complaint naming as defendants Mr. Kumar, individually and as manager of Mit-Sar, and Mit-Sar, the LLC. *Kumar vs. Kumar, individually and as manager of Mit-Sar, L.L.C.; Mit-Sar L.L.C.*, 2009 U.S. Dist. LEXIS 26708, (N.D. Miss. March 31, 2009).

5

The complaint asserted six counts. For purposes of this rebuttal, two of the six counts are relevant: Count IV, breach of fiduciary duty; and Count V, misappropriation and conversion of Mit-Sar assets and funds. The case was bench tried on December 9, 2008, before Magistrate Judge David A. Sanders. After discussion of numerous family loans, which because of the Kumars' East Indian culture are commonly interest-free, and unsecured, the court turned its attention to breach of fiduciary duty.

First, the Magistrate found that Mrs. Kumar's complaint was essentially a derivative action in that it alleged Mr. Kumar had breached a fiduciary duty to Mrs. Kumar *and to Mit-Sar*. *Id.* at * 7. (Italics added). This is precisely the point Wyatt and W&M have sought to drive home in the present dispute. This is not merely a contest between two members or member-managers of W&M. More importantly, the interest of W&M itself is entitled to protection under the law to the same extent, if not greater, than the interests of the individual members or member-managers. To borrow a phrase from federal district judge Judge William C. Keady, "it is hornbook law" that a LLC has separate existence as an entity, distinct and apart from its members. Like a corporation or partnership, a LLC can sue or be sued, own or sell property, borrow funds, and essentially "do all things necessary to carry out its business and affairs." Miss. Code 79-29-108 (2)(a)-(m).

In *Kumar*, Magistrate Sanders was quick to make it clear that the fiduciary duty is owed "to Mit-Sar first and foremost and is only owed to Mrs. Kumar derivatively." *Id.* at * 7. In line with *Jackson & Miller*, *supra*, that corporate duties derived from common law are analogously applied to LLC's, Magistrate Sanders cited *Derouen v. Murray*, a seminal case in Mississippi holding that in close corporations, shareholders owe each

6

other a duty of fiduciary care. *Id.* at * 7 [citing *Derouen v. Murray*, 604 So. 2d 1086, 1090-91 (Miss. 1992)]. Magistrate Sanders applied the close corporation doctrine to Mit-Sar, a two member LLC, and relying on a recent case, ruled that Mrs. Kumar's complaint may be treated as a direct action for individual recovery, provided certain conditions are met. *Id.* at * 7 [citing *ERA Franchise Sys. v. Mathis*, 931 So.2d 1278, 1281 (Miss. 2006) [citing *Derouen v. Murray*, 604 So. 2d 1086, 1090-91, n. 2 (Miss. 1992)].

The *Kumar* court recited the statutory duties required of a person in Mr. Kumar's position (a 50% member-manager), as enumerated in Miss. Code 79-29-402(1)(a)(b)(c), and held that Mr. Kumar "breached his fiduciary duty to Mrs. Kumar by taking a salary and making distributions to himself and his relatives without [Mrs. Kumar's] consent or knowledge following the parties' separation." *Id.* at * 7.

In the present case, McAlister misrepresents that the statutory duties enumerated under Miss. Code 79-29-402(1)(a)(b)(c) and applied in *Kumar*, somehow do no apply to her conduct in repudiating a buyout/name agreement upon which the firm was formed and capitalized; revoking funding in order to cause W&M's insolventcy; *de facto* withdrawing in violation of black letter law prohibiting withdrawal; converting and misappropriating W&M's Avandia case assets; unilaterally waiving payment of a $24,377.82 debt owed to W&M by Nutt under the buyout agreement; and converting $75,000.00 of capital contributions to undocumented loans. As the authorities clearly demonstrate, McAlister is simply wrong.

In addressing the conversion and misappropriation count asserted by Mrs. Kumar, the court held Mr. Kumar breached his fiduciary duty to Mrs. Kumar by paying distributions to himself and relatives without Mrs. Kumar's consent; using Mit-Sar funds

7

to pay for personal expenses not related to Mit-Sar; and taking a salary without consent. The court ruled the law applicable to closely-held corporations applied equally to Mit-Sar, making Mr. Kumar directly liable to Mrs. Kumar for the converted and misappropriated funds. *Id.* at * 8.

APPLICATION OF *HOME TELEPHONE*

**COMMON LAW FIDUCIARY DUTY; CONFLICTS OF INTERESTS; TORT LIABILITY WHEN AGENT VIOLATES AUHTORITY OR NEGLECTS DUTY TO PRINCIPAL.**

In *Home Telephone*, federal district judge William C. Keady, an eminent jurist honored for his integrity and years of service to the federal bench,[4] was tasked with deciding a case involving conflicts of interest in a corporate merger setting. *Home Telephone Company v. Darley et al*, 355 F. Supp 992 (N.D. Miss. 1973).

The facts in *Home Telephone* are aptly comparable if not parallel to the situation that existed within W&M on January 9, 2009, when McAlister elected to repudiate the buyout/name change agreement upon which W&M was formed and capitalized, *de facto* withdrew in direct violation of a statute, and attempted to wrongfully dissolve W&M.

Home Telephone Company owned a certificate of convenience to provide dial telephone service to subscribers in Marshall and DeSoto counties, Mississippi. *Id.* at * 11. Home's common shares were owned by the Darley family of Tennessee, whose leader was Lon Darley, Home's President and majority shareholder. Serving in these capacities, Lon Darley "controlled and dictated the affairs of the company." Lon's son, Rex Darley, also common owned stock and served as an officer of Home. *Id.* at * 3-4.

---

[4] Among others, Judge Keady's rulings include the famous *Gates v. Collier* case which set in motion reform of the infamous Mississippi State Penitentiary at Parchman, and the epic *Environmental Defense Fund, Inc. v. Alexander* saga, which resulted in the defeat of a lengthy procedural challenge to the Tennessee-Tombigbee Waterway.

Mid-Continent, a major telephone system in Hudson, Ohio, approached Home with a merger proposal. Acting on Home's behalf, Lon Darley negotiated the merger agreement with Mid-Continent. After the agreement was consummated, Clarke M. Williams, a Memphis resident "and person of large net worth," made an offer to Lon Darley to purchase Home's common stock for approximately $1,650,000 cash. Despite knowing that Home had committed to Mid-Continent under a merger agreement, Lon Darley countered that it would take $2,000,000 to purchase Home's common stock. Williams offered the $2,000,000 and delivered a cash payment of $100,000 to bind the transaction. Darley accepted. *Id.* at * 3-5.

Later, Lon Darley told Williams that he would have to get a legal opinion concerning the binding effect of Mid-Continent's merger agreement, and warned that Home might get sued if the agreement were breached. Eventually, the Home stock was transferred to Union, a Mississippi company set up by Williams to own the Home stock. At the same time, Darley's son Rex executed a management agreement with an affiliate of Union, for a ten-year period at $18,000 annual salary. The agreement was later bought at for a lump sum payment of $90,000 to Rex Darley. *Id.* at * 5.

Mid-Continent sued Home Telephone Company for wrongful breach of the merger agreement and was awarded $218,000 in damages. *Mid-Continent Telephone Corporation v. Home Telephone Company et al*, 319 F. Supp. 1176 (N.D. Miss. 1970). *Id.* at * 8-9.

The present suit by Home against Lon and Rex Darley, sought damages incurred by Home as a result of Lon Darley's and Rex Darley's actions as officers and persons in control of Home. The Mid-Continent suit resulted in a devaluation of Home's stock by

9

56%.  *Id.* at * 10.  The suit alleged that the Darleys owed a fiduciary duty to Home, which they violated "by causing Home to breach the merger agreement for no corporate business purpose and solely for their own personal gain," and were liable in tort "for causing Home to breach its contract with Mid-Continent in bad faith and without reasonable justification."  *Id*. at * 11-12.

Based on diversity jurisdiction, the court applied Mississippi law under the *Erie* doctrine.  Judge Keady remarked that although there appeared to be no factual precedent, "the jurisprudence of [Mississippi] recognizes well-established principles of corporation law which exist for our sure guidance and compel recovery for Home."  The court was careful to point out that as a corporation, Home had a separate and distinct existence, and was entitled to sue and recover for its losses.  *Id*. at * 12-13.

Having laid the groundwork, Judge Keady next articulated the law in Mississippi applicable to officers and directors of a corporation.  Citing the now famous *Knox Glass* case, and *Cooper v. Mississippi Land Co*., the court held that directors and officers "occupy a fiduciary relation to the corporation and to its stockholders."  *Id*. at * 14, [citing *Knox Glass Bottle Co. v. Underwood,* 228 Miss. 699, 89 So.2d 799, 814 (1956); and *Cooper v. Mississippi Land Co.,* 220 So.2d 302 (Miss. 1969)].  In applying this duty to the Darleys' conduct, Judge Keady stated:

> As such, an officer or director must act in accordance with the best interests of the corporation and by the strict standards of rectitude that bind a fiduciary; he is not entitled to use his position for personal gain where harm will befall the corporation, its creditors, or stockholders.

*Id*. at * 14.

By analogy to the common law of fiduciary duty, a member-manager in a LLC is likewise prohibited from using his position for personal gain where harm will befall the

10

LLC its creditors, or its members. McAlister grossly violated both the letter and spirit of this fiduciary duty. As a member-manager, McAlister was bound by both the statutory duties set forth in Miss. Code § 79-29-402(1)(a)(b)(c), and by analogy, the common law of fiduciary duty. Furthermore, as a member-manager, McAlister was at all relevant times an agent of W&M, able to bind W&M. Miss. Code § 79-29-303(1). As an agent, McAlister is liable in tort for breaching the buyout agreement in bad faith and without justification. *See e.g.*, *Home Telephone, supra*, at * 18-19 (applying tort liability under agency law to a corporate officer who causes the breach of a contract in bad faith and without justification).

As stated in *Jackson & Miller*, *supra*: "[i]n member-managed limited liability companies, all members are agents of the company and bind the LLC unless the members, by operation of the agreement or otherwise, have no actual agency authority . . ." 6 *Jackson & Miller* 49:20. When McAlister, a member-manager of W&M, negotiated the buyout/name change agreement for the purpose of forming and capitalizing W&M, by statute she was as acting as an agent for W&M. She cannot later use her position as a member-manager and agent "for personal gain," and repudiate the buyout agreement intending to wrongfully dissolve W&M. This is especially true when McAlister's actions are also colored with conflicts of interests.

The actions of McAlister in this case bring into play legal rules governing conflict of interests. It is useful to cite a relatively simple example. Assume a lawyer represents two estates, estate A and estate B. If he renounces a contract right claimed by estate A, estate B stands to gain. No one would reasonably suggest that a person in this situation can fulfill a fiduciary duty simultaneously owed to both of the estates.

11

When on January 9, 2009, McAlister repudiated the buyout/name change agreement upon which W&M was formed, as a matter of law she was a member-manager W&M, and at the same time, a member of Nutt & McAlister.  Likewise, when McAlister revoked funding for W&M, *de facto* withdrew and tried to force the firm into insolvency, as a matter of law she was a member-manager W&M, and at the same time, a member of Nutt & McAlister.  During these events, McAlister was statutorily obligated to discharge her management duties to W&M in "good faith," with the care of an "ordinarily prudent person in a like position," and in a manner reasonably believed to be in the best interests of W&M.  Miss. Code § 79-29-402(1)(a)(b)(c); 6 *Jackson & Miller*, § 49:30.  Further, a common law duty of fiduciary care and a duty of loyalty prohibited McAlister from self-dealing, acting in her own personal interests, or to purposefully inflict harm on W&M, its creditors, and other members. *Home Telephone Company v. Darley et al*, 355 F. Supp 992 (N.D. Miss. 1973); *see also*, *Omni Bank v. United Southern Bank*, 607 So. 2d 76 (Miss. 1993); and *Ellzey v. Fyr-pruf, Inc.*, 376 So. 2d 1328 (Miss. 1979).

Citing *Knox Glass*, Judge Keady spelled out the conflict of interest problem in *Home Telephone* by stating:

> Should an officer have a personal interest that conflicts with the interests of the corporation, the officer may not act to the corporation's detriment and must guard its interest. *Knox Glass Bottle Co., supra.* It is no answer to say that the entire Darley family, as owners of the common stock, assented to the acts of Lon and Rex Darley in causing Home to breach its contract, and, therefore, Home has no ground for complaint. Neither the creditors, including REA, Home's first mortgagee, nor the preferred stockholders were shown to have approved the conduct by Darleys which directly caused the corporation to suffer serious financial loss.

*Id.* at * 14-15.

Recognizing the inherent conflict of interests posed by Lon and Rex Darleys' desire for personal gain, and in contrast, the "best interests" a separate and distinct entity, Home Telephone Company, Judge Keady stated:

> There can be no doubt that by renouncing the contract with Mid-Continent the Darleys were acting solely for their personal gain. Home had no prospect of realizing any benefit whatever from the repudiation; its interests were not at all served by the price the Darleys got for their stock. The breach was dictated only for the financial gain of the managing officers and their family."

*Id*. at * 15.

Comparing McAlister's actions to those of the principal actors in *Home Telephone*, it is worthwhile to take note of Judge Keady's comments:

> It plainly appears that when Lon and Rex Darley decided to repudiate the Mid-Continent agreement, they did so with full knowledge of the likely consequences. They anticipated that litigation would probably be instituted by Mid-Continent; they knew that serious issues were raised in renouncing the contract and could ignore Mid-Continent's demands only at their peril; and they also knew that if Home was held liable, the damages recoverable by Mid-Continent might well jeopardize Home's solvency, or at least severely handicap its ability to carry on normal business operations. With matters in this posture, it was improvident for the Darleys to act as they did in complete disregard of Home's position.

*Id*. at * 16-17.

All that has been said about the Darleys' conduct in *Home Telephone*, is equally true of McAlister. She knew that by repudiating the buyout agreement she was acting solely for her own personal gain. She knew W&M had no prospect of realizing any benefit whatever from the repudiation and that its interests were not at all served her actions. She knew the repudiation was dictated only for her own financial gain and as retaliation against Wyatt for requesting payment of overdue and withheld fees. She knew the consequences of repudiating the buyout agreement and that litigation would likely

result. Finally, she knew (and in fact intended) that her actions would jeopardize the solvency of W&M.

Apart from the breach of fiduciary duty, a second ground of liability was found to apply to the Darleys' conduct in *Home Telephone*. In pertinent part the opinion states:

> [. . .] liability for defaulting officers arises in tort where officers cause the corporation under their management and control to breach a contract with a third party in bad faith and without reasonable justification. In such cases, liability rests upon the common law rule which imposes legal responsibility upon every agent who violates his authority or neglects his duty to the damage of his principal. *19 Am.Jur.2d, Corporation, ß 1278*, p. 686.
>
> . . . .
>
> Applying this principle to the case sub judice, we find that Lon and Rex Darley could not possibly have believed that breaching the contract with Mid-Continent would serve Home's corporate interests; on the contrary, they knew that their actions would lead to serious litigation brought against Home with the prospect of great losses. The Darleys evinced no concern for Home's corporate welfare and utterly failed to explore steps which might be reasonably available to justify rescinding the merger agreement. Thus, we conclude that the defendants, by ignoring what was for Home's benefit and acting solely in their personal interest, were guilty of negligence; insofar as their principal -- Home -- was concerned, their acts in breaching the contract were in bad faith and without reasonable justification.

*Id*. at * 18-19.

As a matter of law, when McAlister negotiated the buyout agreement for the purpose of forming and capitalizing W&M, and then later, managed W&M while it substantially performed the terms of the agreement, she was acting as a member-manager of W&M, and an agent of W&M, with full authority to bind W&M. Miss. Code § 79-29-303(1). She cannot globally renounce her legal status and agency relationship, and later claim that these actions were purely personal, and bore no relation to W&M and its

members. Likewise, as a minority member and member-manager of Nutt & McAlister, when McAlister both negotiated and agreed to the buyout/name change agreement, she was as a matter of law acting as an agent of Nutt & McAlister, with full authority to bind Nutt & McAlister.[5] Miss. Code § 79-29-303(1)

### MCALISTER'S DENIALS UNDER OATH IN THE JUDICIAL DISSOLUTION CASE

The judicial dissolution petition was filed by Wyatt on January 16, 2009, a week after McAlister repudiated the buyout agreement, unlawfully withdrew and tried to force W&M into insolvency. Every attempt to get a hearing on the merits of the petition failed. McAlister and her counsel consistently gamed the system with frivolous motions, denials and delays. It is relatively easy to see why McAlister would not want the court adjudicating the grounds and declaring as a matter of law that McAlister, "while acting as a manager or member in control of W&M was guilty of or knowingly countenanced: persistent or pervasive fraud; or abuse of authority; or persistent unfairness towards another member; or waste or misapplication of property." *See*, First Amended Application for Judicial Dissolution, [Chanc. Dkt. 2], citing the statutory grounds found in Miss. Code 79-29-802(b).

Eventually, McAlister and her attorneys nominated a special master, and the court ordered him appointed. Without ever adjudicating a single ground stated in the petition, and before any decree of dissolution was granted, McAlister and her attorneys called for the special master to conduct a "hearing to determine the assets" of W&M. Wyatt registered his objection to the hearing, both for himself and W&M, but to no avail. At

---

[5] According to records on file with the Secretary of State, Nutt & McAlister has no operating agreement and its certificate of formation does not designate managers. By operation of law, Nutt & McAlister was member-managed. Miss. Code § 79-29-302.

15

the hearing, McAlister testified adversely to W&M and Wyatt on every issue, shamelessly falsifying the facts and circumstances pertaining to the formation of W&M, the buyout/name change agreement, and her facetious "resignation."

While McAlister has incessantly tried to downplay the wholesale transfer of Nutt & McAlister's assets to W&M, and convince the court that she and Nutt made a private arrangement having nothing to do with the formation of W&M or Wyatt, the documents and records of W&M and her own words refute these shameful falsehoods.

The very day W&M was formed, McAlister sent a memo confirming the buyout/name change agreement to the Brunini law firm, whose lawyers intimately knew the entire history the Nutt lay off, and why and how McAlister and Wyatt planned to form their own firm. (Exh. 3, memo to Brunini). On October 6, 2008, McAlister and Wyatt met with separate counsel, Richard Montague, and reviewed the terms of the Nutt & McAlister buyout/name change agreement, as detailed in a three page, jointly drafted memo. (Exh. 4, memo). Among other things, McAlister and Wyatt confirmed to Montague that the purchase included the firm name of Nutt & McAlister PLLC, which would either be changed, or alternatively, Nutt & McAlister would be dissolved. (Exh. 4, memo, p. 3, no. 13).

After the wholesale transfer of assets from Nutt & McAlister to W&M, in November and early December 2008, W&M provided updated memos to Nutt's office itemizing the assets transferred pursuant to the buyout, and carefully noting serial numbers and software licenses for all computers and printers acquired by W&M. (Exh. 15, composite). In return, Nutt's office supplied McAlister and Wyatt with internal accounting records, transaction histories, income statements and year-end financial

16

reports of the Nutt & McAlister firm. Upon receipt, McAlister and Wyatt met with Nutt's chief financial officer (Coward) and in-house CPA (Jones), to review the financial records, and then handed them over to a private CPA (Lefoldt) retained to evaluate the buyout for W&M.

On November 20, 2008, McAlister sent an internal email to W&M employees and to Wyatt stating in pertinent part: "Derek, please look carefully at how I phrased the transition of N&M to W&M." (Exh. 37, email and draft letter). McAlister attached a draft letter to be sent to Avandia clients on W&M letterhead, advising the clients: "<u>Please note that we are in the process of dissolving Nutt & McAlister, and have formed Wyatt & McAlister, PLLC which is handling the Avandia litigation in association with the law firm of Beasley, Allen, Crow, Methvin, Portis & Miles, PC of Montgomery, Alabama</u>." (Exh. 37, email and draft letter). (Underline added).

The next day W&M mailed Beasley-Allen referral packets and joint retainer contracts designating Beasley-Allen and Wyatt & McAlister as jointly retained attorneys to 70 of Avandia clients. (Exh. 38). Along with the cover letter on W&M letterhead advising "we are in the process of dissolving Nutt & McAlister, and have formed Wyatt & McAlister PLLC which is now handling the Avandia lititgation," a referral packet and joint retainer contract was enclosed. The joint retainer contract stated in pertinent:

> Client hires Beasley-Allen and Wyatt & McAlister to pursue a claim
> for injuries and damages possibly caused by ingestion of AVANDIA.
> . . . .
>
> If this agreement is terminated before the case is closed, Client gives
> Beasley-Allen and Wyatt & McAlister a lien against any subsequent
> recovery in this case for Beasley-Allen and Wyatt & McAlister's
> expenses. If an offer has been negotiated, Beasley-Allen and Wyatt &

17

> McAlister will have a lien upon any subsequent recovery equal to 45% of the offer, or an amount to compensate for time and expenses, whichever is greater.

(Exh. 38, p. 2).

These are but some of the facts established through the documents and records of W&M, serving to disprove and refute the shameless falsehoods McAlister has asserted in her testimony.

## CONCLUSION

Empowered by the court's dismissal order, McAlister now claims that W&M has no right to advice of counsel, without her vote and approval. This reckless statement illustrates what happens when litigants or their attorneys are permitted to game the system, negating the efforts of legislatures and courts to maintain order by rule of law. If we are to believe against the weight of evidence that McAlister had honest intentions, not retaliatory ones, when she executed her plan to "resign" and force-dissolve W&M, less than one hour of Westlaw research would have revealed that her "resignation" from W&M was neither justified nor authorized under any honest interpretation of the law. The Mississippi statute squarely forbids withdrawal, and ample if not overwhelming authority shows that "resign" means "withdraw," both in common dictionary meaning, and within LLC statutes using the words "resign, retire and withdraw" interchangeably.

By successfully circumventing the statute, if only momentarily, McAlister asserts that she can hold W&M hostage to her every whim by claiming her vote is necessary for any act of the LLC. In making the claim, McAlister says nothing of what approval or vote may have been necessary for her to terminate funding; "resign" from W&M; repudiate the buyout/name change agreement; unilaterally waive payment of a

18

$24,377.82 debt owed to W&M by Nutt; and so on.  Indeed McAlister and her attorneys now claim that the chancery court can "dissolve" a limited liability company which is neither present jurisdictionally, nor a party to the dissolution proceeding itself.

The minute McAlister "resigned" and renounced the buyout/name change agreement agreement, her interests were inimical to W&M from that point forward.  When McAlister wrongfully breached and renounced the buy out/name change agreement used to capitalize and form W&M, she was in effect proclaiming her adversity to W&M, its "best interest," and remaining members.  Worse, her decisions were carried out in circumstances riddled with irreconcilable conflicts of interests.  Having plundered W&M through conversion, misappropriation wrongful dissolution, for one to argue that McAlister remains a viable voting member-manager of W&M, able to control or veto *in abstentia* every right, remedy and means of redress available to W&M and its members, is in a word, absurd.

                                            Respectfully submitted,

                                            Derek A. Wyatt, an interested party filer and member-manager of WYATT & McALISTER, PLLC, appearing *pro se*,

                                            By: s/ Derek A. Wyatt, *pro se*
                                                Derek A. Wyatt, MSB No. 7413

**Physical and Mailing Address:**
Derek A. Wyatt, Esq.
MSB No. 7413
102 Northlake Lane
Madison, MS 39110
email: dwyatt@wyattlawpllc.com
tel 601 954-1140
tel 601 497-3817

## CERTIFICATE OF SERVICE

The undersigned counsel of record, Derek A. Wyatt *pro se*, for interested party filer Derek A. Wyatt, has this day caused the above and foregoing pleading or other document to be served by electronic mail on the following:

| | |
|---|---|
| For Debtor: | Vann F. Leonard<br>P. 0. Box 16026<br>Jackson, MS 39236-6026 |
| Trustee: | Stephen Smith<br>5 Old River Place<br>Suite 107<br>Jackson, MS 39202-3449 |
| Trustee's attorney: | Eileen N. Shaffer<br>P.O. Box 1177<br>Jackson, MS 39215-1177 |
| U.S. Trustee: | R. Michael Bolen<br>100 W. Capitol St.<br>Suite 706<br>Jackson, MS 39269 |
| For Mary McAlister: | Lawrence Allison<br>Joseph Sclafani<br>Brunini Law Firm<br>P.O. Drawer 119<br>Jackson, MS 39205-0119 |

This the 21st day of May, 2010.

By: s/ Derek A. Wyatt, *pro se*
Derek A. Wyatt, MSB No. 7413